**POMERANTZ LLP**
Jennifer Pafiti (SBN 282890)
jpafiti@pomlaw.com
Justin D. D'Aloia (*pro hac vice*)
jdaloia@pomlaw.com
600 Third Avenue, 20th Floor
New York, New York   10016
Telephone:   (212) 661-1100

*Counsel for Lead Plaintiff The KL Kamholz*
*Joint Revocable Trust and Lead Counsel for*
*the Proposed Class*

— additional counsel on signature page —

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re B. Riley Financial, Inc. Securities Litigation* | No. 2:24-cv-00662-SPG-AJR<br><br>CLASS ACTION<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |
| This Document Relates to:<br>All Actions | |

# TABLE OF CONTENTS

Page(s)

I.    NATURE OF THE ACTION ..................................................................... 1

II.   JURISDICTION AND VENUE ................................................................. 6

III.  PARTIES ................................................................................................... 7

IV.   THE CONFIDENTIAL WITNESSES .................................................... 7

V.    SUBSTANTIVE ALLEGATIONS .......................................................... 8

      A.    Relevant Background ................................................................... 8

            1.    B. Riley and Its Business ................................................ 8

            2.    B. Riley's Concentration and Correlation Risks ................... 11

            3.    Brian Kahn and His Affiliates ................................... 14

            4.    B. Riley's Business Relationship with Kahn ........................ 15

      B.    The Formation of FRG ............................................................... 17

      C.    Kahn's Participation in the Multiyear Prophecy Fraud .............................. 19

      D.    B. Riley's Undisclosed Margin Loans to Kahn and His Affiliates ............. 25

      E.    The FRG Buyout Transaction ................................................... 28

      F.    Concentration and Correlation in B. Riley's Investment Portfolio ............. 33

            1.    Concentration of Risk ................................................ 33

            2.    Correlation of Holdings ............................................. 35

      G.    Defendants' Fraudulent Scheme Slowly Unravels ..................................... 37

      H.    Relevant Post-Class Period Developments .................................. 53

VI.   MATERIALLY FALSE AND MISLEADING STATEMENTS ........................ 55

      A.    FRG Buyout ............................................................................... 56

      B.    Concentration of Risk ................................................................ 65

      C.    Correlation of Investments ........................................................ 69

AMENDED CLASS ACTION COMPLAINT:  Case No. 3:24-CV-00662-SPG-AJR

D.  Customer Due Diligence ............................................................. 74

E.  Risks Posed by Kahn ................................................................. 75

F.  Defendants GAAP Violations and SOX Certifications .............................. 75

VII.  THE TRUTH EMERGES IN A SERIES OF PARTIAL DISCLOSURES .......... 76

VIII.  ADDITIONAL FACTS PROBATIVE OF SCIENTER ....................................... 82

A.  Bryant Riley's Admitted Knowledge of B. Riley's Transactions with Brian Kahn And His Close Personal Relationship with Kahn Support Scienter ................................................................................ 83

B.  Analysts Focused B. Riley's Loan Portfolio, Including Its Concentration ........................................................................ 85

C.  B. Riley's Loan to Conn's Supports Scienter ............................................. 86

D.  Bryant Riley Had a Personal Motive to Conceal B. Riley's Exposure Because He Was Exposed to the Risk of a Margin Call ............................ 88

E.  Numerous Government Investigations Support an Inference of Scienter .. 91

F.  Bryant Riley Admitted to Monitoring the Allegations Against Kahn ........ 93

G.  The Size of the FRG Buyout Supports an Inference that The Individual Defendants Were Aware of Kahn's Involvement With Prophecy or Were Deliberately Reckless in Not Knowing ........................................ 94

H.  Defendants' Multiple GAAP Violations Support Scienter ........................ 95

1.  Undisclosed Related Party Transactions Violate GAAP ....... 95

2.  Undisclosed Concentration Risk Violates GAAP ................. 98

I.  Defendants' SOX Certifications Support an Inference of Scienter .......... 99

J.  Respondeat Superior and Agency Principles Apply ................................. 100

IX.  LOSS CAUSATION ................................................................... 100

X.  PRESUMPTION OF RELIANCE ........................................................ 101

XI.  NO SAFE HARBOR ................................................................... 103

XII.   CLASS ACTION ALLEGATIONS ................................................................. 104

XIII.  CLAIMS FOR RELIEF .......................................................................... 106

COUNT I ..................................................................................................... 106

COUNT II .................................................................................................... 108

XIV.  PRAYER FOR RELIEF .......................................................................... 109

XV.   JURY TRIAL DEMANDED ................................................................... 110

AMENDED CLASS ACTION COMPLAINT:  Case No. 3:24-CV-00662-SPG-AJR

Court-appointed lead plaintiff The KL Kamholz Joint Revocable Trust ("**Lead Plaintiff**") and additional plaintiff Mike Coan (collectively, with Lead Plaintiff, "**Plaintiffs**"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, as for their Amended Class Action Complaint against Defendants B. Riley Financial, Inc. ("**B. Riley**" or the "**Company**"), Bryant Riley, Tom Kelleher, and Phillip J. Ahn (collectively, the "**Individual Defendants**" and, together with B. Riley, "**Defendants**"), allege the following based on personal knowledge as to their own acts and on information and belief as to all other matters based upon the investigation conducted by Plaintiffs' counsel, which has included, among other things a review and analysis of regulatory filings made with the U.S. Securities and Exchange Commission ("**SEC**"), financing filings made in various states, filings, testimony, and other evidence submitted in collateral proceedings, securities research reports, press releases, media reports, and other publicly available information issued by or about B. Riley, interviews with persons knowledgeable about relevant events, including former employees of B. Riley, and expert consultation. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

# I.    NATURE OF THE ACTION

1.    This is a federal securities class action against B. Riley and certain of its top officials for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "**Exchange Act**"), codified at 15 U.S.C. §§ 78j(b) & 78t(a), and SEC Rule 10b-5 promulgated thereunder, codified at 17 C.F.R. § 240.10b-5, on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired B. Riley securities between February 22, 2022 and November 1, 2024, both dates inclusive (the "**Class Period**"), and were damaged thereby (the "**Class**").

2.    While the facts here are complex—because Defendants sought to mask their fraudulent conduct in a spiderweb of related party transactions and high-risk financial arrangements—the fraud, at bottom, concerns Defendants' concealment of their

fraudulent scheme to extend over $200 million in undisclosed related party loans to longtime Bryant Riley friend and compatriot Brian Kahn, an extremely high-risk borrower who is a known co-conspirator in a criminal and SEC investigation arising from a multiyear fraud that led to the collapse of a multimillion dollar hedge fund and triggered a series of lawsuits against him. These undisclosed loans—for hundreds of millions of dollars—went on for years and fundamentally changed the risk profile of B. Riley. They were extended to a man who himself was being sued for fraud for losing *hundreds of millions of dollars* and entered into settlements to *pay that money back*. And because the civil litigation related to Kahn's misconduct had been ongoing before Defendants loaned him money, it was impossible for B. Riley, a sophisticated financial institution that purports to have anti-money laundering and know your customer policies as well as purportedly sound underwriting practices, to miss. There is no nonculpable reason why Defendants would lend so much money to such an obviously risky borrower.

3.     This high risk and undisclosed practice culminated in the largest equity transaction in B. Riley's history: the Company invested $280 million of its *own* capital to enable Kahn to take his company, Franchise Group, Inc. ("**FRG**") private in a management buyout ("**FRG Buyout**"). Unbeknownst to investors, however, this already substantial bet on Kahn was undertaken in parallel with B. Riley increasing its undisclosed loans to Kahn to *$200.5 million*, with unconventional terms that increased the risk to B. Riley by collateralizing the loan with Kahn's holdings in FRG. Taken together, B. Riley had—without investor knowledge—tied up *$480 million* in entities controlled by a single high-risk borrower with a history of fraud.

4.     To be clear, this is not a case about a single loan that went bad because the economy turned south, or due to some unforeseeable business risk. The facts here are inescapable: Defendants either turned a blind eye to the serious claims of fraud against Kahn or were deliberately reckless by failing in the most basic sense to perform any form of baseline diligence before agreeing to lend him hundreds of millions of dollars. And, unbeknownst to investors, as time went on, B. Riley's exposure to Kahn grew.

5.    Worse still, Defendants completely misrepresented the nature of their loan portfolio, giving investors a misleading impression about the nature of what B. Riley invested in.    Defendants insinuated that they were deploying B. Riley's capital into "uncorrelated" businesses that would provide stability during downturns.    Indeed, Defendants publicly touted B. Riley's supposedly non-correlated investments as a competitive advantage that its competition lacked.  In reality, B. Riley's investments were correlated, concentrated, and performing terribly.

6.    Nor were these undisclosed practices an immaterial or technical oversight. The size of these transactions would be material for *any* Company, no matter its size, nor who the borrower was.  The $480 of capital B. Riley concentrated with Kahn and his related entities alone exceeded the $413.8 million in shareholders' equity on B. Riley's balance sheet, creating such a large risk that when the truth came to light—which it did— it dragged the entire Company down and transformed it into a fundamentally different business than it was during the Class Period.

7.    However, several months after the FRG Buyout, news reports emerged in November 2023 that began to reveal the material undisclosed risks to B. Riley investors that Defendants' misrepresentations and omissions posed.  On November 2, 2023, the CEO of a hedge fund known as Prophecy Asset Management pleaded guilty to charges of conspiracy to commit securities fraud for his role in a multiyear fraud that led to the collapse of a hedge fund known as Prophecy Asset Management.    The charging documents, and a parallel SEC civil suit filed against him, made clear that he acted with the assistance of two unindicted coconspirators.    Investors took notice and soon determined that Kahn was one of the unindicted coconspirators at the center of the fraud.

8.    Yet nine days later, when B. Riley issued its latest quarterly report, Defendants still said nothing about their undisclosed related party loans to Kahn, continuing to obscure the scale of Defendants' fraudulent scheme.

9.    It was not until December 13, 2023, that investors began to learn the scale of the risk posed by the relationship to Kahn.  That day, B. Riley hosted an investor day

conference as news about Kahn continued to mount in which Defendants sought to quietly bury the undisclosed $200.5 million loan in a single bullet on slide 59 of their investor presentation.  Investors on the call peppered Defendants with questions about the loan.  One investor asked Defendants if B. Riley might need to change its dividend policy.  In response, Defendant Riley stated that "we are making sure we're very liquid. . . anytime there's questions around a part of your business, you want to make sure that you're very liquid."  During the same investor call, Defendants also admitted that B. Riley's loan portfolio was not uncorrelated.  Even though Defendants' partial corrective disclosure came buried in a nondescript slide titled "Credit Investments", it took no time for market participants to appreciate the ramifications.  The same day, one market participant asked, on Twitter, "Why was this never disclosed?"  Another market participant responded, "This was highly material and undisclosed."  Another said, "Seems like a material exposure that should have been disclosed."  Yet another said, "The fraud is real with this one."  As one investor later put it, "I fell out of my chair" when Riley put up the slide showing that it had a $200 million loan to Kahn.

10.    Notwithstanding Bryant Riley's promise to stay liquid just five days later, and with full knowledge of not just Kahn's involvement of fraud, but his identification as a participant in a fraud by the federal government, Defendants executed ***another*** transaction that benefited Kahn.  On December 18, 2023, B. Riley extended a $108 million loan to Conn's Stores Inc. ("**Conn's**"), so that Conn's could buy a subsidiary of FRG, helping further stabilize FRG and ultimately benefiting Kahn.

11.    Over the following weeks and months, the truth continued to emerge in dribs in drabs.  For instance, in late January 2024, news emerged that the SEC was probing B. Riley's dealings with Kahn.  Kahn would later resign as CEO of FRG.  Market participants would reveal that financing statements filed in Delaware showed that Kahn's hedge fund, Prophecy, had a lien on a substantial number of his FRG shares, suggesting that security Kahn pledged for the undisclosed loans he received from B. Riley—FRG shares—might have already been pledged to other entities.  In February 2024, B. Riley

reported larger losses and cut its dividend as a direct result of the fallout associated with its large investments with Kahn.  In August 2024, B. Riley announced that it was forced to write off $370 million of its various principal investments in FRG, noting, "additional challenges" caused by "reports concerning Brian Kahn . . . and his alleged misconduct at Prophecy."  B. Riley also announced that it had suspended its dividend, could not file its quarterly report, and that B. Riley and its CEO received subpoenas from the SEC.  In November 2024, FRG filed for bankruptcy, and B. Riley announced that this compelled it to write off the entire remaining value of its $480 million investment in FRG and Kahn.

12.    By the time the truth was revealed, the value of B. Riley securities was decimated.  At its Class Period high, B. Riley's stock price hit $72.00 per share on March 21, 2022.  By the end of the Class Period, it dwindled down to just $5.70 per share, representing a loss of $1.86 billion in market value, and a peak to trough stock price decline of 91.5%.  Today its shares closed at $2.95 per share.  B. Riley's publicly traded bonds have experienced a similar sea change, with multiple issues falling to distressed levels.  The B. Riley bond issue publicly traded under the ticker "RILYT" hit $25.18 on March 29, 2022, and ended the Class Period at $11.48, a peak to trough bond price decline of 54.4%—a staggering amount for a debt security.

13.    In addition, B. Riley is now—as a direct result of the financial fallout from the undisclosed fraud—a fundamentally different company than it was when members of the class like Plaintiffs invested in it.  After waves of defections of financial advisors, taking with them hundreds of millions in client investments, B. Riley sold off a significant portion of its Wealth Management group.  Between the attrition and the sale, B. Riley's assets under management dropped from $24 billion to $15 billion.  The Company also spun off its appraisal and liquidation business, Great American Group, and its securities business, B. Riley Securities.  In Bryant Riley's own words, "[W]e are certainly a smaller company than we were."  The Company has been unable or unwilling to file its annual report for 2024, which is long overdue, jeopardizing the Company's public stock listing.

14.     Simply put, notwithstanding the level of complexity that some of the financial transactions in this case may present, the fraud here is staggering.  Indeed, in a February 5, 2025 Twitter space, investors gathered to discuss B. Riley. During that call, Marc Cohodes, former General Partner of hedge fund, Rocker Partners/Copper River and vocal B. Riley critic, stated that "B. Riley right now, is the biggest pound-for-pound financial fraud I've seen."

15.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of B. Riley's securities, Plaintiffs and other members of the Class have suffered significant damages.  This lawsuit seeks to hold them accountable.

## II.     JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27(a) of the Exchange Act, codified at 15 U.S.C. § 78aa(a). The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, codified at 15 U.S.C. §§ 78j(b), 78t(a), and pursuant to the rules and regulations duly promulgated thereunder, including SEC Rule 10b-5, codified at 17 C.F.R. § 240.10b-5.

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and Section 27(a) of the Exchange Act, codified at 15 U.S.C. § 78aa(a).  Since at least the start of the Class Period, B. Riley has maintained its principal executive office in Los Angeles, California, within this judicial district.  Defendants therefore transact business in this judicial district, and a substantial part of the events or omissions giving rise to the claims asserted herein, including the dissemination of materially false or misleading statements to the public, occurred in this judicial district.

18.     In connection with the acts and omissions alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, the facilities of a national securities market, and interstate telephonic and digital communications systems.

### III.    PARTIES

19.    Plaintiffs purchased or otherwise acquired B. Riley securities at artificially inflated prices during the Class Period, as set forth in the certifications they previously filed with the Court (ECF Nos. 1, 17-3), and were damaged thereby, as set forth herein.

20.    B. Riley is a financial services company incorporated in Delaware that maintains its principal executive offices at 11100 Santa Monica Blvd., Suite 800, in Los Angeles, California.  The Company's securities have traded on the NASDAQ Global Market under various ticker symbols beginning with the prefix RILY, including, for example, RILYG, RILYK, RILYL, RILYM, RILYN, RILYO, RILYP, RILYT, and RILYZ. B. Riley's common stock is represented by the standalone ticker symbol RILY.

21.    Defendant Bryant Riley ("**Riley**") has served as B. Riley's Chairman of the Board since its founding in 1997 and Co-Chief Executive Officer since July 2018, as well as serving on the Board of Freedom VCM, LLC since August 2023.  Previously, Riley had served as sole Chief Executive Officer from June 2014 to July 2018, and as a Director since August 2009.  Riley also previously served on the board of Babcock & Wilcox Enterprises, Inc. from April 2019 to September 2020 and Freedom VCM Holdings, LLC from September 2018 through March 2020.

22.    Defendant Tom Kelleher ("**Kelleher**") has served as B. Riley's Co-Chief Executive Officer since July 2018 and as a Director since October 2015.  He previously served as President of B. Riley from August 2014 to 2018.  Kelleher served in management positions at B. Riley, from its founding in 1997 through its merger into B. Riley in 2014, including as Chief Financial Officer, Chief Compliance Officer, and finally Chief Executive Officer from 2006 to June 2014.

23.    Defendant Phillip J. Ahn ("**Ahn**") has served as B. Riley's Chief Financial Officer and Chief Operating Officer since April 2013.

### IV.    THE CONFIDENTIAL WITNESSES

24.    CW1 was a Director in B. Riley's Investment Banking Group from August 2019 to August 2024 in Chicago, Illinois.  In this role, CW1 was an investment banking

and restructuring advisor, specializing in mergers and acquisitions and private capital advisory, and financial restructuring.

25.    CW2 was a Senior Executive Assistant at B. Riley from July 2013 to January 2025.    CW2 was based at the headquarters in Los Angeles, California, where CW2 reported to Bryant Riley as well as other senior bankers.  In this role, CW2 worked closely with Riley.

26.    CW3 was a Managing Director for B. Riley Securities from January 2023 to March 2025.  Previously, CW3 worked as a director, then managing director, for a B. Riley Company subsidiary from January 2020 to January 2023.  CW3 was based in Los Angeles, California.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Relevant Background

#### 1.    B. Riley and Its Business

27.    B. Riley is a financial services company based in Los Angeles, California that has made a name for itself by catering to middle-market or "small cap" companies often overlooked by large Wall Street banks.  Through its subsidiaries and affiliates, B. Riley offers a range of financial products and services, including investment banking, securities brokerage, wealth and asset management, direct lending, and business and asset disposition consulting.  In recent years, it has also opportunistically invested in, or acquired, small companies.  As of the start of 2023, it generated over $1 billion in annual revenue and relied on a network of more than 2,700 professions, including employees and independent contractors.

28.    After working at several small brokerages, Bryant Riley founded B. Riley in 1997 together with his wife, Carleen Riley, and his fraternity brother, Tom Kelleher.  The Company began by providing research to institutional investors, focusing on small local California companies ignored by larger banks.  The first year that it opened, the National Association of Securities Dealers sought to expel Riley from the finance industry for violations on trade reporting and lax record keeping.  The SEC also fined B. Riley $5,000.

29.     Until approximately mid-2014, B. Riley remained a relatively small, niche-market operation.  As of mid-2014, B. Riley still had fewer than 100 employees.

30.     However, B. Riley entered a new phase of growth in June 2014 when it acquired the business formerly known as Great American Group, an appraisal and liquidation service provider known for liquidating chains such as Mervyn's during the 2008 financial crisis.  At the time of the acquisition, Great American Group was already a public company and B. Riley became publicly traded as a result of the deal.

31.     Since going public in mid-2014, B. Riley continued to grow by acquiring businesses with complimentary products and services to form what stands today as B. Riley, including wealth managers, niche market investment banks, and other brokerages. Chief among those was the acquisition of FBR & Co., also known as FBR Capital Markets ("**FBR**"), a boutique investment bank and brokerage firm with a business platform that fit within B. Riley's portfolio, in mid-2017.  The Company's profits have soared in the years that followed.

32.     Beginning in approximately 2016, B. Riley also began investing directly in various debt and equity opportunities on a "principal basis," meaning that it used its own funds for such investments as opposed to funds collected from investors or other sources. Engaging in principal investments was a departure from most investment banks' practice because larger investment banks such as Goldman Sachs or Morgan Stanley are subject to the so-called Volcker Rule under the Dodd-Frank Wall Street Reform and Consumer Protection Act, commonly referred to as the Dodd-Frank Act, which prohibits or limits bank holding companies from engaging in certain proprietary investments.  Because B. Riley was not a bank holding company, it was not subject to the Volcker Rule.

33.     According to CW1, even as B. Riley grew larger, the principal investing group remained tiny and close-knit.  Riley was the ultimate decision-maker, and the small group was responsible for all principal investments made by the Company.

34.     B. Riley, as a regulated financial institution operating in the United States, is subject to a series of laws and regulations requiring due diligence on customers they

transact business with called Know Your Customer rules ("**KYC**").  The goal of these rules is to ensure that financial institutions do not facilitate crime and to improve financial transparency.  KYC incorporates requirements from the 1970 Bank Secrecy Act, the PATRIOT Act, FINRA's Rule 2090 (Know Your Customer), and other laws and regulations.  In additional to laws and regulations, B. Riley is also required to follow KYC under Nasdaq's rules in order to remain listed on their exchange.

35.    KYC is required to be performed whenever a financial institution enters a new financial relationship with a client and must be monitored on an ongoing basis. KYC has three main components: a customer identification program ("**CIP**"), customer due diligence ("**CDD**"), and enhanced due diligence ("**EDD**").  CIP requires collecting and verifying information on the customer's identity, including negative news or media screening, ultimate business ownership detection, and other fraud checks.  CDD requires generating a "risk profile" by analyzing past transactions and existing financial relationships to assess risk.  For clients with a high-risk profile, EDD requires extra research and scrutiny.

36.    B. Riley is also subject to a variety of laws and regulations aimed at preventing money laundering ("**AML**").  AML, like KYC, requires regulated financial institutions to identify and report suspicious activities that could be related to money laundering or other illegal activities.

37.    In addition to KYC and AML, B. Riley performs underwriting before entering financial transactions.  Underwriting is the industry-standard process of evaluating the risk of a financial transaction before deciding whether to move ahead with the transaction, including gathering documents and performing research.  Underwriting looks not only at the individual risk, but the acceptable risk levels for the lender on a collective basis.  Underwriting is a critical process, as it protects financial institutions like B. Riley from unknowingly assuming too much risk.

38.    Not only did B. Riley perform these compliance functions for its own principal investments, it also provided these services to clients, including offering risk management, due diligence, and underwriting services.

### 2. B. Riley's Concentration and Correlation Risks

39.    **Concentration risk**.    Concentration risk measures how much a given portfolio or company is exposed to any discrete investment that it makes with its own capital.  For example, an investor who hypothetically invests $1,000 into 1,000 different stocks, has a very diversified portfolio, and thus low concentration risk.  Yet if that same investor instead allocated his $1,000 in capital to just two or three stocks, it becomes concentrated.    More precisely, it measures the degree to which a portfolio has been allocated to its constituent parts, expressed as a percentage of the portfolio.    Many investors consider that a single holding that exceeds 10% of the portfolio's value is considered concentrated.

40.    Investors care about whether a financial institution such as B. Riley has concentration risk when B. Riley uses its balance sheet to extend capital to B. Riley's clients because, for example, if B. Riley were to hypothetically use its entire balance sheet to extend a loan to a single customer, call it Customer A, such an act would essentially transform B. Riley equity investors into Customer A's debt investors.  In other words, if investors wanted that much credit exposure to Customer A, they could just loan Customer A the money themselves (*i.e.*, directly invest in Customer A's debt), rather than paying B. Riley to do it for them.    Thus, concentration risk within B. Riley's principal investments is highly material to investors because, among other reasons, having undisclosed concentrated investments in another company fundamentally changes the risk profile of investing in B. Riley's securities; it increases the riskiness of B. Riley's capital allocation; and counteracts any benefit that B. Riley might have from its other less-risky business lines.

41.    Even apart from the Customer A example (where 100% of a company's balance sheet was extended to a single customer), the same principle applies to

concentrated portfolios that have more than one investment and thus less than 100% of the Company's balance sheet allocated to just a single customer. Even with more than one, or several customers, B. Riley's investments in such customers can still be concentrated.

42. Concentrated portfolios create more risk to investors. Having a concentrated portfolio increases idiosyncratic (or firm-specific) risks of those investments. A concentrated portfolio will also tend to have higher volatility as measured by, among other things, standard deviation of returns. Widely used risk measurement metrics, such as Value-at-Risk ("**VAR**") and/or Conditional Value-at-Risk are typically worse in more concentrated portfolios. It is customary for investment banks to employ such risk measurement metrics, and this became even more important and prominent beginning in mid-2021 across Wall Street following the highly publicized and dramatic collapse of Archegos Capital Management, which led to Credit Suisse (a then large investment bank) losing $5.5 billion and nearly going bankrupt as a result of Credit Suisse's exposure to a hedge fund with highly concentrated, and leveraged, positions. Following the collapse of Archegos, there was significant literature written on the need for financial institutions to improve monitoring of their customers' concentration risks.

43. As explained more fully below, B. Riley's principal investments were highly concentrated throughout the Class Period.

44. **Correlation risk**. Correlation represents the degree to which to things move in the same (or opposite direction). Here, it refers to the degree to which different securities' prices rise or fall together. It can be expressed as either a percentage (e.g., two securities are 100% correlated), or as an absolute number between -1 and 1, where a perfect positive correlation is 1 and a perfect negative correlation is -1. So, if two stocks have a correlation coefficient of 1, that means if one stock goes up 2%, then the other stock would as well. By contrast, if two stocks have a negative correlation coefficient of -1, that would mean if one stock goes up 2%, then the other goes down 2%.

AMENDED CLASS ACTION COMPLAINT:  Case No. 3:24-CV-00662-SPG-AJR

45.    Two businesses that are likely *positively* correlated are Dell and Microsoft. As more people buy more laptops from Dell, they likely also buy more software licenses from Microsoft.  Two *negatively* correlated businesses would be venture capitalists and bankruptcy attorneys.  Venture capitalists experience peak earnings during economic booms, where there are lots of IPOs, and risk-seeking behavior in the financial markets, while bankruptcy attorneys thrive during recessions.

46.    All else being equal, investors prefer to own a portfolio of assets that is uncorrelated: both with respect to the securities within that portfolio (*i.e.*, investors prefer that the securities within a portfolio not be correlated with one another); and with respect to the broader stock market (*i.e.*, investors prefer that the portfolio itself not rise or fall with the market).  The reason investors prefer non-correlated assets is that, among other reasons, non-correlated assets tend to protect against tail risk (*i.e.*, investors don't want all of their assets to decline at once based on a market risk); increase Alpha (a measure of risk-adjusted return); and decrease volatility of the portfolio because as some assets fall, the non-correlated assets will either rise or stay the same.

47.    To provide an example at the portfolio level, the expected return of a portfolio comprised entirely of oil and natural gas stocks would be highly correlated with the price of oil: because all stocks within that portfolio sell oil, so higher oil prices means higher revenue and thus higher earnings for companies that sell oil.  Additionally, because all of those oil stocks are exposed to the same underlying commodity, their expected return would also be correlated with one another.  That is, in the oil stocks example, two things are correlated: (1) the portfolio itself with the price of oil; and (2) the stocks in that portfolio, with each other.  By contrast, a portfolio that has just one oil stock out of 50 stocks (with the other 49 being different types of businesses, like airline stocks), would be much less correlated to the price of oil, and the stocks within that portfolio would also be far less correlated with one another: because a higher oil price is good for oil companies, but not airlines, who have to pay for jet fuel.  And while both oil stocks and airline stocks may rise or fall with economic activity overall, their earnings power would

AMENDED CLASS ACTION COMPLAINT:  Case No. 3:24-CV-00662-SPG-AJR

have opposite exposures to the price of oil itself, which would cut down on their correlation with each other.

48.    Investment banking and capital markets businesses, both of which B. Riley has, tend to be pro-cyclical—meaning their revenue and earnings rise during economic expansions and fall in recessionary periods.  Accordingly, if a pro-cyclical business is using its own balance sheet to invest in other companies, whether through debt or equity investments, as B. Riley did, investors in B. Riley's securities will want to know whether such investments are increasing B. Riley's market risk.  Thus, it is highly material to investors whether B. Riley is investing its capital and thus risking its balance sheet by lending to correlated assets—both with respect to being correlated with the market and with respect to the loans being correlated with one another.  Investors want to know if B. Riley is generally lending to businesses that are pro-cyclical, like venture capitalists, or counter-cyclical, like bankruptcy attorneys.

49.    Generally speaking, the more diversified a portfolio is, the less the individual investments will be correlated with one another because some will do well while others fall.  But diversification itself does not necessarily cut down on correlation with the stock market overall.

### 3.  Brian Kahn and His Affiliates

50.    Non-party Brian R. Kahn is a private equity investor and entrepreneur.  In March 1998, a little more than two years after graduating from college, he formed the private equity firm Kahn Capital Management, LLC ("**KCM**") under Delaware law. KCM was later succeeded by Vintage Capital Management, LLC ("**VCM**"), formed under Delaware law in March 2010 and based in Orlando, Florida, close to Kahn's personal residence in the Orlando suburb of Windermere, Florida.  VCM is described as a "value-oriented" private equity firm specializing in the consumer, aerospace, defense, and manufacturing sectors.

51.    Kahn has referred to himself as an "accidental franchisee" having acquired two rent-to-own chains that were in receivership in the early 2000s.  He later sold them

AMENDED CLASS ACTION COMPLAINT:  Case No. 3:24-CV-00662-SPG-AJR

to Aaron's Company, Inc. ("**Aaron's**"), the rent-to-own industry's largest chain store. Kahn claimed that he learned "a ton" about this business model from that experience, including, most notably, that "I'd rather be a franchisor" as opposed to a franchisee.

52.     Kahn soon began to invest in major rent-to-own franchise operators.  In late 2012, VCM purchased a controlling equity stake in Buddy's Newco, LLC, which did business as Buddy's Home Furnishings ("**Buddy's**").  At the time, Buddy's, based in Tampa, Florida, was the fourth largest rent-to-own chain operator, with more than 125 stores throughout the United States.  Between 2011 and 2013, VCM also privately offered to acquire Aaron's, but each offer was ignored by Aaron's management.

53.     During this time, VCM was not the only business in which Kahn participated.  By no later than the fourth quarter of 2017, Kahn also became involved with a New York-based hedge fund known as Prophecy Asset Management LP ("**PAM**"). Specifically, Kahn served as a "sub-advisor" who was allocated a portion of PAM's capital for further investment.  In this role, Kahn was entitled to a large part of the profits on the trades he managed.

### 4.  B. Riley's Business Relationship with Kahn

54.     B. Riley has had a business relationship with Kahn practically since its formation in 1997.  Riley said that he met Kahn in 1998 soon after he formed KCM.  Kahn was a client to whom B. Riley offered stock research in the hope that, one day, it would lead to stock trades the Company could execute for him or one of his affiliated entities, such as KCM.  In fact, Riley recalled that, working out of a one room office at that time, he would often get on the phone with clients when he heard them speaking with associates, and "that's how I got to know Brian."

55.     Because Kahn was such an important client for B. Riley, Bryan Riley sent one of his closest confidants to work at VCM and/or KCM.  Jeremy Richard Nowak ("**Nowak**") was an employee of B. Riley since at least August 1999 and friend of Riley. Nowak helped open B. Riley's office in New York, New York.  In fact, Riley served as best man at Nowak's wedding.  From September 2006 to January 2016, however, he was

---

15

a partner at VCM responsible for business development, transaction due diligence and trade execution. To be sure, Nowak returned to B. Riley in February 2016.

56.    B. Riley continued to provide brokerage services for Kahn and VCM but the two began working on larger deals together as both grew.

57.    In late 2017, a friend put Kahn in touch with John Hewitt, who had recently been ousted as CEO of Liberty Tax, Inc. ("**Liberty Tax**"), a public company he founded, after an internal review found that he had romantic relationships with employees in his office and gave jobs to their relatives. Although he was removed as CEO, he remained chairman of its board as well as its largest shareholder and was entrenched in a bitter dispute with other board members. Over a dinner at a steakhouse in Orlando, Florida, Kahn outlined a proposal to buy out Hewitt's equity stake in Liberty Tax. On July 19, 2018, Hewitt entered into an agreement to sell his shares to an affiliate of Vintage, which Vintage amended days later to allow B. Riley to participate in the deal. After consummating the transaction, VCM and B. Riley collectively owned almost 37% of Liberty Tax. Effective August 9, 2018, two individuals from B. Riley and two individuals from VCM were appointed to Liberty Tax's board of directors, including Riley and Kahn.

58.    Given the above, both Riley and Kahn have openly acknowledged their longstanding business relationship. For example, in a press release from June 18, 2018, Riley stated "[w]e have worked with the Vintage Capital team for over two decades and have seen firsthand their experience in the space." In that same press release, Kahn was quoted as saying "Having worked with the B. Riley team on multiple deals, I have a great deal of respect for their willingness to think differently to get deals done."

59.    CW2 confirmed the relationship between Riley and Kahn, saying "Brian Kahn had been a major client for years, and Bryant [Riley] had a very close relationship with him." CW2 also described how Kahn was not just another client, he was considered part of the B. Riley family. According to CW2, Kahn's status as a trusted associate was well-established. Everyone at the firm knew Kahn was one of Bryant's go-to partners and a significant source of business for B. Riley. CW2 recalled how, upon meeting Brian

AMENDED CLASS ACTION COMPLAINT:  Case No. 3:24-CV-00662-SPG-AJR

Kahn prior to COVID, "I remember asking [Bryant Riley] who [Brian Kahn] was, and he said 'he's a friend of the company.'"

## B.    The Formation of FRG

60.    After failing to strike a deal with Aaron's, Kahn soon became interested in the industry's second largest rent-to-own chain, Rent-A-Center, Inc. ("**Rent-A-Center**"). On June 17, 2018, VCM and Rent-A-Center entered into an agreement pursuant to which Rent-A-Center agreed to be acquired by an affiliate of VCM.  Riley helped raise money for the $1.37 billion transaction, including an equity stake for B. Riley itself.  However, as the review by antitrust authorities dragged on, someone "simply forgot" to send a notice extending the terms of the deal by the deadline to do so in December 2018, and Rent-A-Center demanded that VCM pay an unusually large $126.5 million breakup, or "reverse termination," fee.  Days later, the parties brought claims against one another in the Delaware Court of Chancery to enforce their rights.  Notably, Rent-A-Center brought claims not only against VCM but also against B. Riley as guarantor of the reverse termination obligation set forth in the merger agreement.

61.    With the Rent-A-Center acquisition in shambles, Kahn approached Riley with a proposal to buyout Liberty Tax and then use it to acquire other franchise businesses and, later, sell them off.  At the time, Liberty Tax was a publicly traded operator of tax preparation franchises.  After reviewing the plan, Riley decided that he liked the idea and wanted B. Riley to join in the transaction.  On July 10, 2019, Liberty Tax entered into an agreement pursuant to which it acquired Buddy's, which was already majority owned by entities controlled by Kahn, and agreed to launch a tender offer for all outstanding shares not already owned by VCM or B. Riley as it shifted to investing, in or acquiring, other franchise-oriented businesses.  Liberty Tax successfully completed the tender offer, named Kahn as CEO, and, in recognition of its business shift, changed its name to Franchise Group, Inc. (*i.e.*, FRG) in September 2019.

62.    In the months that followed, VCM and B. Riley significantly increased their investment in FRG.  For example, on July 10, 2019, a VCM affiliate entered into a

subscription agreement with FRG pursuant to which it purchased 2,083,333.33 shares of FRG common stock for $25 million. On October 21, 2019, and October 23, 2019, a VCM affiliate, Kahn and his wife, purchased 2,333,333.33 shares of FRG common stock for $28 million. Meanwhile, on October 22, 2019, B. Riley's investment bank subsidiary B. Riley FBR, Inc. ("**BRFBR**") purchased 1 million shares of FRG common stock for $12 million. On December 6, 2019, VCM affiliates purchased 937,500 additional shares of FRG common stock for $11.3 million. Then, on January 3, 2020, a VCM affiliate entered into another subscription agreement with FRG pursuant to which it purchased 2,354,000 more shares of FRG common stock for $28.2 million.

63.    During this time, FRG also acquired a series of franchise-oriented businesses, including several in which VCM was already invested. For example, in October 2019, FRG acquired the Sears Outlet segment from Sears Hometown and Outlet Stores, Inc. In December 2019, FRG next completed the acquisition of the Vitamin Shoppe, Inc. ("**Vitamin Shoppe**"), in which VCM and its affiliates had an ownership interest of approximately 15%. Then, in February 2020, FRG acquired American Freight Group, Inc. ("**American Freight**"). Following these transactions, and the equity investments described in the preceding paragraph, VCM and its affiliates owned approximately 45.4% of FRG's common stock and B. Riley and its affiliates owned approximately 13.2% of FRG's common stock.

64.    FRG continued to reshape its portfolio of businesses in 2021. In March 2021, FRG completed the acquisition of the retail chain Pet Supplies Plus ("**PSP**"). In July 2021, FRG also sold Liberty Tax, the business that led to the formation of FRG. FRG later acquired the tutoring franchise Sylvan Learning ("**Sylvan**") in September 2021. Then, in November 2021, FRG acquired W.S. Badcock Corporation, doing business as Badcock Home Furniture & more ("**Badcock**"), a home furniture company with over 375 stores across the Southeast United States. The acquisition was valued at $580 million.

65.    As demonstrated by the above, B. Riley has been intimately involved in FRG since its formation. In fact, B. Riley boasted in an investor presentation from December

2023 that "B. Riley helped build the Company [FRG] since its inception and is deeply familiar with the asset base and management team." Bryant Riley also described the development of Liberty Tax into FRG by saying, "we were involved in every part of that. . . We raised equity with our investors . . . We acquired a number of companies. . . . We financed the receivables. We were involved in this transaction every step of the way."

### C. Kahn's Participation in the Multiyear Prophecy Fraud

66. PAM is an investment management company that, as of January 2015, operated through several subsidiaries as purported hedge funds (collectively, the "**PAM Funds**"). Between January 2015 and March 2020, PAM had up to $500 million in assets under management which it received from institutional investors, pension plans, family trusts, and high net worth individuals.

67. Since inception, PAM told investors that it used a unique "first-loss" business model to minimize risk and generate positive returns. According to this strategy, PAM was supposed to (1) allocate the capital contributed to the PAM Funds to a diverse mix of professional traders, known as "sub-advisors," for investment in liquid securities; (2) require each advisor to post cash collateral equal to approximately 10% of any capital allocated to them to cover any trading losses; and (3) if trading losses approached the amount of the cash collateral, contact the sub-advisor to replenish the cash collateral or, if necessary, suspend further allocations or terminate sub-advisor. Kahn began serving as one such sub-advisor by no later than the second half of 2017.

68. In truth, the vast majority of capital under management by PAM was allocated solely to Kahn and/or entities he controlled, rather than being diversified across an array of sub-advisors. As of December 2018, Kahn had been allocated approximately 78% of PAM's capital. At its peak, Kahn received approximately 86% of the capital under management by PAM.

69. Making matters worse, PAM effectively abandoned the requirement that Kahn post cash collateral for capital that was allocated to him and his affiliates. For

AMENDED CLASS ACTION COMPLAINT: Case No. 3:24-CV-00662-SPG-AJR

instance, as of October 2017, Kahn's cash collateral was approximately $19 million short of what it should have been based on the amount of money he had been allocated.

70.    Worse still, Kahn began sustaining massive trading losses far in excess of the cash collateral he initially contributed.  As of January 2018, Kahn had trading losses on the capital allocated to him and/or his affiliates of approximately $68 million.  The cumulative losses grew to $111 million by January 2019.

71.    As this unfolded, Kahn conspired with PAM executives, including its Chief Operating Officer and Chief Compliance Officer, John Hughes ("**Hughes**"), to cover up his losses and growing cash collateral deficit.  For example, to cover up the $19 million cash collateral deficit Kahn had as of November 2017, he facilitated a series of "round trip" transactions further to which one of his affiliates received an $11 million "loan" from the PAM Funds, the vast majority of which was redeposited into his cash collateral account and recollected by the PAM Funds.  Kahn even forged the signature of a former colleague to facilitate the transactions and mask his involvement.

72.    In late 2018, Kahn and PAM executives engaged in another sham transaction to cover up a substantial off-platform loan he was unable to repay.  In the fall of 2018, PAM's CEO and Hughes agreed to cause the PAM Funds to give Kahn's primary equity firm, VCM, an unsecured $36 million loan to provide rescue financing to a company in which VCM was heavily invested.  By December 2018, the loan matured but Kahn failed to repay the loan.  But rather than acknowledge that the loan was in default, Hughes caused the PAM Funds to "invest" $36 million into two entities controlled by Kahn, which were later rerouted to VCM so it could repay the loan.

73.    On March 14, 2019, the Delaware Court of Chancery issued a ruling after a two-day bench trial finding that Rent-A-Center validly terminated the merger agreement with VCM after it failed to provide a notice extending its terms by the necessary date, but reserved a ruling on the amount of damages owed by VCM and B. Riley under the reverse termination fee provision.  The decision caught the attention of many in the transactional space and was widely reported on by the media.  Even as of today, VCM's blunder is

considered by many as one of the most colossal mistakes in investment banking. Kahn later testified that the outcome was "a disaster . . . an absolute disaster."

74.     On April 18, 2019, VCM agreed to pay Rent-A-Center $92.5 million to settle all remaining litigation against VCM and B. Riley over the amount owed under the reverse termination provision of the merger agreement. Despite B. Riley's role as guarantor, it paid ***no money*** in connection with the settlement as a result of a prior indemnification agreement between B. Riley and several VCM affiliates. Indeed, B. Riley told investors on April 22, 2019, that it made "no financial contribution in connection with the settlement." Bryant Riley also confirmed in December 2023 that "B. Riley did not pay a single dollar in connection with that settlement." Instead, VCM and/or other Kahn affiliates reportedly paid the $92.5 million settlement in full by no later than the end of May 2019.

75.     Between April and May 2019, the cumulative trading losses suffered by Kahn and/or his affiliates on capital allocated to him by PAM surged by more than $100 million. As of the end of March 2019, Kahn's cumulative trading losses totaled approximately $165 million. By the end of May 2019, that figure grew to $270 million. In fact, the amount jumped by $77 million in May 2019 alone, the single largest increase in Kahn's losses until the PAM Funds ultimately collapsed in March 2020.

76.     At around the same time, Kahn also forged documents to fabricate collateral that did not exist as PAM's auditor and administrator began asking questions about his cash collateral deficit. In April 2019, Kahn created a Buddy's preferred stock agreement, backdated to January 1, 2018, purporting to show that the PAM Funds owned $125 million of Buddy's preferred shares. Kahn and Hughes exchanged additional drafts of the fake stock agreement by email in which the value of the shares ranged from $75 million to $150 million. On June 3, 2019, Kahn delivered a final copy of the stock agreement along with a fabricated stock certificate, backdated to January 3, 2018, valuing the shares at $75 million, which Hughes shared with PAM's auditor. Kahn then falsely confirmed for PAM's auditor that the shares were issued to PAM to secure his trading

losses. Kahn subsequently falsified another Buddy's stock agreement, backdated to January 1, 2019, purporting to grant PAM $150 million in Buddy's preferred shares in response to questions from PAM's administrator in mid-2019. During this time, Buddy's never issued any shares to PAM or the PAM Funds.

77.     To avoid reporting losses to PAM's auditor and investors, PAM's CEO and Hughes caused it to record Kahn's trading losses on its books *as a receivable*. By the end of 2019, however, the receivable from Kahn grew to approximately $192 million and accounted for nearly 53% of the assets under management by PAM.

78.     PAM's CEO and Hughes grew concerned that its auditor would scrutinize when PAM had not taken any steps to collect on the falsified Buddy's shares posted by Kahn and decided that they needed to be replaced with a different asset. In response, Kahn formed a limited partnership called Samjor LP ("**Samjor**") in December 2019. The partnership agreement for Samjor provided that Kahn was to capitalize the partnership by contributing $194 worth of shares of a publicly traded company for which he served as CEO, and Samjor would issue the sole limited partnership interest to PAM and/or the PAM Funds. As such, the receivable on PAM's balance sheet would be replaced by a partnership interest secured by real equity. At the time the only publicly traded company for which he served as CEO was FRG. However, Kahn never contributed any shares to Samjor, rendering the partnership interest issued to PAM and/or the PAM Funds worthless. Kahn later issued a falsified account statement to PAM's administrator purporting to value PAM's investment in Samjor at $194 million.

79.     The PAM Funds ultimately collapsed in March 2020. By then, Kahn's cumulative losses totaled more than $401 million, an amount that eclipsed the $386 million of assets under management by PAM due to Kahn's use of leverage. On March 18, 2020, Prophecy's auditor, Deloitte & Touche LLP ("**Deloitte**"), withdrew its audit reports for 2018 and resigned after uncovering the fraud. On March 31, 2020, PAM officially notified its investors that Deloitte resigned and that it decided to indefinitely suspend redemptions, which prevented investors from recovering their investments. Of

course, there were no funds left to redeem at that point.  Notably, that very same day, Bryant Riley and the other B. Riley-appointment member on FRG's board of directors abruptly resigned as directors from FRG's board, effective immediately.

80.    PAM soon took action to recover the massive losses sustained by Kahn that were not secured with adequate collateral.  On April 1, 2020, just one day after PAM notified investors that it suspended redemptions, one of the PAM Funds filed a financing statement in Delaware against the VCM affiliate Vintage Opportunity Partners, L.P. ("**VOP**") in accordance with its Uniform Commercial Code (the "**UCC**"), which reported that it had a security interest in specified property owned by VOP for debt it owed.  That filing identified the collateral as "the assets set forth on Schedule A hereto," which included 1,923,094 shares of FRG, along with "any securities exchangeable for or convertible into shares of equity interests of any class of any issuer, or equity interests in any other entity or person" owned by VOP.  Then, on May 27, 2020, PAM filed an arbitration claim against Kahn and certain of his affiliated entities before the American Arbitration Association ("**AAA**").  Kahn consented to a single, consolidated AAA proceeding to avoid the need for multiple actions in different forums.

81.    PAM investors also brought their own lawsuits to recover losses from the fraud, several of which named or implicated Kahn by name.  For example, on August 24, 2020, a group of investors led by Lyonross Partners Master Fund LP ("**Lyonross**") sued PAM, Kahn, and others in the United States District Court for the Southern District of New York for securities fraud, breach of contract, and a variety of torts, including common law fraud and breach of fiduciary duty (the "**Lyonross Action**").  According to Lyonross' complaint, filed August 24, 2020, it sent an analyst to a PAM office in January 2020 after becoming deeply concerned about its connections with Kahn, who "dramatically" discovered that Kahn syphoned off a staggering $160 million from the PAM Funds into a "secret" side account, which he then used to ***purchase his controlling position in FRG***.  On April 14, 2021, IMG Memorial Fund 1, LLC ("**IMG**"), a family investment fund, brought another suit against certain PAM Funds and others in the United

States District Court for the Southern District of New York for securities fraud, breach of fiduciary duty, and various torts (the "**IMG Action**").  According to IMG's initial complaint, publicly filed April 14, 2021, nearly of all PAM's funds were allocated to Kahn, who lost most if not all of them trading on illiquid assets and failed to post requisite collateral to support his allocations.  IMG's complaint specifically stated that, according to communications from PAM's CEO, copies of which were attached to the complaint, PAM had initiated an arbitration claim against Kahn to recover "hundreds of millions" in losses.

82.     The nature of the claims asserted in the Lyonross Action and the IMG Action—including Kahn's alleged involvement in the Prophecy fraud and his exposure to significant liabilities arising therefrom—were public by no later than May 2022.  The complaint in the IMG Action, including the documents attached thereto, were fully accessible since filing in April 2021.  The complaint in the Lyonross Action was initially filed under seal but Kahn was identified as a defendant on the public docket from the outset.  On September 8, 2020, the parties agreed to submit the matter to arbitration and activity in the Lyonross Action came to a standstill.  By May 9, 2022, the parties returned from arbitration and the suit was voluntarily dismissed.  In connection with the voluntary dismissal, the original complaint was unsealed in its entirety.

83.     The collapse of the PAM Funds and the ensuing litigation also caught the attention of the SEC and the U.S. Department of Justice ("**DOJ**"), both of which opened investigations into the matter.  In January 2023, the SEC sent a subpoena to FRG seeking, among other things, all documents relating to the issuance of Buddy's preferred stock between January 2018 and December 2019.  In June 2023, FRG received another subpoena from the DOJ in connection with its investigation into the collapse of the PAM Funds seeking, among other things, all communications between Kahn and PAM's principals.  Kahn also received a similar subpoena from the DOJ at that time.

84.     By no later than July 2022, Kahn was subject to substantial liabilities as a result of the PAM arbitration.  The arbitration that PAM initiated against Kahn was not

AMENDED CLASS ACTION COMPLAINT:  Case No. 3:24-CV-00662-SPG-AJR

public but persons familiar with the matter told *Bloomberg* that Kahn agreed to repay $200 million to investors in connection with the proceeding.  Indeed, by no later than July 2022, a settlement trust, titled the Settlement-Related Liquidating Trust 2022-23 (the "**PAM Settlement Trust**"), was established for the benefit of the victims of the fraud to recover monies provided by that settlement agreement.  In fact, Kahn signed the agreement that created the PAM Settlement Trust.  In connection with the settlement, Kahn transferred approximately 2.5 million shares of FRG stock to VOP and made the PAM Settlement Trust a partner of VOP.

85.    Kahn entered into additional agreements with the PAM Settlement Trust in 2023 in relation to his settlement obligations. In March 2023, Kahn entered into a Forbearance Agreement in which he, among other things, agreed to make an initial payment of $1.5 million in cash or $5 million in shares to the PAM Settlement Trust by no later than January 31, 2024.  In August 2023, Kahn also entered into a Consent & Agreement in which he agreed to turn over to the PAM Settlement Trust the FRB shares held by VOP, the same entity against which one of the PAM Funds filed a UCC claim in April 2020 after the collapse of the PAM Funds.

## D.    B. Riley's Undisclosed Margin Loans to Kahn and His Affiliates

86.    As noted above (¶ 32), B. Riley was making opportunistic investments with its *own* capital since at least 2016.  Over time, these principal investments expanded to include private loans to public and private middle market companies and firms.  In fact, between 2019 and the fourth quarter of 2023, B. Riley made approximately 53 such loans, 15 of which remained outstanding.

87.    As Kahn was building his ownership stake in FRG, B. Riley provided Kahn and his affiliated entities a series of large loans with B. Riley's capital, which loans accumulated into a significant amount of debt.  For example, BRFBR loaned a VCM affiliate approximately $9.8 million as far back as July 2018.  In July 2019, B. Riley extended VCM and/or its affiliates another loan for $37 million and the parties amended and restated the promissory note evidencing Kahn's debt to B. Riley.  As Kahn received

AMENDED CLASS ACTION COMPLAINT:  Case No. 3:24-CV-00662-SPG-AJR

more loans from B. Riley, the parties continued to amend and restate the operative promissory note. According to a presentation from one of B. Riley's lenders reviewed by *The Wall Street Journal*, the total principal balance remaining on the loans to Kahn and his affiliates totaled ***$154 million*** by mid-2023.

88. Each of the aforementioned loans to Kahn and his affiliated entities were protected by a security interest in equity shares that Kahn owned or controlled, a form of lending known as a "margin loan." Because the value of this form of collateral can fluctuate significantly, financial institutions do not typically provide margin loans that exceed more than 50% of the underlying securities, *i.e.*, the loan to value ("**LTV**") ratio. For example, Elon Musk was reportedly offered a loan to finance the buyout of Twitter that amounted to 20% of the value of the Tesla shares that he owned. In other words, he had to pledge approximately $30 billion in Tesla stock to get a $6 billion loan.

89. As Kahn and his affiliated entities borrowed more from B. Riley, he began pledging shares of FRG owned by him and his wife as collateral. For example, in approximately July 2020, Kahn and his wife pledged 2,173,590 shares of FRG that they owned as collateral for the outstanding debt. By August 2020, the amount they pledged as collateral for the loans grew to 5,062,628 shares of FRG. In fact, by no later than early January 2023, Kahn and his wife granted B. Riley a security interest in ***all*** FRG shares that they owned or beneficially held.

90. As stated above, the terms and conditions of the margin loans made by B. Riley to Kahn and his affiliates were memorialized in the form of a promissory note, as amended and restated from time to time. It is standard practice for promissory notes of this type to contain a variety of "representations and warranties" by the borrower that bear on the collectability of the loan, including that that borrower is not subject to any pending or threatened litigation that could adversely impact the financial condition of the borrower or the lender's security interest in the collateral. The standard promissory note used by B. Riley for margin loans contains such provisions. For example, promissory notes that

B. Riley used for secured loans it made to several different clients in the second half of 2021 included the following representation and warranty:

> No action, suit, litigation, investigation, or proceeding of, or before, any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower, threatened by or against the Borrower or any of its property or assets . . . that have had or could reasonably be expected to have a Material Adverse Effect.

Material Adverse Effect, in turn, is defined as "a material adverse effect on (a) the business, assets, properties, liabilities (actual or contingent), operations or financial condition of the Borrower" or "(c) the perfection or priority of any Lien purported to be created under any Collateral Document" executed in connection with the note, including any security agreement describing the collateral pledged by the borrower.

91.    Similarly, each form of collateral pledged by Kahn, his affiliates, or his wife as collateral for the loans from B. Riley were memorialized in a corresponding pledge agreement.  It is standard practice for pledge agreements of this type to contain additional representations and warranties by the borrower specific to the collateral, including that the collateral is not subject to any other liens.  The standard pledge agreement used by B. Riley for margin loans contains such provisions.  Indeed, the pledge agreement entered by one of VCM's affiliate on July 24, 2018, contained a representation and warranty that the pledged collateral was "free and clear of all liens other than those created by this Agreement" and "[n]o [UCC] financing statements relating to any of the Pledged Collateral is on file in any public office except those on behalf of Holder" of the promissory note.  B. Riley has entered into pledge and security agreements with the same or substantially similar language as recent as March 6, 2024.

92.    The representations and warranties described in the preceding two paragraphs are typically a key term of any loan.  Promissory notes for margin loans nearly always specify that any representation or warranty provided by the borrower that is false in any material respect constitutes an "Event of Default," which allow the lender to exercise various rights and remedies, including collection on the collateral.  Indeed, the

AMENDED CLASS ACTION COMPLAINT:  Case No. 3:24-CV-00662-SPG-AJR

promissory notes used by B. Riley described in ¶ 90 all specified that if "[a]ny representation, warranty, certification, or other statement of fact made or deemed made by the Borrower to the Noteholder hereunder or in the other Loan Documents," including the corresponding pledge agreement, is found to be "incorrect in any material respect," then it qualifies as an Event of Default.

### E.    The FRG Buyout Transaction

93.    As stated above (¶ 64), FRG completed the acquisition of Badcock in November 2021. Prior to the acquisition, Badcock was in the business of extending loans to customers to finance furniture sales and, as such, had a large portfolio of consumer receivables. For instance, if someone wants to buy a sofa, and does not pay cash, they instead pay over time. That stream of cash is accounted for as a payment "receivable." FRG planned to have Badcock exit the consumer credit business to improve its balance sheet and, as such, began exploring partnerships with third-party consumer finance vendors to facilitate the transition out of underwriting, holding, and servicing Badcock's consumer credit accounts.

94.    On December 20, 2021, Badcock entered into a Master Receivables Purchase Agreement with a newly formed B. Riley subsidiary pursuant to which it purchased a series of receivable portfolios from Badcock. In December 2021, B. Riley purchased a receivables portfolio from Badcock for $400 million. In October 2022, B. Riley purchased another receivables portfolio from Badcock for approximately $168 million. Between October 2022 and March 2023, B. Riley purchased four more receivable portfolios for approximately $377 million.

95.    By March 2023, however, B. Riley informed FRG that it was no longer interested in purchasing anymore receivables from Badcock. This was especially concerning to FRG because its management understood by then that the failure to move the remaining Badcock receivable assets off its balance could prevent it from paying the quarterly dividend on FRG's common stock and lead to an Event of Default under FRG's operative credit agreement. Representatives of B. Riley subsequently advised that they

preferred to explore an acquisition of FRG rather than expose itself to continued balance sheet risk without any upside.  Riley and Kahn met in person on March 16, 2023, and March 17, 2023, to discuss the terms of a potential transaction.

96.    On March 19, 2023, FRG received a letter from B. Riley expressing interest in taking the company private at a price of $30 per share.  However, by May 5, 2023, B. Riley determined that while it remained interested in taking FRG private that it wished to avoid doing so in a manner that resulted in it controlling FRG and, thus, consolidating it into its own financial statements and, as such, it was only interested in financing a management buyout by Brian Kahn and/or his affiliates.

97.    On May 10, 2023, FRG entered into a definitive agreement (the "**Merger Agreement**") pursuant to which a group of senior executives led by Brian Kahn, in financial partnership with a consortium of other investors including Kahn's affiliated entities and B. Riley, agreed to take FRG private by purchasing all shares they did not already own at $30 per share through a newly formed investment vehicle.  Specifically, upon the successful completion of the transactions contemplated by the Merger Agreement, FRG would become a wholly owned subsidiary of Freedom VCM, Inc. ("**Freedom VCM**"), an indirect wholly owned subsidiary of Freedom VCM Holdings, LLC ("**Freedom VCM Topco**"), both newly formed under Delaware law.

98.    In accordance with the Merger Agreement, and concurrent with the execution thereof, certain FRG stockholders participating in the buyout entered into a letter agreement (the "**Rollover Agreement**") pursuant to which they agreed to contribute certain FRG shares they owned to Freedom VCM Topco in exchange for a common membership interest therein.  In particular, (i) Kahn agreed to rollover 2,154,807 shares of FRG that he controlled in his individual capacity, valued at $64,644,210; (ii) Kahn and his wife agreed to rollover 7,576,543 shares of FRG they owned, as joint tenants by the entirety, valued at $227,296,290; and (iii) Kahn agreed to rollover 7,576,543 shares owned by VOP, valued at $75,000,000, *i.e.*, the ***same shares*** subject to a lien asserted by the PAM Fund in the UCC financing statement that it filed against VOP in April 2020 (¶

80).  Because the PAM Settlement Trust had a beneficial interest in the shares held by VOP, Kahn, through counsel, obtained written consent from the PAM Settlement Trust to rollover the shares held by VOP.

99.     In addition, on May 10, 2023, B. Riley entered into a letter agreement (the "**Equity Commitment Letter**") pursuant to which it agreed to contribute $560 million to Freedom VCM Topco immediately prior to closing in exchange for common membership interests therein, provided that B. Riley could assign all or part of the commitment amount to other investors.  The Equity Commitment Letter was signed by Bryant Riley.  B. Riley subsequently filed a current report with the SEC on Form 8-K on May 11, 2023 (the "**May 11, 2023 Form 8-K**"), which summarized the Equity Commitment Letter and advised that "B. Riley expects the actual amount to be funded by it," as opposed to other investors, "to be substantially less than $560 million."  The May 11, 2023 Form 8-K was signed by Phillip Ahn.  Both the Equity Commitment Letter and the May 11, 2023 Form 8-K specifically refer to the Rollover Agreement and, thus, both Riley and Ahn were on notice of it.  In fact, Riley and Kelleher both filed an Amendment to a previously-filed Schedule 13D on August 8, 2023, in which they stated that they "entered into a separate rollover contribution agreement in the same form as the Rollover Agreement" entered into by Kahn and VOP on May 10, 2023.

100.     According to CW3, B. Riley's executives, particularly Bryant Riley, were directly involved in the Kahn and FRG deals. CW3's account is confirmed by CW1, who stated that as the primary decisionmaker regarding all principal investing, Bryant Riley was personally involved with the FRG deal. Said CW1, "Much of that was handled by Bryant Riley." In addition to Bryant Riley's handling of the deal, CW2 said Co-CEO Andy Moore "was deeply involved in the FRG financing and Kahn's deals," overseeing the deal structure and due diligence performed on the deal.

101.     As a significant financial transaction, B. Riley performed due diligence prior to closing the transaction.  Indeed, after Riley admitted on November 8, 2023, that "we underwrote" before deciding to invest and "that is what we invested in, the FRG

business." According to CW2, B. Riley's due diligence associated with the deal followed the standard underwriting process, stating, "everything that should be done was done," noting that it was "by the list."

102. On August 21, 2023, the parties consummated the FRG Buyout and FRG became a wholly owned subsidiary of Freedom VCM and an indirect wholly owned subsidiary of Freedom VCM Topco. In connection with the FRG Buyout, B. Riley invested $216.5 million of its own cash for equity interests in Freedom VCM Topco. It also terminated an investment advisory agreement with Kahn, further to which it regained control over shares of FRG valued at $64,644,210 that were previously controlled by Kahn and, thus, converted into equity interests in Freedom VCM Topco under the Rollover Agreement, bringing its total equity investment in Freedom VCM Topco to $281.1 million, representing 31% of its outstanding equity.

103. Unbeknownst to investors, however, on August 21, 2023, B. Riley amended and restated its promissory note with VCM (as amended, the "**Amended and Restated Note**") to reflect that the aggregate principal amount that it owed to B. Riley *increased* in connection with the FRG Buyout to *$200.5 million* and was now secured by equity interests in Freedom VCM Topco. As amended, the Amended and Restated Note had a maturity date of December 31, 2027. In addition, the Amended and Restated Note required repayments prior to maturity from certain proceeds received by Mr. Kahn or his affiliates from, among other proceeds, distributions or dividends paid by Freedom VCM, and bears interest at the rate of 12% per annum payable-in-kind ("**PIK**"). Finally, the debt owed under the Amended and Restated Note was secured primarily by equity interests in Freedom VCM Topco held by Kahn and his wife with a value at closing of $227,296,290, *i.e.*, the same amount of FRG shares that they converted into equity interests in Freedom VCM Topco under the Rollover Agreement. Indeed, B. Riley subsequently confirmed that it took *physical possession* of the certificates evidencing these shares.

104.   The terms of the Amended and Restated Note with Kahn were highly unusual.  First, it was structured to allow Kahn to avoid making any interest payments in cash.  Debt typically requires the borrower to repay the principal amount of the loan along with interest.  Interest is effectively the cost of borrowing money.  All else being equal, a lender would rarely, if ever, loan money—especially large sums—for nothing in return other than the amount of the loan.  A PIK note is a form of debt in which interest payments are satisfied with additional debt rather than cash and, in return for the added risk, carry a higher interest rate.  Thus, the structure of the Amended and Restated Note suggests that B. Riley knew Kahn was unable to repay it in cash and, as such, amounted to incremental equity in Freedom VCM Topco that it did not need to keep on its books.  Second, the Amended and Restated Note was severely undercapitalized.  With only $227.3 million of equity instruments securing the debt, the Amended and Restated Note had a staggering LTV of almost *90%*.  As explained above (¶ 88), margin loans rarely exceed 50% of the securities posted as collateral to account for the fact that their value can change significantly.  A loan with a 90% LTV leaves no margin for error.

105.   Individually and together with its $280 million equity investment in Freedom VCM Topco, the Amended and Restated Note exposed B. Riley to an extreme concentration of risk in a highly illiquid private company controlled and managed by Kahn.  The $200.5 million loan to Kahn represented 36% of B. Riley's overall loan receivable balance as of September 30, 2023, by far the largest exposure therein. Indeed, on an earnings call in February 2023, Bryant Riley stated that the "average loan is $32 million," which Ahn confirmed. Similarly, the $280 million investment in Freedom VCM Topco was one of, if not the single largest, equity investment B. Riley ever made with its own cash.  Together, B. Riley had $480 million of its own cash tied to the performance of Freedom VCM Topco and, thus, Kahn.  For context, that amount exceeded the $413.8 million in stockholders' equity that B. Riley reported in its financial statements as of September 30, 2023.

AMENDED CLASS ACTION COMPLAINT:  Case No. 3:24-CV-00662-SPG-AJR

106.    CW2 reported that the underwriting efforts did not result in red flags, and when the Company became aware of the failed hedge fund, they did not halt the deal. "Usually, if there' a big issue, you'd see some hesitation or extra meetings, CW2 said, including a briefing for senior leadership if the compliance team finds a client has serious legal exposure.  "In this case, I never heard anyone internally raise a red flag on Kahn." It was CW2's understanding that leadership likely already knew Kahn's background and decided to proceed regardless. "

107.    Given B. Riley's significant equity interest, Bryant Riley became a member of Freedom VCM Topco's board of directors and privately held FRG upon the closing of the FRG Buyout.  At the time, Kahn was also a board member of Freedom VCM Topco and FRG.  In addition, Kahn continued to serve as CEO of FRG.

108.    On August 25, 2023, B. Riley filed a current report on Form 8-K with the SEC (the "**August 25, 2023 Form 8-K**").  The August 25, 2023 Form 8-K reported that a subsidiary of B. Riley "made a new cash Equity Investment of $216.5 million in FRG's new parent entity, bringing the Company's entire equity investment in the parent entity to approximately $280.

## F.    Concentration and Correlation in B. Riley's Investment Portfolio

### 1.    Concentration of Risk

109.    Throughout the Class Period, B. Riley had a surging but undisclosed concentration risk, and this concentration risk was not limited to entities associated with Kahn (though it did include them).  For example, according to research analysis by a market participated authored in February 2023, B. Riley's then current loans outstanding totaled $554.8 million spread over seven publicly traded companies.  The findings translate to an average loan size of roughly $79 million spread over those seven borrowers, which indicates a far higher degree of concentration than that indicated by Bryant Riley at the time, who would often indicate the average loan size was around $32

to $44 million per company, spread across over a dozen companies, and more than 20 loans.

110.  And as it relates to Kahn and his affiliates, by January 5, 2023, Kahn had pledged **all** of his FRG shares as well as those shared with his wife, and a Wells Fargo Securities Account to B. Riley, which marks a significant increase from prior pledges that Kahn gave B. Riley.  Prior UCC filings before January 2023, specified a dollar amount of shares or collateral.  This increased collateral requirement, as of January 5, 2023, suggests a loan size of tens of millions, if not more than a hundred million dollars given the value of all of Kahn's FRG shares as of January 2023.  According to an FRG Proxy filed on June 8, 2023, Brian Kahn owned 2.154 million shares of FRG; Vintage Opportunity Partners, L.P. owned an additional 2.5 million shares of FRG and Bran Kahn and Lauren Kahn Joint Tenants by Entirety owned an additional 7.576 million shares.  Given the lowest price FRG traded in January 2023 was $24.06 per share, that implies total collateral of at least $294.2 million (12,231,350 shares x $24.06 per share). At even a 30% loan to value, that would be a loan of at least $88.3 million.

111.  The FRG transaction compounded the Company's concentration.  Unbeknownst to investors, the $200.5 million undisclosed related party loan to VCM was more than a six-fold increase from Bryant Riley's purported average loan size of $32 million.  The VCM loan comprised a whopping 35% of B. Riley's loan portfolio as of September 30, 2023 and grew to a 40.5% concentration by Q1 2024.  And the VCM loan also concentrated risk within a single industry.  As the Company would eventually admit in an SEC filing on May 15, 2024, VCM was a "concentration of risk" for B. Riley.

112.  Yet notwithstanding these significant concentration risks stemming from B. Riley's exposure to concentrated debt investments, including to Kahn and his affiliates, was not disclosed.

113.  Subsequent to B. Riley's admission of the existence of the $200.5 million loan, the Company warned the market of significant concentration of risk represented by the size of the loan.  As described more fully above (¶ 141), the 2023 Form 10-K noted

the Company was "subject to risks as a result of the concentration of investments in Freedom VCM" given the 31% equity ownership, $200.5 million loan, and the Freedom Receivables Note, as well as the "current and future claims, demands, and legal proceedings arising out of the FRG take-private transaction itself and for Mr. Kahn's ownership of and involvement with Freedom VCM and FRG." These risks, the Company conceded, "may be material." B. Riley described these risks again in the quarterly report on Form 10-Q for the quarter ended March 31, 2024 (the "2024 Q1 Form 10-Q").

114.    Similarly, in B. Riley's form 10-K for the year ended December 31, 2023, filed on April 24, 2024, B. Riley also admitted that "On December 18, 2023, the Company loaned $108,000 to Conn's Inc. ('Conn's') as more fully described in Note 22. This loan combined with two other existing loans receivable with an outstanding balance of $62,808 as of December 31, 2023 is collateralized by consumer loan receivables of customers of the furniture and electronics retailer. These loans have an aggregate fair value of $167,568 or 31.5% of the loan portfolio as of December 31, 2023 and are concentrated in the retail industry. In the event there is a recession or economic downturn that would put pressure on the retailer's customers, this could impact the operations of the retailer and payment patterns of the customers and the overall performance and collectability of these loans."

115.    "This loan [to Conn's] is reported as a related party loan receivable due to the Company's related party relationship with Freedom VCM and Freedom VCM's ability to exercise influence over Conn's as a result of the equity consideration Freedom VCM received from the sale of Badcock to Conn's on December 18, 2023."

## 2.    Correlation of Holdings

116.    B. Riley's principal investments and investment products were correlated with the market throughout the Class Period, including for non-Kahn related investments. For instance, with respect to non-Kahn related investments, one market participant who had access to, and used, proprietary databases and information sources, such as Bloomberg, calculated the respective equity portfolio performance B. Riley Financial Inc. and B. Riley Asset Management LLC. This analysis calculated their respective returns

during 2022 to be **_negative 45.4% and negative 26.3%,_** respectively. Because most major equities indices fell in 2022, those portfolios were correlated with the market—and not in a good way.

117.  The research also observed similar characteristics in B. Riley's loan portfolio.  A February 2023 analysis stated that, "We were able to reconstruct much of RILY's corporate loan book, even though it is not directly disclosed by RILY and found that many of the borrowers are in severe distress.  We also noticed a pattern; RILY apparently does not admit mistakes or cut its losses but will throw good money after bad again and again to save face."

118.  This same market participant analyzed B. Riley's debt-related principal investments during 2022 and calculated that 30 out 31 operating companies in the B. Riley Financial Inc. portfolio experienced negative returns in 2022, making the securities within that portfolio _highly correlated_ with one another. As of early 2023, 4 out of 7 of B. Riley's largest corporate borrowers were at a high risk of default or in default. But, because B. Riley did not publicly disclose the returns of its principal investment portfolio, investors were left unaware until the truth was fully revealed.

119.  B. Riley's debt investments through its loans to Kahn and his affiliates were also correlated.  They were correlated because they all faced the same risk that Kahn's collateral might end up being worthless, and they were also correlated because the underlying business of FRG consisted of similar types of consumer businesses (_e.g._, both FRG and Badcock were exposed to furniture sales, and a consumer's ability to pay for such purchases on credit).  In other words, they were largely in the same industry, which increases correlation risk.  By mid-2023, Defendants had extended approximately $152 million in undisclosed loans which were then outstanding to Kahn. When the truth was fully revealed, investors would learn that $200.5 million, or roughly 36% of B. Riley's portfolio was extended to Kahn and his affiliates.

### G.    Defendants' Fraudulent Scheme Slowly Unravels

120.    On the day the FRG Buyout closed, B. Riley's common stock closed at $46.93 per share.  In fact, the closing price of B. Riley's common stock rose to more than $51 between August 29, 2023, and September 1, 2023.

121.    On the afternoon of November 2, 2023, John Hughes made an initial appearance before a federal judge in New Jersey and pleaded guilty to an Information filed against him by the U.S. Attorney's Office charging him with one count of conspiracy to commit securities fraud under SEC Rule 10b-5, in violation of 18 U.S.C. § 371, for his role in the fraud at PAM pursuant to a plea agreement that he entered into approximately two months earlier.  An Information is an official charging document used by the DOJ when the defendant has waived the right to an indictment.   Later that same day, the SEC also filed a civil complaint against Hughes in the United States District Court for the District of New Jersey (the "**SEC Complaint**") for violations of the antifraud provisions of the Securities Act of 1933, the Exchange Act of 1934, and the Investment Advisers Act of 1940 arising from the same misconduct.

122.    At approximately market close on November 2, 2023, the DOJ announced that Hughes pleaded guilty to the charges it brought against him and the SEC announced that it brought civil charges against him arising from the fraud at PAM.  Although the criminal case against Hughes was not made public until November 3, 2023, the DOJ attached a copy of the Information it filed against him to the press release.  Similarly, the SEC attached a copy of the SEC Complaint to its press release.  Both the Information and the SEC Complaint detail many of the acts set forth in ¶¶ 66-79 above.

123.    Neither the Information nor the SEC Complaint against Hughes identified Kahn by name, but they made clear that Hughes committed the violations described therein with the assistance of two co-conspirators, including the co-founder of PAM and the "sub-advisor" who received the vast majority of its capital.  The Information only identified the sub-advisor as "Co-conspirator-2" but stated that Co-conspirator-2 has been "the CEO and President of a multi-billion-dollar company that owned and managed large

and diversified retail franchises" since 2019.  The more detailed SEC Complaint only identified the sub-advisor as "Individual 2" but specified that Individual 2 lived in Florida and received loans from the PAM Funds through "Vintage Capital Management LLC," *i.e.*, VCM.

124.   Soon after market close on November 3, 2023, the investment community identified Kahn as the unindicted co-conspirator referenced in the Information and SEC Complaint filed against Hughes and the implications for B. Riley.  For example, one investor on X with the username BigRiverCapita1 linked to a copy of the Information on the DOJ's website and raised questions about it, in a post that has received 24 thousand views.  Another investor with the username The Friendly Bear soon responded, "Brian Kahn is co-conspirator 2 here" and added "$RILY is in big trouble."  This post has received 24 thousand views.  Similarly, another investor made a post about Kahn's involvement and asked "is $RILY now holding the bag?"  This post has received 9.6 thousand views on X.  The Friendly Bear raised similar questions that evening: "Did Kahn disclose this to B Riley?  Hard to believe that this was withheld or unknown.  The parallel civil litigation was known and available for years.  This post has received 4.9 thousand views on X.  Another investor posted a link to a Bloomberg News article about Hughes' guilty plea, then followed-up with the comment, "$RILY down on news?"  The next day, an investor posted to X to ask, "Did $RILY even do a basic google search on Brian Kahn before betting their money, reputation, and client money on Brian Kahn?"  This post has been viewed 2.5 thousand times on X.

125.   B. Riley had previously scheduled a call for after market close on November 9, 2023, to discuss its financial results for the most recent quarter, ended September 30, 2023.  But due to the investor interest in the fraud allegations surrounding Kahn and the sharp sell-off in B. Riley shares, the Company moved the call up to before the start of trading on November 8, 2023.

126.   By November 8, 2023, if not much earlier, Riley was aware of Kahn's involvement in the PAM fraud and concerned enough about it to authorize an

investigation by counsel. Between November 2, 2023, and November 8, 2023, the members of FRG's board of directors other than Kahn, including Bryant Riley, authorized FRG to engage the law firm Petrillo Klein & Boxer LLP ("**Petrillo**") upon learning about Kahn's involvement in the PAM fraud to investigate matters relating thereto. On November 8, 2023, those same board members, including Riley, authorized FRG to formally retain Petrillo to investigate whether any of its directors, officers, or employees were involved in, or had any knowledge of, Kahn's alleged misconduct. The law firm Willkie Farr & Gallagher LLP ("**Willkie**"), who represents B. Riley in certain matters and assisted Petrillo in connection with its investigation for FRG, said in papers filed in federal court that FRG took this action "to distance itself from Mr. Kahn."

127. However, according to CW2, within B. Riley there was no talk of cutting ties with Kahn, and the message from the top was that Kahn was still the same reliable partner he always had been.

128. Before market open on November 8, 2023, B. Riley issued a press release announcing its financial results for the quarter ended September 30, 2023. In the press release, B. Riley disclosed that it recorded a net loss of $75.8 million for the quarter, compared to net *income* of $45.8 million in the same period for the prior year, primarily due to a decrease in the market value of its equity investments. As explained more fully below (¶ 131), privately held FRG's financials significantly deteriorated during the quarter. On the investor call held later that morning, before opening the call to questions, Bryant Riley said, "I just wanted to take a few moments to address the news surrounding FRG" and stated in pertinent part:

> I've known Brian for many years and have had no direct experience with what has been alleged. We learned of this matter late last week like many others, and we continue to closely monitor relevant develops. However, I have no interest in going through hypotheticals and speculation.

After the question and answer part of the call ended, Riley said he "I want to actually answer some questions that I don't think were asked" because "I think there's noise out there, so I want to address it and be crystal clear." Riley stated in relevant part:

> We would have bought all of Franchise Group. We are a huge fan of that business . . . . ***And I know that, today, a statement came out from Brian denying any involvement and what happened with Prophecy, and that's good enough for me.*** So I'm—I don't—I want to just be crystal clear. I believe we are going to make a lot of money for our shareholders and Franchise Group just like we did in the first investment when we bought a big chunk of Liberty Tax at 8 [dollars per share] and just like we did in Badcock, and we will continue to do so.

(emphasis added.)

129. Riley's unwavering defense of Kahn proved to be troublesome. Kahn had ***not yet made any public statement*** about the matter as of November 8, 2023. As described more fully below (¶ 131), the first statement that Kahn gave denying any involvement in the fraud was not published until November 13, 2023. Indeed, Wolfpack Research posted on X.com the next day that "[w]e found no such statement" f. In addition, Riley and communication professionals at B. Riley later acknowledged that the comment was improper. A B. Riley spokesperson told *Bloomberg* in early December 2023 that, in hindsight, "the CEO acknowledges his statement was too strong before the completion of an independent investigation." Riley also told the *Los Angeles Times* in October 2024 that he "regrets making such a forceful statement defending Kahn" without complete information.

130. After the close of trading on November 9, 2023, B. Riley filed its quarterly report on Form 10-Q for the period ended September 30, 2023 (the "**Q3 2023 Form 10-Q**"). The Q3 2023 Form 10-Q disclosed that B. Riley purchased a 31% equity interest in Freedom VCM Topco for approximately $281 million but made ***no mention*** of the $200.5 million PIK loan to VCM secured by Kahn's shares of Freedom VCM Topco.

131. Although FRG ceased reporting its financial results as a public company, it continued to have public debt, which was rated by debt rating agencies, including S&P

Global Ratings, a division of S&P Global Inc. ("**S&P**"), based in part on its financial results as a private company.  At approximately the close of trading on November 10, 2023, S&P announced that it decided to downgrade FRG from B to B-, pushing it further into "junk" status.  The release by S&P stated that "Franchise Group reported revenue declines and an operating loss in the third quarter which were weaker than we expected." The release also stated that "[w]e are also monitoring developments associated with news last week regarding investment fund Prophecy Asset Management LP" and "various media outlets have reported that Mr. Kahn appears to be one of the two unnamed individuals referenced in a related SEC civil complaint."

132.  On November 13, 2023, *Reuters* published a story reporting on the sharp decline in B. Riley's share price following the earnings release and S&P downgrade of FRG titled "B. Riley shares plummet after investment losses, ratings downgrade on Franchise Group."  Kahn provided a statement to *Reuters* for the story in which he stated "[a]t no time during my former business relationship with Prophecy did I know that Prophecy or its principals were allegedly defrauding their investors, nor did I conspire in any fraud."  This was the first time this statement was published.

133.  As later confirmed by *Bloomberg*, the losses stemming from B. Riley's recent financial results and S&P's downgrade of FRG prompted Bryant Riley to host an "investor day" conference ahead of schedule in order to quell ongoing investor concern. On November 20, 2023, B. Riley announced that it planned to host the event on December 13, 2023.   The release stated that the event will feature presentations by B. Riley leadership which will "provide an in-depth review of B. Riley's business strategy, diversified service lines, growth drivers and shareholder value creation."

134.  B. Riley held its investor day conference soon after trading opened on December 13, 2023 (the "**Investor Day Conference**").  As previewed, leaders from across B. Riley presented on their respective businesses.  After those presentations, Bryant Riley led a discussion on B. Riley's "principal investments," including its portfolio of principal loans.  The slides for this discussion gave a breakdown of the most significant

items in that portfolio and revealed, for the first time, that B. Riley had a "$201MM secured Vintage loan" that "bears PIK interest of 12%" and the "vast majority of the collateral are shares of FRG." But rather than address this loan when he presented this slide, Riley simply said "we'll talk about Vintage" later. After principal investments, Riley then led a discussion on FRG. Riley acknowledged that this was "where I think a lot of people are interested" and "I appreciate what's happened with Franchise Group and Prophecy." However, Riley made *no mention* of the VCM loan referenced in the slides. Alarmed by the disclosure, an investor asked Riley to confirm during the Q&A that "[y]ou guys made a $280 million equity investment" in FRG and "you also have a $200 million loan out to Vintage, which is secured by these shares in FRG." Riley responded, "Yeah – perfected and secured, as well as a personal guarantee, and shares in excess of the loan – but yes." Pressed further about VCM's ability to repay the loan, Riley responded: "Well, it's securitized by the equity. . . . [s]o that would be paid back by us owning more of the equity." The investor then asked Riley to confirm what its effective ownership in FRG would be if it did so, to which Riley replied "[b]elow 55%, something like that." During the Investor Day Conference, Bryant Riley also admitted that most of B. Riley's business *was* in fact correlated: "a simple way to think about our sensitivity to that small-cap issuance activity is we have roughly $80 million to $85 million of uncorrelated revenue that's our commission business, it's our securities lending business, it's our restructuring business. *Substantially, everything else that we do exudes significant correlation* with small cap-issuance activity."

135.  On December 18, 2023, Conn's, a specialty retailer, purchased Badcock from Freedom VCM in exchange for 1 million of Conn's shares. The same day, December 18, 2023, B. Riley loaned $108 million to Conn's Inc. so that Conn's could acquire Badcock from FRG for $70 million in stock. Given the nature of the all-stock transaction, valuations of the transaction differed, with one firm estimating the deal as valuing Badcock at $3.4 million. In the press release announcing the transaction, Conn's disclosed that FRG's board—which included Bryant Riley—had unanimously approved

of the transaction. B. Riley's $108 million loan to Conn's represented 31.5% of B. Riley's loan portfolio at the time, creating another significant concentration and correlation risk to the Company. Together with two other loans that B. Riley had outstanding to customers of Conn's, B. Riley's total exposure to Conn's reached $167.5 million, or 32.6% of its portfolio as of December 31, 2023. Together with the $200.5 million in outstanding loans used to finance its purchase of FRG, the total exposure of B. Riley's balance sheet to FRG-related businesses rose to nearly 2/3rds of its loan receivables portfolio (32.6% to Conn's and 36% to Kahn and his related entities). B. Riley classified the Conn's loan as a "related party" transaction in the 2023 Form 10-K. Together with its $108.0 million loan to Conn's, B. Riley also previously extended two other loans to customers of Conn's worth an additional $62.8 million, bringing B. Riley's total exposure to Conn's to $167.5 million, or 32.6% of its portfolio as of December 31, 2023. Thus, B. Riley also had concentrated exposure to Conn's, which was yet another correlated consumer business and Kahn affiliated entity. Conn's filed for bankruptcy just over seven months later, on July 23, 2024.

136. On December 20, 2023, the U.S. Attorney's Office for the District of New Jersey filed a motion in the SEC's civil case against Hughes to stay all further proceedings pending the conclusion of the parallel criminal case against him. The motion explained that the stay was necessary to "limit the ability of uncharged subjects and targets to tailor evidence, testimony, and defenses, and circumvent or defeat prosecution." The Court subsequently granted the motion.

137. By no later than December 21, 2023, the website for VCM was taken down. As of December 21, 2023, visitors to the site were redirected to a page that simply said, "The Vintage Capital Management website is no longer active."

138. Despite Kahn's involvement in the PAM fraud, the ongoing investigations into those matters, and Kann's inability to pay the loan from B. Riley in cash, Riley authorized Freedom VCM Topco—the company in which B. Riley was heavily invested—to make a $15 million unsecured loan to Kahn to induce him to resign from his

various positions in Freedom VCM Topco and FRG.  In connection with the Conn's Acquisition in December 2023, and in exchange for providing his consent for that transaction, Freedom VCM Topco authorized the payment of $15 million into an escrow account maintained by Willkie for the benefit of Kahn.  On January 19, 2024, Kahn entered into an agreement (the "**Separation Agreement**") that memorialized the terms and conditions of his resignation from his roles as (a) a member of the board of directors of Freedom VCM Topco and FRG; and (b) CEO of FRG.  In connection with the execution of the Separation Agreement, the $15 million held in escrow by Willkie was released to Kahn and he entered into an unsecured promissory note to repay the amount with interest in favor of Freedom VCM Topco.  According to sworn testimony provided by the Chairman of Willkie in federal court, "Mr. Riley was actually the person negotiating with Mr. Kahn over the departure," including the $15 million payout.

139.   By no later than January 21, 2024, the SEC investigation arising from the PAM fraud expanded to include B. Riley.  On the evening of January 21, 2024, *Bloomberg* reported that SEC was investigating B. Riley's deals with Kahn.  In fact, the article stated that people familiar with the matter confirmed that the SEC "carried out interviews in recent months about B. Riley and its relationship with Brian Kahn," including how the two worked together to finance the FRG Buyout.

140.   Shortly after the close of trading on January 22, 2024, *Bloomberg* published another story reporting that Brian Kahn stepped down as CEO of FRG as regulators continued to look into his role in the PAM fraud.  A person familiar with the matter told *Bloomberg* that FRG held a call with lenders to inform them of Kahn's departure.

141.   On February 12, 2024, *The Wall Street Journal* published an exclusive titled "How an Unremarkable Deal Became a Big Threat to a Small Investment Bank."  In the story, the *Journal* confirmed from its review of UCC filings that it had made a series of loans to Kahn and Kahn affiliates from as far back as 2018.

142.   Following the lead of *The Wall Street Journal*, another investor on X with the username AV uncovered that one of the PAM Funds filed a UCC lien against VOP in

April 2020 for the FRG shares that it owned and posted a copy of the UCC financing statement mid-day on February 15, 2024. The tweet stated, "Please inform $RILY that a simple UCC search actually shows Prophecy has a lien on Vintage from 2020."

143.    On or around February 17, 2024, the image of a letter from the trustee of the PAM Settlement Trust began circulating online. A copy of the image was tweeted by The Friendly Bear on the afternoon of February 17, 2023. In the letter, the trustee stated that it provided notice to Brian Kahn that he (i) defaulted under an August 2023 Consent & Agreement by failing to turn over post-transaction FRG shares owned by VOP to the trust; and (ii) defaulted under a March 2023 Forbearance Agreement by failing to remit payment of $1.5 million in cash or $5 million in shares by January 31, 2024. By no later than February 19, 2024, Head of Investor Relations at B. Riley, Mike Frank, commented on a short report that incorporated an image of the letter and held numerous calls with investors after the letter was released, during the Company's "blackout period," to address the letter. Thus, B. Riley management, including Bryant Riley—given his commitment to continue to monitor relevant developments—were aware by no later than Feb 19, 2024, that Kahn was delinquent on payments to creditors situated similarly to B. Riley (indeed, involving nearly identical assets as those pledged to B. Riley).

144.    After market close on February 29, 2024, B. Riley issued a press release announcing $70 million in net losses, a 50% reduction in its dividend, and that it planned to notify the SEC that it would be unable to file its annual report on Form 10-K for the year ended December 31, 2023 by required deadline due to "delays experienced in finalizing the Company's financial statements" arising from "the review by the Audit Committee of the Company's Board of Directors, with the assistance of outside counsel, of the Company's transactions with Brian Kahn." At approximately the same time, the Company issued a separate press release announcing that it retained Moelis & Company, a financial advisory firm, to commence a review of strategic alternatives for the appraisal and asset disposition business, formerly known as Great American Group.

AMENDED CLASS ACTION COMPLAINT:  Case No. 3:24-CV-00662-SPG-AJR

145.   On the morning of April 24, 2024, B. Riley filed its annual report on Form 10-K for the year ended December 31, 2023 (the "**2023 Form 10-K**").  The 2023 Form 10-K revealed that the obligations under the Amended and Restated Note are primarily secured by shares of *Freedom VCM Topco* held by Kahn and his spouse—not FRG—and included a new cautionary statement on the risks arising from "our investment in Freedom VCM and our prior business relationship with Brian Kahn."  While B. Riley continued to disclaim any knowledge of "any of the alleged misconduct concerning [PAM]," the disclosure also confessed that B. Riley had been subject to serious risks, including concentration risk all along for other reasons:

> We are also subject to risks as a result of the concentration of investments in Freedom VCM given (i) our ownership of a 31% equity interest in Freedom VCM, (ii) the $200.5 million amended and restated promissory note secured by Freedom VCM equity interests (the "Amended and Restated Note"), and (iii) the Freedom Receivables Note. Accordingly, we may suffer adverse impacts on our financial condition or results of operations as a result of Freedom VCM and its subsidiary FRG performing worse than we expect; the development of their strategies, including the possible disposition of additional businesses and further de-leveraging of their balance sheet, taking longer than expected; the risks associated with consumer-facing businesses described elsewhere in these Risk Factors; and current and future claims, demands, and legal proceedings arising out of the FRG take-private transaction itself and for Mr. Kahn's ownership of and involvement with Freedom VCM and FRG and related expenses which may be material. . . .  In addition, in light of Mr. Kahn's alleged involvement with the alleged misconduct concerning Prophecy Asset Management LP, we can provide no assurances that we will not be subject to claims asserting an interest in the Freedom VCM equity interests owned by Mr. Kahn, including those that collateralize the Amended and Restated Note.  If a claim were successful, it would diminish the value of the collateral which could impact the carrying value of the loan.  If such claims are made, however, we believe we have valid defenses from any such claim and any such claim would be without merit.

In addition, the 2023 Form 10-K also reported the $200.5 million loan to VCM as a "related-party transaction" at page 160 of that filing.  Specifically, the 2023 Form 10-K justified the decision to report it as such "[i]n light of the Company's determination that

AMENDED CLASS ACTION COMPLAINT:  Case No. 3:24-CV-00662-SPG-AJR

the repayment of the Amended and Restated Note will be paid primarily from the cash distributions from Freedom VCM or foreclosure on the underlying collateral provided by Mr. Kahn and his spouse being in Freedom VCM equity interests." Finally, the Company's independent auditor, Marcum LLP ("Marcum"), determined that B. Riley suffered from numerous material weakness in its internal controls which merited a rare "adverse opinion," including (i) controls over its investment valuations; and (ii) controls to properly identify and disclose material related party transactions.

146. However, the shocking new disclosures in the 2023 Form 10-K were muted by the fact that Marcum otherwise signed off on the financial statements included in the 2023 Form 10-K. *Bloomberg* ran a story in the wake of the filing which called out each of the aforementioned items but noted that the stock nevertheless rose "after its auditors signed off on its annual report, while flagging concerns about weak internal controls."

147. Meanwhile, the SEC continued to move forward with its investigation into B. Riley and its ties to Kahn. SEC staff reportedly spoke with informants and requested additional information from them in June and July of 2024. Then, on July 3, 2024, B. Riley and Bryant Riley each received subpoenas from the SEC seeking documents concerning: (i) B. Riley's business dealings with Kahn; (ii) certain transactions in an unrelated public company's securities; and (iii) the communications and related compliance and other policies and procedures of certain B. Riley subsidiaries.

148. In addition, privately held FRG continued to underperform. On July 15, 2024, Bloomberg News reported that Conn's was "teetering near bankruptcy," putting B. Riley "potentially on the hook for about $148 million, around a third of its entire loan portfolio." The article quoted a B. Riley spokesperson saying that that the Company was "an active participant and fully engaged with Conn's." On July 23, 2024, Conn's filed for bankruptcy protection, rendering FRG's stock interest in Conn's effectively worthless.

149. Then, midday on July 24, 2024, S&P downgraded the credit rating for FRG from B to CCC+, pushing it further into "junk" status. S&P reported that the recent Conn's bankruptcy put FRG in danger of violating covenants in its loan documents and

that "FRG's capital structure appears to be unsustainable." After the downgrade, the *Wall Street Journal* covered the news in an article with the subheading "Chapter 11 will have implications for investment bank B. Riley and brand investor Franchise Group." The article described the S&P downgrade and its statement that FRG was in danger of breaching covenants, as well as noting B. Riley's remaining $93 million of second-lien debt from the Conn's-Badcock merger.

150. Before the start of trading on August 12, 2024, B. Riley issued a press release announcing its preliminary financial results for the quarter ended June 30, 2024. Among other things, the release disclosed that B. Riley planned to report a ***net loss*** for the quarter of ***$435 to $475 million***, driven primarily by a markdown on its investment in FRG and the VCM loan receivable of up to $370 million, B. Riley would suspend the historically stable dividend on its common stock, and that it once again was unable to file its quarterly report on Form 10-Q with the SEC by the required deadline because it was facing problems valuing its loans and investments. The release quoted Bryant Riley as stating that the "overwhelming majority" of the non-cash losses related to the investment in FRG and the Vintage Capital loan receivable. Bryant Riley was also quoted as saying that "reports concerning Brian Kahn, FRG's former CEO, and his alleged misconduct at Prophecy have continued to create additional challenges for this investment." Bryant Riley also announced that it would be suspending its once-stable common dividend "as we prioritize deleveraging."

151. Also on the morning of August 12, 2024, *Bloomberg* reported that the SEC was expanding its investigation into B. Riley. *Bloomberg* spoke to people familiar with the matter, who confirmed that the SEC is assessing if "B. Riley adequately disclosed the risks embedded in some of its assets" and was "seeking information on the interactions between founder Bryant Riley and longtime business partner Brian Kahn" as well as "the movement between companies of receivables due from cash-strapped retail customers whose repayment might be doubtful." The story stated that the SEC's civil probes involved agency lawyers in Los Angeles, Washington, and Philadelphia, and is

proceeding alongside a federal criminal inquiry in New Jersey.  On the conference call that B. Riley held later that morning to discuss its preliminary financial results for the most recent quarter, Bryant Riley confirmed for the first time that "the company and I received subpoenas in July from the SEC" that "primarily relate to the company's dealings with prior [sic] Brian Kahn."  Riley also stated that "the ongoing fallout related to the alleged misconduct of FRG's former CEO" has "created challenging dynamic among FRG's lenders and counterparties."

152.    After the investor call on August 12, 2024, Bryant Riley told the several hundred financial advisors that work with or for B. Riley, along with all other employees, in a company-wide email that "I am not naïve to the distractions and reputational challenges this [FRG investment] has created for our firm" and "I fully recognize how disappointing the FRG transaction has been for our employees, our investors and our partners."  As *Investment News* later reported, "[i]t's highly unusual for brokerage chiefs or senior officers to admit any shortcomings in their positions."  But this private *mea culpa* offered little redress for investors like Plaintiffs.  As explained below (¶ 227), the disclosures described above wiped out ***over 51%*** of the remaining value of B. Riley's share price.

153.    On August 15, 2024, Bryant Riley submitted a letter to the Company's board of directors outlining a non-binding proposal to take B. Riley private by purchasing all shares of common stock he does not already own at $7 per share in a desperate attempt to stave off further losses.  After the letter became public on August 16, 2024, B. Riley's stock price rebounded.  However, Riley never moved forward with the purported offer.

154.    On September 23, 2024, *Bloomberg News* reported that "B. Riley Financial Inc.'s bankers hiked the interest rate on the company's key loan and cut how much the embattled firm can borrow" as the "embattled" Company dealt with the fallout from the FRG collapse.

155.    On October 4, 2024, *AdvisorHub* reported that a significant amount of B. Riley's brokers had left the firm, based on records from the Financial Industry Regulatory

Authority ("**FINRA**"), where brokers must maintain information about their affiliation. The report noted "[a]t least two dozen brokers, almost half the roster at B. Riley Wealth's branch office in Boca Raton," left for a competing firm, and that "[t]hose exits plus a spate of other departures in recent weeks would represent about 8% of B. Riley's brokerage force," noting another group in Memphis that had recently defected, taking $650 million in client assets away from B. Riley to a competitor.

156.    On October 29, 2024, B. Riley announced that it had raised $236 million in cash proceeds by selling off assets and intellectual property. In the press release announcing the sale, Bryant Riley described this transaction as coming during "a period of asset monetization." The *Los Angeles Times* described the sale by "[s]truggling B. Riley" as "the second such asset sale in a month as it works to pay down debt related to a buyout deal that turned sour."

157.    By October 2024, Kahn was also scrambling to save FRG from entering into bankruptcy and respond to ongoing criminal probes. Through counsel, in approximately October 2024, Kahn asked the settlement trust established for the benefit of victims of the PAM fraud for a support letter to assist him with the ongoing government investigations and, in turn, help prevent bankruptcy filings. By no later than October 16, 2024, Kahn hired former New Jersey prosecutor Chris Christie to represent him in the ongoing criminal investigation arising from the PAM fraud, meaning he had reason to believe the case against him was moving forward.

158.    On November 3, 2024, FRG filed for bankruptcy protection in Delaware federal court. On the morning of November 4, 2024, B. Riley filed a current report on Form 8-K with the SEC in which it disclosed that the Company determined that it was necessary to write down the remaining value of its investments in Freedom VCM Topco, including its loan to VCM, in the amount of approximately $120 million.

159.    As a result of B. Riley's undisclosed exposure to Brian Kahn, the value of B. Riley securities was decimated. At its Class Period high, B. Riley's stock price hit $72.00 per share on March 21, 2022. By the end of the Class Period, it dwindled down

to just $5.70 per share, representing a loss of $1.86 billion in market value, and a peak to trough stock price decline of 91.5%. Indeed, Bryant Riley told the *Los Angeles Times* on October 2, 2024, that the investments with Kahn had "been devastating to our stock price." On August 20, 2024, *Bloomberg News* wrote an analysis titled "How B. Riley's Multibillion-Dollar Financial Empire Stumbled," which stated, in relevant part:

> Bryant Riley, who built an underdog investment firm into a multibillion-dollar financial empire that bears his name, was defending his close friend and business partner, Brian Kahn.

> It was November 2023, and Kahn had been implicated in a federal investigation of a failed hedge fund that lost hundreds of millions of dollars. Kahn had insisted he hadn't done anything wrong.

> "That's good enough for me," Riley said during the quarterly earnings call for B. Riley Financial Inc., which was one of Kahn's biggest financial backers. "We're going to make a lot of money for our shareholders."

> It wasn't good enough for US authorities, who've now widened their investigation of Kahn, his dealings with Bryant Riley and the firm Riley co-founded more than 25 years ago. It didn't work out well for shareholders, either. The stock collapsed on Aug. 12 on word that Riley and his firm received subpoenas from the US Securities and Exchange Commission, and that the company was headed for its worst-ever quarterly loss, largely because of its investment in Kahn's business.

> Riley tried to stop the bleeding last week with an informal offer to take B. Riley private – he's the biggest stakeholder at about 24%, he wrote. But his letter to the board lacked specifics on who would give him the money to do it, and B. Riley's market value remained mired at a fraction of the $1.77 billion it commanded little more than a year ago.

160.   Prior to the Class Period, B. Riley had also issued publicly traded Senior Notes, called "Baby Bonds" because they are issued in small denominations to enable retail investors to invest. The trading price of these Baby Bonds also declined precipitously over the course of the Class Period. The B. Riley bond issue publicly traded under the ticker "RILYT" hit $25.18 on March 29, 2022, and ended the Class Period at $11.48, a peak to trough stock price decline of 54.4%. On August 21, 2024, *Bloomberg News* published an analysis of how FRG's collapse impacted Baby Bond holders in an

article titled, "B. Riley's Money Machine Ensnared Retail Investors $25 at a Time," which stated, in relevant part:

> The beleaguered firm used an unusual debt product known as baby bonds to raise cash from small-time investors. Now their money is at risk.
>
> (Bloomberg) -- Retail investors are caught in the crossfire of B. Riley Financial Inc. 's downward spiral.
>
> The Los Angeles-based investment firm's mounting problems, from regulatory probes to record losses, are shining a light on one of its favored fundraising strategies. B. Riley is a self-proclaimed leader in baby bonds — fixed-income securities issued in denominations small enough to appeal to everyday investors, rather than the million-dollar increments favored by institutions.
>
> B. Riley raised more than $1.5 billion in recent years to strengthen its own balance sheet by selling baby bonds for as little as $25 per note. The acquisition of National Holdings Corp. in 2021 turbocharged the process, giving B. Riley a more direct pipeline to the portfolios of retail investors.
>
> For buyers of the bonds, the investment has since turned sour. The securities, which face less scrutiny than typical fixed-income products, are low on B. Riley's list of repayment obligations if it goes bust. That means the company's growing woes have sent prices for the bonds plummeting — one such note has lost more than half its value in August and now changes hands at a yield of nearly 50%.



\* \* \*

AMENDED CLASS ACTION COMPLAINT:  Case No. 3:24-CV-00662-SPG-AJR

Now, B. Riley is taking sizable writedowns on its investments in risky companies just as it faces maturities on its own lumbering debt load. B. Riley warned of losses last week as it cut the value of its stake in Franchise Group Inc. and a related loan receivable. It's expecting a non-cash markdown of about $330 million to $370 million, according to a company statement.

* * *

B. Riley is facing increased scrutiny after the company warned of its largest-ever quarterly loss and suspended its dividend, sending the prices of the baby bonds spiraling alongside its shares.

The B. Riley baby bonds are unsecured, meaning they're not backed by any specific assets or collateral. That makes them riskier for investors, who are putting their faith in the company's creditworthiness. In the event of a bankruptcy, the company has at least $600 million of secured debt it would need to repay before baby bond holders see a dime.

## H.    Relevant Post-Class Period Developments

161.    On November 15, 2024, B. Riley completed a transaction to sell its Great American business division to Oaktree Capital for $386 million. *Reuters* reported that the deal would allow B. Riley "to tackle immediate challenges as it looks to contain the hit from its exposure to Vitamin Shoppe-owner Franchise group." *Los Angeles Business Journal* reported that B. Riley "continue[d] efforts to mitigate the aftermath of its former ties with Franchise Group Inc." by selling the majority of its Great American business unit to Oaktree Management for $203 million, noting B. Riley's "need for cash stems from a deal gone wrong with Franchise Group . . . and its former Chief Executive Brian Kahn, who Riley has known professionally for decades."

162.    On November 22, 2024, B. Riley and Bryant Riley each received an *additional* subpoena from the SEC seeking the production of documents relating to FRG, including its holding company, Freedom VCM Topco, as well as Riley's pledge of B. Riley shares as collateral for a personal loan.

163.    In November and December 2024, *InvestmentNews* ran a series of reports following the continued drain of wealth managers and financial advisors from the company "amid an SEC assessment of whether the firm correctly disclosed risks in some

of its assets, and questions about its founders interactions with Brian Kahn." A December 4, 2024 article quoted a senior industry executive who said, "These bankers leaving mean potential revenue reductions. It's not about headcount. Will this impair deals being generated?"

164.  On February 3, 2025, *Bloomberg News* reported that B. Riley executives, including Bryant Riley, were exploring ways to divest certain of B. Riley's operations by spinning off B. Riley Securities, the investment banking group, as an independent business.  A senior executive commented to *InvestmentNews* that "the way the company is structured right now raises questions about the investment bank," but that the independent bank might be successful because "[i]t was one deal, the Franchise Group, that blew up."

165.  On March 3, 2025, during a conference call to discuss B. Riley's financial results for the year ended December 31, 2024 (the "**Q4 2024 Earnings Call**"), Bryant Riley described the announced sale of a portion of Wealth Management and the sale of Great American Group, as well as efforts to reduce debt, saying "we will continue to look to monetize other noncore assets on our balance sheet . . .  This will go a long way to further strengthening our balance sheet and providing the necessary foundation for renewed growth."  In response to a question about what remained of B. Riley's Wealth Management business, Bryant Riley responded, "assets under management before these sales and some attrition was closer to $24 billion and now it's closer to $15 billion."  In general, Bryant Riley stated, "we are certainly a smaller company than we were."

166.  On March 11, 2025, B. Riley announced that it spun off B. Riley Securities, selling an approximately 11% ownership stake to outside investors. According to B. Riley's press release, the independently operated B. Riley Securities would "provide stakeholders with enhanced transparency and the ability to independently value a pure-play investment bank focused on the small cap and middle markets."

167.  On April 4, 2025, after missing the deadline for filing an annual report to on Form 10-K, B. Riley received another delinquency notification letter from Nasdaq based

1  on its inability to file its annual report, requiring B. Riley to file a plan by June 2, 2025,
2  to address how it would return to compliance for listing rules.

3    168.  On April 9, 2025, B. Riley announced it completed a sale of a portion of its
4  wealth management business to Stifel Financial Corp. ("**Stifel**"), which transferred 36
5  full-time employee financial advisors and $4 billion in client assets from B. Riley to Stifel.
6  In the statement announcing the deal, Bryant Riley was quoted as saying, "[t]he past year
7  has proved disruptive to our Wealth Management business, with competitors taking
8  advantage of the noise surrounding our principal investments business.  We decided to
9  take a proactive approach for those who wanted a fresh start[.]"  In other words, B. Riley
10 was forced to sell a portion of its Wealth Management in order to avoid losing broker
11 resources and assets under management *without* compensation as brokers defected *en*
12 *masse*.  The deal had originally been rumored to be for $100 million and would include
13 B. Riley's independent contractor advisors as well, but the deal as completed was
14 estimated to be worth between $27 and $35 million.  According to a senior executive
15 interviewed by *InvestmentNews*, that meant Stifel was acquiring the "profitable part of
16 the company and [B. Riley] will still have the expenses of maintaining the independent
17 contractor business."

18   169.  Despite entering a guilty plea in the DOJ action, Hughes has not been
19 sentenced.  At the initial appearance to enter the guilty plea, the District Court set
20 sentencing for March 21, 2024.  However, the sentencing hearing was reset to August 13,
21 2024, then February 5, 2025, and is currently scheduled for August 20, 2025.  As the
22 transcript excerpt posted by The Friendly Bear shows that Hughes was cooperating with
23 the investigation, it is likely that sentencing is being deferred until after Hughes continues
24 to cooperate, to ensure Hughes does not cease cooperating once sentence is finalized.

25  **VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS**

26   170.  Despite the substantial loans and investments, and corresponding balance
27 sheet risk, associated with Kahn and his family of companies, Defendants made numerous
28 false and misleading statements during the Class Period about the FRG Buyout, the

Company's undisclosed concentration and correlation risk; the Company's customer due diligence practices, the risks posed to the Company by Kahn, and Defendants' compliance with generally accepted accounting principles ("**GAAP**"). Plaintiffs assert that all statements set forth below that are bolded and italicized are materially false and misleading for the reasons set forth therein. Statements that are not bolded and italicized are included for context.

### A.    FRG Buyout

171.    On May 10, 2023, B. Riley filed a current report with the SEC on Form 8-K disclosing B. Riley's agreement to provide funding for the FRG Buyout ("**FRG Buyout 8-K**"). The FRG Buyout Form 8-K was signed by Defendant Ahn. The FRG Buyout 8-K stated, in relevant part:

> ***On May 10, 2023, B. Riley Financial, Inc., a Delaware corporation (the "Company" or "B. Riley"), entered into certain agreements pursuant to which B. Riley has, among other things, agreed to provide certain equity funding and other support in connection with the acquisition (the "Acquisition") by Freedom VCM, Inc., a Delaware corporation (the "Parent"), of Franchise Group, Inc., a Delaware corporation ("FRG").*** Parent has agreed to acquire FRG pursuant to an Agreement and Plan of Merger, dated as of May 10, 2023, by and among the Parent, Freedom VCM Subco, Inc., a Delaware corporation and a wholly-owned subsidiary of the Parent (the "Merger Sub"), and FRG (the "Merger Agreement"), pursuant to which, upon the terms and subject to the conditions set forth therein, at the closing, Merger Sub will merge with and into FRG, with FRG surviving the merger as a wholly owned subsidiary of Parent. The buyer group includes members of the senior management team of FRG, led by Brian Kahn, FRG's Chief Executive Officer, in financial partnership with a consortium that includes B. Riley. B. Riley is not a party to the Merger Agreement. . . . . A copy of the press release issued by FRG is furnished as Exhibit 99.1 to this Current Report on Form 8-K.

172.    As indicated in the FRG Buyout 8-K, attached as Exhibit 99.1 was a press release issued by FRG titled "Franchise Group, Inc. Announces Definitive Agreement to Be Acquired by a Consortium Led by Management Group," which stated, in relevant part:

Franchise Group, Inc. (NASDAQ: FRG) ("Franchise Group" or the "Company"), today announced that it has entered into a definitive agreement and plan of merger (the "Merger Agreement") pursuant to which members of the senior management team of Franchise Group led by Brian Kahn, the Company's Chief Executive Officer, (collectively with affiliates and related parties of the senior management team, the "Management Group"), in financial partnership with a consortium that includes B. Riley Financial, Inc. and Irradiant Partners, will acquire the approximately 64% of the Company's issued and outstanding common stock that the Management Group does not presently own or control.

. . .

The Management Group has agreed to rollover their shares of common stock of the Company in connection with, and vote their shares of common stock in favor of, the proposed merger, with such voting obligation terminating should the Merger Agreement be validly terminated, including in connection with a "superior proposal." ***The consortium has also received definitive financing commitments from third party lenders and institutional investors, including B. Riley Financial Inc. and Irradiant Partners, to finance a portion of the purchase price.***

173.    The statements identified in bold and italicized text in the preceding paragraphs were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, B. Riley failed to disclose that (i) as part of the transaction, B. Riley increased its loans to Brian Kahn to $200.5 million, 36% of B. Riley's overall loan receivable balance; (ii) the Company therefore was investing a total of $480 million in the transaction. Thus, the statements misrepresented the scale of B. Riley's exposure to Brian Kahn and FRG by omitting a significant amount of the Company's investment. Moreover, the portion of the statement that represented that the financing came from purported "third party lenders" was materially misleading because Defendants instructed B. Riley to extend the $200.5 million PIK Loan, which was in fact a *related party* transaction. To the extent these statements are not technically untrue, they gave the false impression as to the degree and nature of the risk to which B. Riley was exposed through participating in the FRG Buyout.

174.    On May 11, 2023, B. Riley filed a current report with the SEC on Form 8-K (the "**FRG Buyout Agreement Form 8-K**").  The FRG Buyout Agreement Form 8-K was signed by Ahn.  The FRG Buyout Agreement 8-K went on to state, in relevant part:

*On May 10, 2023, B. Riley Financial, Inc., a Delaware corporation (the "Company" or "B. Riley"), entered into certain agreements pursuant to which B. Riley has, among other things, agreed to provide certain equity funding and other support in connection with the acquisition (the "Acquisition") by Freedom VCM, Inc., a Delaware corporation (the "Parent"), of Franchise Group, Inc., a Delaware corporation ("FRG").*

. . .

*Certain financial institutions have agreed to provide Parent with debt financing in an aggregate principal amount of up to $475 million* on the terms and subject to the conditions set forth in a debt commitment letter. Under the terms of the Merger Agreement, if the closing of the Merger does not occur by November 10, 2023, FRG or the Parent may terminate the Merger Agreement subject to the terms and conditions thereof.  Closing of the Merger is conditioned on customary conditions to closing including expiration of the waiting period (and any extension thereof), if any, applicable to the consummation of the Merger under the Hart-Scott Rodino Antitrust Improvements Act of 1976 and the receipt of the Requisite Company Vote (as defined in the Merger Agreement).

175.    The statements identified in bold and italicized text in the preceding paragraphs were false and/or materially misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, it was misleading for Defendants to claim that "certain financial institutions" were providing debt financing when, by extending the $200.5 million PIK Loan, B. Riley was one such institution. Moreover, Defendants failed to disclose that as part of the transaction, B. Riley increased its loans to Brian Kahn to $200.5 million, 36% of B. Riley's overall loan receivable balance.  To the extent these statements are not technically untrue, they gave the false impression as to the degree and nature of the risk to which B. Riley was exposed through participating in the FRG Buyout.

176. The statements identified in bold and italicized text in the preceding paragraphs were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, it was materially misleading for Defendants to conceal the $200.5 million PIK note and instead refer to it as "other support." And B. Riley failed to disclose that as part of the transaction, B. Riley increased its loans to Brian Kahn to $200.5 million, 36% of B. Riley's overall loan receivable balance (and measured as a percentage of the $321.9 million of non-Badcock loan purchases that B. Riley reported in its investor supplement, the $200.5 million loan to Kahn constituted **63.6%** of B. Riley's 2023 loan purchases); the Company therefore was investing a total of $480 million in the transaction. To the extent these statements are not technically untrue, they gave the false impression as to the degree and nature of the risk to which B. Riley was exposed through participating in the FRG Buyout.

177. On August 9, 2023, B. Riley filed a quarterly report with the SEC on Form 10-Q for the quarter ended June 30, 2023 (the "**Q2 2023 Form 10-Q**"). The Q2 2023 Form 10-Q was signed by Defendant Ahn, and included certifications from Riley, Kelleher, and Ahn attesting that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading." The Q2 2023 Form 10-Q stated as follows:

> ***On May 10, 2023, the Company entered into certain agreements pursuant to which the Company has, among other things, agreed to provide certain equity funding and other support in connection with the acquisition (the "Acquisition") by Freedom VCM, Inc., a Delaware corporation ("Parent"), of Franchise Group, Inc., a Delaware corporation ("FRG").*** Parent has agreed to acquire FRG pursuant to an Agreement and Plan of Merger, dated as of May 10, 2023, by and among Parent, Freedom VCM Subco, Inc., a Delaware corporation and a wholly-owned subsidiary of Parent (the "Merger Sub"), and FRG (the "Merger Agreement"), pursuant to which, upon the terms and subject to the conditions set forth therein, at the closing, Merger Sub will merge with and into FRG, with FRG surviving the merger as a wholly owned subsidiary of Parent. The buyer group includes members of the senior management team of FRG, including FRG's Chief Executive Officer. The Company is not a party to the Merger Agreement.

AMENDED CLASS ACTION COMPLAINT:  Case No. 3:24-CV-00662-SPG-AJR

B. Riley entered into the Equity Commitment Letter and the Limited Guarantee, each as defined below, in connection with the Acquisition. FRG has scheduled a special meeting of stockholders for August 17, 2023 to vote on the transaction and related matters. The proposed transaction is anticipated to close in the second half of 2023, subject to FRG's stockholder's approval and satisfaction or waiver of the closing conditions contained in the definitive documentation.

178.    The statements identified in bold and italicized text in the preceding paragraphs were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, it was materially misleading for Defendants to conceal the $200.5 million PIK note and instead refer to it as "other support." Moreover, B. Riley failed to disclose that as part of the transaction, B. Riley increased its loans to Brian Kahn to $200.5 million, 36% of B. Riley's overall loan receivable balance; the Company therefore was investing a total of $480 million in the transaction; and it was not just "equity financing" because the PIK Loan was a hybrid debt instrument. To the extent these statements are not technically untrue, they gave the false impression as to the degree and nature of the risk to which B. Riley was exposed through participating in the FRG Buyout.

179.    On August 25, 2023, B. Riley filed a current report with the SEC on Form 8-K announcing the closure of the FRG Buyout (the "**FRG Buyout Closing Form 8-K**"), signed by Defendant Ahn. The FRG Buyout Closing Form 8-K stated, in relevant part:

On August 21, 2023, B. Riley Financial, Inc. (the "Company" or "B. Riley") completed a previously announced equity financing (the "Equity Investment") in connection with the acquisition (the "Acquisition") of Franchise Group, Inc., a Delaware corporation ("FRG"), by a buyer group that included members of senior management of FRG, led by Brian Kahn, FRG's Chief Executive Officer, in a financial partnership with a consortium that includes certain of Brian Kahn's affiliate entities, the Company and certain other investors. The Acquisition was completed pursuant to the terms of that certain Agreement and Plan of Merger, dated as of May 10, 2023 (the "Merger Agreement"), by and among FRG, Freedom VCM, Inc., a Delaware corporation ("Parent") and Freedom VCM Subco, Inc., a Delaware corporation and wholly-owned subsidiary of Parent ("Merger Sub"). Pursuant to the Merger Agreement, Merger Sub merged with and into FRG

(the "Merger"), with FRG surviving the Merger as a subsidiary of Parent. The Company was not a party to the Merger Agreement. ***In connection with the Acquisition, a subsidiary of the Company made a new cash Equity Investment of $216.5 million in FRG's new parent entity, bringing the Company's entire equity investment in the parent entity to approximately $280 million.***

180.    The statements identified in bold and italicized text in the preceding paragraphs were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, it was materially misleading for Defendants to discuss the equity investment and the purported total capital commitment while concealing the Company's $200.5 million PIK Loan. Moreover,  B. Riley failed to disclose that as part of the transaction, B. Riley increased its loans to Brian Kahn to $200.5 million, 36% of B. Riley's overall loan receivable balance; the Company therefore was investing a total of $480 million in the transaction. To the extent these statements are not technically untrue, they gave the false impression as to the degree and nature of the risk to which B. Riley was exposed through participating in the FRG Buyout.

181.    On August 28, 2023, B. Riley published a press release titled "B. Riley Leads Financing for Management Buyout of Franchise Group" that stated, in relevant part:

> ***B. Riley invested $216.5 million of new capital in the transaction.  Other institutional, financial and strategic investors invested approximately $280 million of additional equity capital in the new FRG alongside significant rollover equity contributions from FRG management.*** As result of the completed transaction, the management-led consortium has acquired all the outstanding and issued common and preferred stock of FRG.

182.    The statements identified in bold and italicized text in the preceding paragraphs were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, B. Riley failed to disclose that (i) as part of the transaction, B. Riley increased its loans to Brian Kahn to $200.5 million, 36% of B. Riley's overall loan receivable balance; (ii) the Company therefore was investing a total of $480 million in the transaction.  To the extent

these statements are not technically untrue, they gave the false impression as to the degree and nature of the risk to which B. Riley was exposed through participating in the FRG Buyout.

183.    On November 8, 2023, the Company hosted a conference call to discuss its financial results for the quarter ended August 31, 2023 (the "**Q3 2023 Earnings Call**"), attended by Defendants Riley, Kelleher, and Ahn.  During the prepared remarks section of the earnings call, Defendant Riley stated the following with respect to FRG:

> Before we open up the call for Q&A, I just wanted to take a few moments to address the news surrounding FRG.  It wouldn't be appropriate for us to speculate or provide commentary on the reported allegations. However, I do think it's important for us to lend context to how we view FRG as a business and our rationale for that investment.

> During the quarter, we announced our role leading the financing of FRG's $2 billion take-private transaction.  We placed a significant portion of the equity and principally invested in the deal alongside management and other co-investors.  We own a little over 30% equity interest in the private entity in connection with that transaction.   FRG is comprised of 6 distinct businesses with over 3,000 combined locations across the U.S. and Canada, including American Freight, Badcock Furniture, Buddy's Home Furnishing, Pet Supply Plus, Sylvan Learning Centers and the Vitamin Shoppe. Given our view that FRG's public valuation was below the sum of its parts, we saw a compelling opportunity to participate in its take private as do many co-investors of that deal.

> ***We invested in FRG based on the fundamental[s] of those distinct businesses***, that is we underwrote and that is what we invested in, the FRG business. And our confidence in these businesses has not waned at all. From an operational perspective, FRG is not run by any one individual. As franchise businesses, these companies are run by 6 different management teams that operate with their own infrastructures.  FRG was formed through the purchase of shares of the founder of Liberty Tax in 2018. We purchased these shares at approximately $8 per share, and we were a largest shareholder than the current management team at that time. We realized a return of over 30% IRR over the next few years on that original investment. We know these assets.

184.    The statements identified in bold and italicized text in the preceding paragraphs were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, B. Riley failed to disclose that (i) as part of the FRG transaction, B. Riley also increased its loans to Brian Kahn to $200.5 million, 36% of B. Riley's overall loan receivable balance; (ii) the Company therefore was investing a total of $480 million in the transaction.  To the extent these statements are not technically untrue, they gave the false impression as to the degree and nature of the risk to which B. Riley was exposed through participating in the FRG Buyout.

185.    On November 9, 2023, B. Riley filed Q3 2023 Form 10-Q.  The Q3 2023 Form 10-Q was signed by Ahn, and included certifications from Riley, Kelleher, and Ahn attesting that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading."  Within the Q3 2023 Form 10-Q, Defendants stated the following with respect to FRG:

**c) FRG Commitments**

***On May 10, 2023, the Company entered into certain agreements pursuant to which the Company had, among other things, agreed to provide certain equity funding and other support in connection with the acquisition*** (the "Acquisition") by Freedom VCM, Inc., a Delaware corporation (the "Parent"), of FRG. The Company entered into an Equity Commitment Letter with Freedom VCM ("TopCo"), the parent company of the Parent, and the Parent, pursuant to which the Company agreed to provide to TopCo, at or prior to the closing of the Acquisition, an amount equal to up to $560,000 in equity financing. The Company and FRG also entered into a Limited Guarantee in favor of FRG, pursuant to which the Company agreed to guarantee to FRG the due and punctual payment, performance and discharge when required by Parent or its subsidiary to FRG of certain liabilities and obligations of the Parent or such subsidiary. On August 21, 2023, in connection with the completion of the Acquisition and the Company's portion of the equity financing, the Company's obligations pursuant to the Equity Commitment Letter and Limited Guarantee were satisfied.

***(d) Other Commitments***

AMENDED CLASS ACTION COMPLAINT:  Case No. 3:24-CV-00662-SPG-AJR

In the normal course of business, the Company enters into commitments to its clients in connection with capital raising transactions, such as firm commitment underwritings, equity lines of credit, *or other commitments to provide financing on specified terms and conditions*. These commitments require the Company to purchase securities at a specified price or otherwise provide debt or equity financing on specified terms. Securities underwriting exposes the Company to market and credit risk, primarily in the event that, for any reason, securities purchased by the Company cannot be distributed at the anticipated price and to balance sheet risk in the event that debt or equity financing commitments cannot be syndicated. With respect to one of the Company's investments, a wholly owned subsidiary of the Company entered into an agreement whereby the subsidiary may be required, commencing in August 2027 and expiring in August 2028, to purchase additional equity capital at fair value which was originally valued at $15,000.

186.    The statements identified in bold and italicized text in the preceding paragraphs were false and/or materially misleading when made, or omitted to state material facts necessary to make them not misleading, because: (i) as detailed more fully above, B. Riley failed to disclose that as part of the FRG transaction, B. Riley also increased its loans to Brian Kahn to $200.5 million, which, as a result, made Defendants' statements about "certain equity funding and other support" materially misleading because it was not just equity funding, but debt and equity funding, and to call a loan that comprised 36% of the Company's then receivables balance "other support" was materially misleading; and (ii) because John Hughes pled guilty on November 2, 2023, and (iii) because B. Riley's collateral of the loan was backed by shares in FRG that might be subject to forfeiture, Defendants either knew or were deliberately reckless in not knowing that the collateral backing B. Riley's then undisclosed loan also presented a material risk to the Company's balance sheet.  To the extent these statements are not technically untrue, they gave the false impression as to the degree and nature of the risk to which B. Riley was exposed through participating in the FRG Buyout.

187.    On December 13, 2023, B. Riley hosted an Analyst and Investor Day. On page 73 of a presentation made during the Analyst and Investor Day, it provided its underwriting sum of the parts analysis for the FRG transaction. In that analysis,

AMENDED CLASS ACTION COMPLAINT:  Case No. 3:24-CV-00662-SPG-AJR

Defendants represented that Badcock had an implied *Enterprise Value of $390 million*. While the footnote on the slide stated that the valuation was "as of July 2023" and that "projections for individual business units may have changed over time, B. Riley *continues to believe that the overall enterprise values in the chart are reasonable estimates*."

188.   The statements identified in bold and italicized text in the preceding paragraphs were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, just five days later, B. Riley extended a $108 million loan to Conn's to purchase Badcock for just $70 million, an 82% decrease in just five days. Given B. Riley's involvement with that transaction, Defendants likely knew or were deliberately reckless in not knowing that $390 million did not represent a reasonable estimate for Badcock's enterprise value.

### B.   Concentration of Risk

189.   On February 22, 2023, the Company hosted a conference call with investors and analysts to discuss B. Riley's financial results for the quarter ended December 31, 2023 (the "**Q4 2022 Earnings Call**"), attended by Defendants Riley, Kelleher, and Ahn. During the Q4 2022 earnings call, analysts asked about the Company's loan portfolio and Riley and Ahn said the average loan value was roughly $32 million and gave no indication of any concentration risk:

> UNIDENTIFIED ANALYST: Great.  Yes, super helpful. And then looking at the loans receivable for the end of the year, $700 million.  Can you just break down a little bit, you or Phil, break down a little bit, kind of what's in there.  We've got Badcock, and we got Babcock. Can you kind of get through those? And then any other big ones?
>
> BRYANT RICHARD RILEY: So Phil, I think you break it up between Badcock and—and I think there's some notable ones that are out there. Some of our loans are related to—*we'll provide margin services for customers with large share amount.* It's kind of all over the place.  So obviously, I wouldn't mention those people by name.  But we have loans all over.  And *the average loan is $32 million.  Is it $32 million? Is that what we said, Phil?*

PHILLIP AHN: *Yes. Excluding Badcock, average fair value per name is roughly $32 million.*

BRYANT RICHARD RILEY: Across 13 names.  And the duration of those should be less than a year.  *They should be 3 to 6 months*.  Our goal is to provide a bridge loan and help a client out and let them get to a more—a lender that's going to be longer term, doesn't have the same kind of capital returns that we would require. But we're helping them get a deal done.

190.   The statements identified in bold and italicized text in the preceding paragraph were false and/or materially misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above: (i) at the time of the above statement, Kahn and his affiliates had already been extended material undisclosed related-party loans, so it was materially misleading for Riley to discuss margin services for customers without mentioning Kahn; (ii) it was separately misleading because Riley suggested an average loan size of $32 million, which was a misleading data point in light of the size of the undisclosed loans extended to Kahn; and (iii) Riley stated that the loans in B. Riley's principal transactions "should be [extended for] 3 to 6 months", which was materially misleading because UCC filings establish that B. Riley had been extending loans to Kahn since 2019.  To the extent these statements are not technically untrue, they gave the false impression that B. Riley's portfolio was not dangerously concentrated.

191.   On February 28, 2023, B. Riley filed an annual report with the SEC on Form 10-K for the year ended December 31, 2022 (the "**2022 Form 10-K**"). The 2022 Form 10-K was signed by Defendants Ahn, Riley, and Kelleher and included certifications by Riley, Kelleher, and Ahn in which they represented that they "reviewed this quarterly report" and "[b]ased on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."  In the 2022 Form 10-K, B. Riley represented the following with respect to its concentration risk:

AMENDED CLASS ACTION COMPLAINT:  Case No. 3:24-CV-00662-SPG-AJR

**(f) Concentration of Risk**

Revenues in the Capital Markets, Financial Consulting, Wealth Management, and Communications segments are primarily generated in the United States. Revenues in the Auction and Liquidation segment and Consumer segment are primarily generated in the United States, Australia, Canada, and Europe.

The Company maintains cash in various federally insured banking institutions. The account balances at each institution periodically exceed the Federal Deposit Insurance Corporation's ("FDIC") insurance coverage, and as a result, there is a concentration of credit risk related to amounts in excess of FDIC insurance coverage. The Company has not experienced any losses in such accounts. The Company also has substantial cash balances from proceeds received from auctions and liquidation engagements that are distributed to parties in accordance with the collaborative arrangements.

The Company's activities in the Auction and Liquidation segment are executed frequently with, and on behalf of, distressed customers and secured creditors. Concentrations of credit risk can be affected by changes in economic, industry, or geographical factors. ***The Company seeks to control its credit risk and potential risk concentration through risk management activities that limit the Company's exposure to losses on any one specific liquidation services contract or concentration within any one specific industry***. To mitigate the exposure to losses on any one specific liquidations services contract, ***the Company sometimes conducts operations with third parties through collaborative arrangements***.

192.   The same, or substantially similar, statements as those quoted in the paragraph above were made in the quarterly report for the quarter ended March 31, 2023, filed with the SEC on Form 10-Q on May 8, 2023 (the "**Q1 2023 Form 10-Q**"); the Q2 2023 Form 10-Q; the Q3 2023 Form 10-Q; and the 2023 Form 10-K. The Q1 2023 Form 10-Q was signed by Defendant Ahn and included the certifications above from Riley, Kelleher, and Ahn. The 2023 Form 10-K was signed by Defendants Riley, Kelleher, and Ahn and included the certifications above from Riley, Kelleher, and Ahn.

193.   The statements identified in bold and italicized text in the preceding paragraph were false and/or materially misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above the Company's material undisclosed risk of being highly concentrated in transactions with

Brian Kahn and his affiliated entities as eventually admitted in the Company's 2023 10-K. Subsequent to B. Riley's admission of the existence of the $200.5 million loan, the Company warned the market of significant concentration of risk represented by the size of the loan. As described more fully above (¶ 145), the 2023 Form 10-K noted the Company was "subject to risks as a result of the concentration of investments in Freedom VCM" given the 31% equity ownership, $200.5 million loan, and the Freedom Receivables Note, as well as the "current and future claims, demands, and legal proceedings arising out of the FRG take-private transaction itself and for Mr. Kahn's ownership of and involvement with Freedom VCM and FRG." These risks, the Company conceded, "may be material." To the extent these statements are not technically untrue, they gave the false impression that B. Riley's portfolio was not dangerously concentrated.

194. For instance, on May 4, 2023, within the Company's Q1 2023, investor supplement, it reported that its $475.2 million loan receivables portfolio was spread across 24 loans and 14 companies and during a conference call to discuss financial results for the quarter ended March 31, 2023. Moreover, on the same day, the Company held an earnings call (the "**Q1 2023 Earnings Call**"). During the Q1 2023 Earnings Call, Bryant Riley s misleadingly described the Company's loan portfolio:

> In contrast, our **loan book is benefiting from stressed environment** for lenders and create a multitude of opportunities for us. As it relates to our balance sheet over the last 1.5 years, we have shifted a meaningful amount of our investments into our loan book, and we believe that this is not only opportunistic but also benefits our clients in a number of ways.

> A recent example of this strategy is Hero Health. We provided Hero with $60 million in debt financing in January to support an acquisition and previously helped the company raise $65 million as lead bat book letter and its equity and not its offering in December. This fully backstop commitment of $125 million helped to finance this acquisition, and our loan was repaid in full in March. This is just one example of how we've utilized our balance sheet to partner with our clients and enable their continued success.

> As we mentioned last quarter, we are providing a little more detail on our loan portfolio, which you will see in our quarterly supplement. At the end of 2022 *we had 12 companies in our loan portfolio, which was fair valued*

*at approximately $380 million.*  This excludes our [B]adcock Furniture receivables portfolio and a few smaller loans at less than $1 million at fair value.

Since year-end, 2 of those 12 positions were closed out and repaid in full. We invested an additional $112 million across 5 new loans during the quarter, of which $65 million was repaid within the quarter. *At quarter end, our loan portfolio was valued at approximately $448 million across 14 companies with an average loan size of approximately $34 million*.

195.  The statements identified in bold and italicized text in the preceding paragraph were false and/or materially misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above: (i) the portion of B. Riley's loan book extended to Kahn was not benefitting from a stressed environment, but, to the contrary, was increasingly deteriorating by May 4, 2023; (ii) it was materially misleading to fail to disclose the related party transactions with Kahn once Riley spoke on the topic of B. Riley's loan portfolio; (iii) it was materially misleading for Riley to speak on the topic of the average loan size of $34 million without also disclosing that the loans to Kahn were significantly greater than that average – by multiples.  To the extent these statements are not technically untrue, they gave the false impression that B. Riley's portfolio was not dangerously concentrated.

### C.  Correlation of Investments

196.  Throughout the Class Period, Defendants misleadingly touted B. Riley's principal investments, such as its loan portfolio, as being non-correlated.  For example, on February 23, 2022, B. Riley filed a current report with the SEC on Form 8-K announcing its financial results for the quarter and year ended December 31, 2021 (the "**Q4 2021 Form 8-K**").  The Q4 2021 Form 8-K was signed by Defendant Ahn and attached a press release issued by B. Riley as Exhibit 99.1, which included a statement from B. Riley in which he said the following:

When we took the business public in 2014 our business was highly correlated to two cyclical businesses, brokerage and liquidation.  Since that time, we have taken aggressive steps to diversify the cash flow profile of our company by adding several ***non-correlated*** companies such as our communications,

brands and financial consulting businesses in addition to our recent accounts receivables portfolio. In addition, ***the credit and current income portion of our investment portfolio provides approximately $85 million of interest and dividend income. Combined, our non-cyclical businesses*** and assets provide enough cash flow to cover the vast majority of our annual operating expenses, interest and dividend. Clearly, we expect strong profits from B. Riley Securities this year and every year. As a reminder, that business has generated a majority of our capital markets operating segment income in each of the last three years. However, we believe our diversification is a competitive advantage and will enable us to invest when others may need to contract.

197.    In essence, Riley was saying B. Riley's portfolio was "non-correlated" and "non-cyclical", and that was a competitive advantage because such purportedly non-cyclical businesses would provide earnings during downturns, enabling B. Riley to expand while "others may contract." But the statements identified in bold and italicized text in the preceding paragraph were false and/or materially misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above: (i) B. Riley's credit portfolio was correlated, both with the market as well with each investment within that portfolio; (ii) it was materially misleading for Defendants to tout their purportedly non-correlated portfolio as a competitive advantage, when the true effect of said portfolio was to increase the Company's risk, not reduce it; and (iii) as discussed more fully below, B. Riley's cash flow profile was correlated with to the markets and, in truth, exudes significant correlation with small cap-issuance activity (as Bryant Riley would later admit on December 13, 2023), which is itself correlated with the market. To the extent these statements are not technically untrue, they gave the false impression that B. Riley's portfolio was not dangerously correlated.

198.    During the Company's year-end 2021 earnings call held on February 23, 2022 (the "**Q4 2021 Earnings Call**"), Bryant Riley attributed in part the Company's purported "minimum correlation to the markets" to "confidently return $4 of dividends to shareholders every year." His full statement reads as follows:

In summary, when I think about the earnings profile of B. Riley Financial, I believe we have strong recurring cash flow *with minimum correlation to the markets* that allows us to confidently return $4 of dividends to shareholders every year, plus a brokerage business that will provide strong cash flow more correlated with the general markets. This was a key factor in our delivering $10 in total dividends to our common shareholders for 2021.

199.    Accordingly, by citing "minimum correlation to the markets" as contributing to the "key factor" in delivering $10 per share in total dividends during 2021, Defendant Riley tacitly acknowledged that whether B. Riley's business was correlated with the market was a highly material term.  As was B. Riley's dividend, which was purportedly fueled in part by Defendants' supposedly non-correlated business. At B. Riley's Investment Day on December 13, 2023, when asked about B. Riley's dividend policy, Bryant Riley stated "So we have paid a dividend, I think, since 2015.  It's really important to us. It's important to all of our employees, and it's important to our shareholders." The statements identified in bold and italicized text in the preceding paragraph were false and/or materially misleading when made, or omitted to state material facts necessary to make them not misleading, because, in truth B. Riley's cash flows did not have minimum correlation to the markets and, in truth, exude significant correlation with small cap-issuance activity (as Byrant Riley would later admit on December 13, 2023), which is itself correlated with the market.   To the extent these statements are not technically untrue, they gave the false impression that B. Riley's portfolio was not dangerously correlated.

200.    On February 22, 2023, B. Riley filed a current report on Form 8-K with the SEC reporting its results for the quarter and year ended December 31, 2022 (the "**Q4 2022 Form 8-K**") results. The Q4 2022 Form 8-K was signed by Defendant Ahn.  Attached as Exhibit 99.1 to the Q4 2022 Form 8-K was a press release issued by B. Riley discussing its financial results.  At the top of the press release, six bullet points appeared prominently, the sixth of which read "Completed multiple acquisitions during 2022, which are expected to enhance *uncorrelated revenues* and cash flow in 2023 and beyond."

201.    The statements identified in bold and italicized text in the preceding paragraph were false and/or materially misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above: B. Riley's revenues were correlated to the markets and, in truth, exude significant correlation with small cap-issuance activity (as Byrant Riley would later admit on December 13, 2023), which is itself correlated with the market.  To the extent these statements are not technically untrue, they gave the false impression that B. Riley's portfolio was not dangerously correlated.

202.    On February 28, 2023, B. Riley filed the 2022 Form 10-K. The 2022 Form 10-K stated, in relevant part:

> B. Riley Financial, Inc. (Nasdaq: RILY) (the "Company") is a diversified financial services platform that delivers tailored solutions to meet the strategic, operational, and capital needs of its clients and partners. We operate through several consolidated subsidiaries (collectively, "B. Riley") that provide investment banking, brokerage, wealth management, asset management, direct lending, business advisory, valuation, and asset disposition services to a broad client base spanning public and private companies, financial sponsors, investors, financial institutions, legal and professional services firms, and individuals.

> The Company opportunistically ***invests in and acquires companies or assets with attractive risk-adjusted return profiles*** to benefit our shareholders. We own and operate ***several uncorrelated consumer businesses and invest in brands on a principal basis***. Our approach is focused on high quality companies and assets in industries in which we have extensive knowledge and can benefit from our experience to make operational improvements and maximize free cash flow. Our principal investments often leverage the financial, restructuring, and operational expertise of our professionals who work collaboratively across disciplines.

203.    The same, or substantially similar, statements as those quoted in the paragraph above were made in the Q1 2023 Form 10-Q; a prospectus supplement filed with the SEC on Form 424B5 on July 27, 2023, signed by Defendant Ahn (the "2023 Prospectus Supplement"); the Q2 2023 Form 10-Q; the Q3 2023 Form 10-Q; the 2023 Form 10-K; and the quarterly report on Form 10-Q for the quarter ended March 31, 2024,

filed with the SEC on May 15, 2024 (the "Q1 2024 Form 10-Q"), signed by Defendant Ahn and included certifications from Riley, Kelleher, and Ahn.

204. The statements identified in bold and italicized text in the preceding paragraphs were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above: (i) B. Riley's principal investments were highly correlated, both with the market, and with one another; (ii) B. Riley's undisclosed related-party loans to the Kahn-related entities were in to similar businesses and were thus exposed to, and correlated with, a weakening consumer as shown by the close in time implosions of FRG and Conn's and thus not uncorrelated; (iii) Defendants failed to disclose that the Company had extended millions of dollars of loans to Brian Kahn and his affiliates; and (iv) the Company had also extended millions of loans to FRG, which was operated by Brian Kahn. Thus, far from being "risk-adjusted," B. Riley's portfolio was highly concentrated, comprised of correlated assets, and heavily exposed to Kahn and his affiliates, thus making it not "risk-adjusted." In truth, B. Riley's cash flow profile was correlated with to the markets and, in truth, exudes significant correlation with small cap-issuance activity (as Byrant Riley would later admit on December 13, 2023), which is itself correlated with the market.

205. Defendants' statements about purportedly being non-correlated continued. On February 28, 2023, when the Company filed its Form 10-K for the period ending December 31, 2022, Defendants represented that "The Company opportunistically invests in and acquires companies or assets with ***attractive risk-adjusted return profiles*** to benefit our shareholders. We own and operate several ***uncorrelated consumer businesses and invest in brands on a principal basis***."

206. The statements identified in bold and italicized text in the preceding paragraph were false and/or materially misleading when made because (i) to the extent that B. Riley's principal investments were uncorrelated with the market, that was only because they performed so much worse; and (ii) the investments were correlated, and this is true for both B. Riley's investments in non-Kahn related securities, and in Kahn related

loans – none of which was disclosed; and (iii) B. Riley's cash flow profile was correlated with to the markets and, in truth, exudes significant correlation with small cap-issuance activity (as Byrant Riley would later admit on December 13, 2023), which is itself correlated with the market.

### D.    Customer Due Diligence

207.    Since at least the start of the Class Period, and throughout the Class Period, the B. Riley website maintained a page titled "Disclosures." Throughout the Class Period, the section titled "Anti-Money Laundering (AML) And Customer Identification Program (CIP)" stated, in relevant part:

> In accordance with the regulations set forth by the USA PATRIOT Act, the Bank Secrecy Act (BSA) and the rules of the Office of Foreign Assets Control (OFAC), the Financial Crimes Enforcement Network (FinCEN), the U.S. Securities Exchange Commission (SEC) and the Financial Industry Regulatory Authority (FINRA), **B. Riley Securities has in place a program to identify and report suspicious activities that could be related to** money laundering or **other illegal activities and to monitor and verify the identities of our customers.** What this means for you: When you open an account, we may ask for your corporate formation documents or other information that will allow us to positively identify you/your entity. We may also ask to see your driver's license or other identifying documents. B. Riley Securities reserves the right to refuse to open any account, or close an existing account, at any time if information requested pursuant to an AML inquiry is refused.

208.    The statements identified in bold and italicized text in the preceding paragraphs were materially misleading when made, or omitted to state material facts necessary to make them not misleading because, as detailed more fully above, B. Riley either had no such procedures in place or failed to use them to detect what could have been discovered by even a cursory level of due diligence with respect to Brian Kahn, who was involved in litigation and arbitration by April 2020. To the extent the statements in the preceding paragraph were not literally untrue, they gave the false impression that B. Riley would not selectively choose to abandon these procedures in certain cases.

209.   On November 8, 2023, B. Riley held the Q3 2023 Earnings Call.  During prepared opening remarks, Defendant Riley stated, in relevant part:

> We invested in FRG based on the fundamental of those distinct businesses, *that is we underwrote and that is what we invested in*, the FRG business. And our confidence in these businesses has not waned at all.

210.   The statements identified in bold and italicized text in the preceding paragraphs were false and misleading when made, or omitted to state material facts necessary to make them not misleading because, as detailed more fully above, B. Riley failed to perform sufficient due diligence on Brian Kahn despite public information documenting his history of fraud, which created a material risk in extending him loans or investing in a business he operated as CEO.

**E.    Risks Posed by Kahn**

211.   On November 8, 2023, B. Riley held the Q3 2023 Earnings Call. During this call, Defendant Riley stated, in relevant part:

> And we, over time, determine that the better path was to allow shareholders that were involved in Franchise Group, many of which rolled as well as management, many of which purchased in the deal to participate.  So there should be no confusion where that is.  And I know that, today, a statement came out from Brian denying any involvement in what happened with Prophecy, *and that's good enough for me.*

212.   The statements identified in bold and italicized text in the preceding paragraphs were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, Bryant Riley failed to disclose that he approved the initiation of an investigation into Brian Kahn as a result of the allegations relating to his involvement in the PAM fraud in his capacity as a board member of FRG on or before that same day.

**F.  Defendants GAAP Violations and SOX Certifications**

213.   On May 8, 2023, the Company filed the Q1 2023 Form 10-Q, which stated, in relevant part, that "[t]he condensed consolidated financial statements include the accounts of B. Riley Financial, Inc. and its wholly owned and majority-owned

subsidiaries and ***have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP")***."

214.    The same, or substantially similar, statements as those quoted in the paragraph above were made in Q2 2023 Form 10-Q, and Q3 2023 Form 10-Q.

215.    The statements in the preceding paragraphs were false and/or misleading and/or omitted to state material facts necessary to make them not misleading, because the financials reported therein violated GAAP, specifically for (i) failing to disclose the FRG and Kahn Loans, which were related party transactions and thus were required to be disclosed as such under GAAP; and (2) failing to disclose the Company's concentration risk with respect to FRG and/or Kahn and/or Vintage. See § V.H below, for additional detail on how Defendants violated GAAP. Subsequent to B. Riley's admission of the existence of the $200.5 million loan, the Company warned the market of significant concentration of risk represented by the size of the loan.  As described more fully above (¶ 145), the 2023 Form 10-K noted the Company was "subject to risks as a result of the concentration of investments in Freedom VCM" given the 31% equity ownership, $200.5 million loan, and the Freedom Receivables Note, as well as the "current and future claims, demands, and legal proceedings arising out of the FRG take-private transaction itself and for Mr. Kahn's ownership of and involvement with Freedom VCM and FRG."  These risks, the Company conceded, "may be material."  B. Riley described these risks again in the Q1 2024 Form 10-Q.

## VII.    THE TRUTH EMERGES IN A SERIES OF PARTIAL DISCLOSURES

216.    As explained below, investors learned through a series of partial disclosures and/or materializations of concealed risks about Defendants' false statements.  Each of these disclosures revealed, for the first time, new facts about Defendants' fraud that were previously unknown by the market.  Investors had been in the dark about these facts and, thus, as the news was released and investors were able to consider the ramifications for B. Riley, the price of B. Riley's stock and bonds dropped precipitously, thereby damaging investors of B. Riley's securities.

217.    As detailed more fully above (¶ 124), after market close on November 3, 2023, the investment community identified Kahn as the unindicted coconspirator referenced in the Information and SEC Complaint against Hughes arising from the fraud at PAM and its implications for B. Riley. As the investment community absorbed this news, B. Riley stock fell $9.02, or 21.7%, to close at $32.54 on November 6, 2023, the next trading day, on volume that was five times higher than usual.  On the same day, the publicly traded bond issue RILYT fell $0.16 to close at $19.64.  The next trading day, November 6, 2023, RILYT fell a further $1.77 to close at $17.87.  The sudden drop was tied directly to Kahn's involvement in the fraud at PAM.  For example, *Seeking Alpha* reported that "B. Riley shares dropped 22% on Monday following a report Thursday that Kahn was affiliated with Prophecy Asset Management," and, as such, "the head of one of its [B. Riley's] companies may be facing fraud allegations."

218.    As detailed more fully above (¶ 128), before the start of trading on November 8, 2023, B. Riley made several disclosures which revealed that the Company reported a $76 million net loss due to decreases in the value of its investments and Bryant Riley expressed unwavering support for Kahn without the results of a complete investigation into the matter.  On this news, B. Riley's stock sank from $34.78 at the close of trading on November 7, 2023, to $30.57 as of the close of trading on November 8, 2023, a drop of over 12%, on unusually heavy volume.  *Reuters* reported on November 14, 2023, that B. Riley's recent stock decline was triggered by the disclosure that it was "forced to mark down the value of its equities portfolio resulting in a net loss of $75.8 million in the third quarter, compared to a profit of $45.8 million a year earlier."  Similarly, *Seeking Alpha* published an article on November 8, 2023, aptly titled "B. Riley CEO defends buying Franchise Group amid possible fraud allegations; shares plummet."

219.    As detailed more fully above (¶ 131), at approximately the close of trading on November 10, 2023, S&P downgraded its rating for FRG further into "junk" status based on its poor quarterly financial results as well the fraud charges leveled against its CEO, Brian Kahn.  On this news, B. Riley shares lost over 14% of their value, declining

AMENDED CLASS ACTION COMPLAINT:  Case No. 3:24-CV-00662-SPG-AJR

from $25.60 at the close of trading on November 10, 2023, to $22.01 on November 13, 2023, the next trading day, on extremely high volume. On the same day, the publicly traded bond issue RILYT fell $1.01 to close at $17.92. The next trading day, November 13, 2023, RILYT fell a further $3.06 to close at $14.86. Many linked the decline to S&P's recent action. For instance, *Bloomberg* published a story titled "B. Riley Shares Drop Most Since 2020 After S&P Downgrades FRG." The story specifically noted that "the ratings firm also touched on the links between FRG Chief Executive Officer Brian Kahn and Prophet Asset Management." Industry publication *Investment News* also reported that "S&P . . . said it was monitoring legal developments relating to Franchise Group's Kahn" and observed that the stock has declined 36% since the announcement.

220. On November 21, 2023, a notice was posted to the docket in the DOJ's criminal case against Hughes stating that a copy of the transcript of the plea hearing from November 2, 2023, was available for purchase from the court reporter. After purchasing and receiving a copy, The Friendly Bear posted an excerpt of the transcript to X before the close of trading on November 27, 2023, which showed that Hughes was continuing to cooperate with the DOJ's investigation. The post was "retweeted" some 23 times and has been viewed 58 thousand times. As this news spread through the investment community, B. Riley shares dropped over 8% on heavy volume from $20.95 at the close of trading on the previous trading day to $19.17 at the close of trading on November 27, 2023. On the same day, the publicly traded bond issue RILYT fell $0.74 to close at $16.22. The next day, November 28, 2023, RILYT fell a further $0.42 to close at $15.80.

221. As detailed more fully above (¶ 134), soon after the start of trading on December 13, 2023, B. Riley revealed, for the first time, that (i) it had a $200.5 million PIK loan to VCM secured primarily by shares of FRG owned by Kahn in **addition** to its $281 equity investment in FRG; and (ii) most of B. Riley's business *was* in fact correlated. The investment community was shocked by this news. User @AurelisValue, a well-known investor with a large following on X tweeted that B. Riley "Admits to making a massive $200 million previously undisclosed loan to Vintage" and "has more than $500

million of balance sheet exposure to Kahn and his companies." The Friendly Bear responded to @AureleisValue's post the same day, saying "RILY for the first time discloses that they have over a $200MM loan to Brian Kahn on top of $280MM in FRG. ***This was highly material and undisclosed***." An anonymous X User responded to AureilsValue saying "Seems like a material exposure that should have been disclosed." As one market participant later told *Institutional Investor*, "I fell out of my chair" when Riley put up the slide showing that it had a $200 million loan to Kahn. Similarly, the second admission establishes that B. Riley's loan portfolio was not invested in non-correlated or countercyclical business, as intimated by his February 2022 representation that B. Riley's portfolio would enable it to grow while others contract and conflicts with his early February 23, 2022 description when it was supposedly the Company's "credit and current income portion of our investment portfolio" that supposedly contributed to the approximately $85 million of non-correlated revenue. On all this news, B. Riley shares tumbled from $22.99 at the close of trading on December 12, 2023, to close at $21.60 on December 13, 2023. The share price continued to sink to $20.44 on December 14, 2023, for an aggregate decline of more than 11%. Also on December 13, 2023, the publicly traded bond issue RILYT fell $0.72 to close at $16.71. The next day, December 14, 2023, RILYT fell a further $0.78 to close at $15.93. *Bloomberg* reported that B. Riley shares dropped by as much as 18% during intraday trading in response to the presentation. Investor Hammerstone Markets posted to X.com confirming that "shares moved sharply lower after the co. [B. Riley] disclosed that they had loaned $200M to a possible co-conspirator in a fraud case, Brian Kahn." That same user said: "While B. Riley's $280M investment in Kahn's investment in Kahn's mgt led buyout of Franchise Group was known, this loan to Kahn was an investor day surprise."

222.    As detailed more fully above (¶¶ 139-140), news reports emerged between the close of trading on Friday, January 19, 2024, and Monday, January 22, 2024, revealing that the SEC was investigating B. Riley's ties to Kahn and that Kahn resigned as CEO of FRG as regulators continued to investigate his involvement in the PAM fraud. Over that

weekend, market participants discussed the revelations on X. For example, one user, @maniapurpledr1, tweeted in response to the Bloomberg story "That's devastating for $rily which has huge exposure to $frg and kahn." On this news, B. Riley stock fell from $20.18 at the close of trading on January 19, 2024, to close at $19.68 on January 22, 2024. On the same day, the publicly traded bond issue RILYT fell $0.99 to close at $15.52. The next day, January 23, 2024, RILYT fell a further $0.26, or 1.68%, to close at $15.26. According to *Reuters*, shares dropped 11% to $17.92 in premarket trading on January 22, 2024 in response to this news that the SEC was investigating B. Riley. *Bloomberg* later reported that shares continued the decline during intraday trading "as the US Securities & Exchange Commission is said to be probing the company's deals with a key client who was linked to a securities fraud." *Seeking Alpha* published another article later that day titled "B. Riley falls on report Franchise Group CEO Brian Kahn steps down."

223. As detailed more fully above (¶ 142), a user on X posted a copy of a UCC financing statement mid-day on February 15, 2024, showing that a PAM Fund had a lien on the FRG shares owned by a VCM affiliate. The post was "retweeted" over a dozen times. As this news spread through the investment community, B. Riley shares dropped over 7.5% on heavy volume to close at $17.68 on February 15, 2024. On the same day, the publicly traded bond issue RILYT fell $1.10 to close at $14.37. The next day, February 16, 2024, RILYT fell a further $0.45, or 3.11%, to close at $13.92.

224. As detailed more fully above (¶ 143143), an image of a letter from a settlement trustee explaining that it provided notice to Kahn that he was in default under various agreements to turn over FRG shares and cash began circulating on X and in investment reports on February 17, 2024. On this news, B. Riley stock fell by more than 7.8% to close at $16.00 on February 20, 2024, the next trading day. On the same day, the publicly traded bond issue RILYT fell $1.02 to close at $12.90. The next day, February 21, 2024, RILYT fell a further $1.00 to close at $11.90.

225. As detailed more fully above (¶144), after the close of trading on February 29, 2024, B. Riley issued press releases which revealed that it reported larger losses than

expected, halved its divided, was unable to file its Form 10-K by the required deadline, and it hired a firm to assess strategic alternatives for its asset disposition business. On this news, B. Riley stock fell from $18.33 at the close of trading on February 29, 2024, to close at $16.85 on March 1, 2024. On the same day, the publicly traded bond issue RILYT fell $0.87 to close at $13.80. In a story titled "B. Riley Posts Loss, Cuts Payout Amid Review of Kahn's Role," *Bloomberg* reported that shares were down by 15% in late trading in response to these disclosures. It provided another update the following morning: "B Riley Financial shares sink 12% in premarket trading after the firm reported an adjusted ebitda loss for the fourth quarter . . . and cut its quarterly dividend in half."

226. As detailed more fully above (¶ 148), during intraday trading on July 24, 2024, S&P downgraded the credit rating for privately held FRG once again after Conn's filed for bankruptcy protection. The *Wall Street Journal* noted the bankruptcy would have "implications for investment bank B. Riley" based on its remaining $93 million second-lien loan and its investment in FRG. Like the previous S&P downgrade to FRG's credit rating (¶ 219), on this news, B. Riley's stock fell more than 9% from $17.55 at the close of trading on July 23, 2024, to $15.94 at the close of trading on July 24, 2024. On the same day, the publicly traded bond issue RILYT fell $0.19 to close at $16.93.

227. As detailed more fully above (¶¶ 150-151), B. Riley disclosed on the morning of August 12, 2024, that it planned to report a massive net loss for the most recent quarter due to a $370 million markdown on its various principal investments in FRG, including its loan to VCM, suspend the dividend on B. Riley's common stock, and that the Company would be unable to timely file its quarterly report on Form 10-Q, and Bryant Riley confirmed for the first time that B. Riley was the subject of an ongoing investigation by the SEC and had received subpoenas in July 2024. This news stunned investors. B. Riley's stock fell by ***over 51%***, dropping from $16.95 on the previous trading day to close at $8.15 on August 12, 2024, on extremely high volume. On the same day, the publicly traded bond issue RILYT fell $6.04 to close at $10.23. The next day, August 13, 2024, RILYT fell a further $0.68 to close at $9.55. As the *New York Post* reported

later that day, the SEC investigation, dividend cut, and losses "sen[t] its stock tumbling more than 50%." Similarly, *Bloomberg* ran a story titled "B. Riley Plunges on Dividend Suspension, Wider Probe." The losses resulting from this news extended through August 13, 2024, with the stock sinking to $7.22 by the close of trading.

228. As detailed more fully above (¶ 158), on the morning of November 4, 2024, B. Riley filed a current report on Form 8-K with the SEC in which it disclosed that the Company determined that it was necessary to write down approximately $120 million, the remaining value of its investments in Freedom VCM Topco, as a result of FRG's bankruptcy. That morning, *Seeking Alpha* wrote, "B. Riley Financial (NASDAQ:RILY) plunged 25% in premarket trade as it said it expects a non-cash impairment of ~ $120 million in the aggregate." *Reuters* also published an article titled "B. Riley slumps on warning of bigger hit from Franchise Group bankruptcy," noting the "shares plunged nearly 13% in afternoon trading." *Benzinga* also covered the write-down in an article titled "B. Riley Shares Are Moving Lower Monday: What's Going On?" Bloomberg News covered FRG's by reporting "B. Riley's shareholders are feeling the effects too after the firm said it will take a $120 million impairment on its exposure to FRG . . . . Shares tumbled almost 14%." On this news, B. Riley fell 13.68% from $5.70 at the close of trading on November 1, 2024, the previous trading day, to $4.92 at the close of trading on November 4, 2024. On the same day, the publicly traded bond issue RILYT fell $1.53 to close at $9.94.

## VIII. <u>ADDITIONAL FACTS PROBATIVE OF SCIENTER</u>

229. The Individual Defendants acted with scienter because at the time they issued public documents and other statements in B. Riley's name, they knew, or with extreme recklessness disregarded the fact that such statements were materially false and misleading or omitted material facts. The Individual Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and

recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

230. A holistic examination of the facts and circumstances, including those set forth above and below, collectively supports a strong inference that throughout the Class Period, Defendants knew or, at a minimum, recklessly disregarded, that their statements were materially false and misleading.

### A. Bryant Riley's Admitted Knowledge of B. Riley's Transactions with Brian Kahn And His Close Personal Relationship with Kahn Support Scienter

231. Bryant Riley had personal knowledge that B. Riley engaged in lending to Brian Kahn and/or VCM and its affiliated entities for many years.

232. Not only were Bryant Riley and Kahn friends for decades, on February 11, 2019, Bryant Riley testified under oath during the Delaware Chancery proceedings in the Rent-A-Center lawsuit. The following exchange occurred during direct examination:

Question: And has B. Riley Financial also made loans to Vintage entities?
Bryant Riley: We have.
Question: And why have you done that?
Bryant Riley: They were good credits and backed by great collateral.

233. Thus, under oath, Bryant Riley demonstrated knowledge that B. Riley was lending to VCM entities and did so based on an understanding of its purported collateral.

234. Given that testimony, and the pair's close friendship, it defies credulity that Bryant Riley would be unaware that Kahn was being sued for securities fraud stemming from Kahn's involvement at PAM.

235. As provided above (¶¶ 54-59), Bryant Riley had a close relationship with Brian Kahn dating back to the early days of their working careers. Bryant Riley met Kahn when he had just started Riley's business in 1998. From then on, B. Riley was closely involved with many of Kahn's biggest deals throughout the years: Liberty Tax in 2018; Buddy's Newco; Sears Outlet; Vitamin Shoppe; and American Freight in 2019; PSP;

Sylvan; Badcock in 2021 and Badcock again in 2023 in connection with the Conn's transaction.

236.    Unsurprisingly, both Riley and Kahn have openly acknowledged their longstanding business relationship.  For example, in a press release from June 18, 2018, Riley stated "[w]e have worked with the Vintage Capital team for over two decades and have seen firsthand their experience in the space."  In that same press release, Kahn was quoted as saying, "Having worked with the B. Riley team on multiple deals, I have a great deal of respect for their willingness to think differently to get deals done."

237.    CW2 validated the close nature of the relationship, describing Kahn as part of the B. Riley family, stating that everyone at the firm knew Kahn was one of Bryant Riley's go-to partners and a significant source of B. Riley's business.  "He was a longtime client and friend," CW2.  When CW2 asked who he was, Bryant Riley responded, "he's a friend of the company."

238.    Given this close relationship, the two remained in close communication.  During the Rent-A-Center Trial, Brian Kahn testified under oath that he "exchanged texts with B.R. frequently." As an example of the types of text messages they exchanged, Brian Kahn discussed under cross-examination text messages exchanged with Bryant Riley included the topic of whether or not to slow down the FTC process to increase Rent-A-Center's cash at closing.  In another suit, where Brian Kahn's texts were entered into the public record, texts that show Brian Kahn frequently engaged in granular discussion of investing strategy.  In fact, during the bankruptcy of FRG and Freedom VCM, the Special Counsel representing both entities applied for fees for, *inter alia*, spending **12.2 hours** reviewing text messages between Brian Kahn and Bryant Riley that had been produced during the proceedings, for the purpose of determining whether FRG or Freedom VCM could assert claims against them.

239.    Bryant Riley displayed how close that relationship was during the November 7, 2023 earnings call, when, despite professing that he had only "learned of this matter late last week like many others," he touted that "we've got a great relationship with Brian"

before boldly declaring "I know that, today, a statement came out from Brian denying any involvement in what happened with Prophecy, and that's good enough for me." Despite the Company's *half a billion dollar investment*, Bryant Riley felt comfortable asserting to the market that he was willing to take Brian' Kahn's assurances as being sufficient.

240.   In an Answer filed during litigation in the Delaware Court of Chancery over FRG's collapse, B. Riley admitted that Brian Kahn and B. Riley were communicating in late February and early March 2023 regarding details of the Badcock accounts receivables. In the same answer, Bryant Riley admitted that Kahn and Bryant Riley both served on the board of Babcock and Wilcox together. The same answer also admitted that B. Riley made loans to Kahn from 2018 to 2023. And in February 2021, Kahn sold 10.7 million shares of Babcock & Wilcock to B. Riley.

241.   In addition to their direct relationship, Bryant Riley and Brian Kahn both worked closely through their mutual connection, Jeremy Nowak. Nowak—who had opened B. Riley's office in New York and asked Bryant Riley to be the best man at Nowak's wedding—worked at B. Riley from August 1999 to September 2006 and then worked at VCM from September 2006 to January 2016, working on business development and transaction due diligence. Nowak returned to B. Riley from February 2016 onward as a proprietary trader, working out of Windmere, Florida, the same 3,030-resident town where Brian Kahn lives.

**B.    Analysts Focused B. Riley's Loan Portfolio, Including Its Concentration**

242.   Investors were focused on B. Riley's loan portfolio. For example, during the Company's Q3 2022 earnings call, held on November 3, 2022, Mike Frank read an email question from an investor asking "and then the last one I have is regarding the loan book ex the receivables portfolio. Are there any metrics we can disclose on sort of either the *concentration of industries or companies*? In response, Bryant Riley gave no indication of any such concentration:

[T]hat piece is about $430 million. It's 13 or 14 loans. The average loan is $37 million. . . we have outside valuators that come in. And every quarter, they look at those loans, and I feel really good about the overall book.

243.    Again, during the Company's Q4 2022 earnings call held on February 22, 2023, Bryant Riley reiterated that the Company's loan book was purportedly valued by an outside valuation firm and that the Company had received "a number of calls on this portfolio." Later in the Q4 2022 earnings call, an unidentified analyst again asked about the loan book and Riley misleadingly mentioned margin loans without mentioning the material undisclosed related party transactions with Kahn that had reached material amounts by the time of Riley's February 22, 2023 statement below:

Great. Yes, super helpful. And then looking at the loans receivable for the end of the year, $700 million. Can you just break down a little bit, you or Phil, break down a little bit, kind of what's in there. We've got Badcock, and we got Babcock. Can you kind of get through those? And then any other big ones?

BRYANT RICHARD RILEY: So Phil, I think you break it up between Badcock and -- and I think there's some notable ones that are out there. Some of our loans are related to -- we'll provide margin services for customers with large share amount. It's kind of all over the place. So obviously, I wouldn't mention those people by name. But we have loans all over. And the average loan is $32 million. Is it $32 million? Is that what we said, Phil?

PHILLIP AHN: Yes. Excluding Badcock, average fair value per name is roughly $32 million.

BRYANT RICHARD RILEY: Across 13 names.

## C.    B. Riley's Loan to Conn's Supports Scienter

244.    On December 13, 2023, at B. Riley's Investment Day, Bryant Riley was asked about whether the Company would change its dividend policy. In response, Riley said that in light of the issues around Prophecy he wanted the Company to **stay liquid**:

I will say that the relationship with Vintage and, ultimately, that relationship with Prophecy, has created a dynamic where I think we are making sure we're very liquid. Because we don't -- anytime there's questions around a part of your business, you want to make sure that you're very liquid.

245.   Five days after telling investors that B. Riley planned to "stay liquid", on December 18, 2023, the Company extended another related party loan of $108.0 million to Conn's so that Conn's could acquire Badcock from FRG for $70 million. After Conn's bought Badcock from FRG, Freedom VCM ended up with 49.99% of the equity in Conn's. If that sounds like a confusing circle, that's because it is. The point is, even after the revelations involving Kahn, and just five days after telling investors—who were worried about B. Riley's financial state as a result of those revelations—that B. Riley wanted to  "make sure you're very liquid," B. Riley turned around and *increased* its exposure to FRG and Freedom by way of the $108 million related party loan to Conn's.

246.   Together with the $108 million loan to Conn's B. Riley also had two other loans outstanding to customers of Conn's, worth an additional $62.8 million, bringing B. Riley's total exposure to Conn's to $167.5 million, or 32.6% of its portfolio as of December 31, 2023.

247.   That B. Riley would extend such a massive amount of money to Conn's in another undisclosed related party transaction, *after* learning of Brian Kahn's alleged involvement in a massive fraud, further supports scienter. Bryant Riley just told investors the Company needed to stay liquid given the ongoing uncertainty, but despite that reassurance to the market, Defendants turned around and risked another $167.5 million of the Company's balance sheet to ultimately benefit Kahn. That Defendants would do that at a time when they unquestionably knew of Kahn's involvement (because they discussed it on the same investor call that Riley said they planned to stay liquid) supports a cogent and compelling inference that Defendants knew of Kahn's fraud all along.

248.   Moreover, that Defendants would further expose the Company to more concentration and correlation risk—because Conn's, like FRG, served consumers in the home-goods sector—supports an inference of scienter for the concentration and correlation misstatements as well.   In other words, the Conn's transaction further concentrated B. Riley's loan portfolio *and* also made it more correlated to the same types of business that FRG was already in (after B. Riley committed nearly $480 million

directly to FRG) *and* further concentrated the Company's balance sheet in FRG-related businesses. The Conn's loan was effectively an additional transaction to FRG because Conn's just used the money to buy Badcock from FRG.

249.    Further supporting scienter is how Defendants presented the value of Badcock just before the Conn's loan.  On page 63 of B. Riley's December 13, 2023 Analyst and Investor Day presentation, Defendants represented that, for purposes of valuing FRG for the FRG buyout, B. Riley ascribed $**390 million** of value to Badcock. Five days later, B. Riley lent Conn's $108 million so that FRG could buy Badcock for just $**70 million, a decrease of 82% in four days** for Badcock's value.  There is no non-culpable reason that B. Riley would value the same business at $390 million and then finance the sale of that business for 82% less just five days later. Doing so would mean either (a) B. Riley spent just four days of diligence on the $108 million loan to Conn's (those four days being between December 14 when Badcock was valued at $390 million and December 18 when the Conn's loan closed) realized Badcock was not worth $390 million but still lent $108 million to Conn's so that Conn's could buy Badcock for $70 million anyways; or (b) Defendants knew that Badcock was not worth $390 million at the time Defendants represented that it was worth $390 million during the December 13 investor day. The former would constitute knowledge of fraud, and the latter would constitute deliberate recklessness.

### D.    Bryant Riley Had a Personal Motive to Conceal B. Riley's Exposure Because He Was Exposed to the Risk of a Margin Call

250.    Throughout the Class Period, Bryant Riley was subject to the threat of a margin call that provided motive to conceal B. Riley's exposure to Brian Kahn.

251.    As discussed more fully above (¶ 88), a margin loan is a loan secured by securities owned by the debtor.  Creditors protect against the risk of default by ensuring that the loan is significantly larger than the value of the equity held in collateral. However, because the value of the equity can change (for example, stock held as collateral can see its price rise or fall), margin lenders protect themselves through the mechanism

of a "margin call." A "margin call" permits the lender to demand additional money or collateral, and it is typically triggered by the value of the collateral falling below a certain threshold. If a margin call cannot be met, the debtor may have collateral liquidated or suffer other contractual penalties.

252. On March 19, 2019, Bryant Riley signed a Credit Agreement with Axos Financial, Inc. ("**Axos**").

253. The Credit Agreement extended to Bryant Riley a $45 million revolving line of credit with a Maturity Date of April 1, 2025. The Credit Agreement gave Axos the right to demand satisfaction of loan-to-collateral value ratios--in other words, a margin call.

254. Also on March 19, 2019, Bryant Riley signed a Pledge Agreement, pledging 4,024,714 B. Riley shares as collateral to the Credit Agreement. One of the terms of the Pledge Agreement was to permit Axos to cause Bryant Riley's pledged shares if Riley defaults under the Credit Agreement.

255. On March 20, 2019, Axos filed a UCC statement providing public notice that the loan to Bryant Riley was secured by "All assets now owned or hereafter acquired by Debor [sic] in which Debtor otherwise has rights and all proceeds thereof." This expansive and exhaustive declaration of collateral ensures that any equity—including equity in Freedom VCM, B. Riley, or other related entities—would form a significant part of the equity of the loan. The terms also meant that, if Bryant Riley breached the Credit Agreement, Axos could pursue any other assets – including Bryant Riley's personal real estate or other high-value assets.

256. B. Riley understood the risk that a margin call on shares owned by insiders posed, and instituted an Insider Trading policy that required insiders to receive approval from the Company's Compliance Officer if they pledged their shares as collateral. For example, on April 18, 2023, B. Riley filed a proxy statement that represented to investors that "[c]overed persons" – which included Bryant Riley – "may not hold Company

securities in a margin account or pledge Company securities as collateral for a loan" without the approval of the Company's Compliance Officer.

257.    On October 30, 2024, B. Riley filed a current report on form 8-K, disclosing that "[w]hile the initial 2019 loan transaction and pledge were approved by the Company in accordance with the Company's insider trading policy, Mr. Riley later pledged additional shares for which he did not receive approval under that policy" which brought the total amount of shares pledged to 5,804,124 shares.  Despite his clear knowledge of the rules, as evinced by his correct disclosure in 2019, he still failed to abide by the Company's insider trading over the years leading up to and including the Class Period.

258.    This disclosure admitted that Bryant Riley's failure to inform the Company of the change in shares pledged had caused it to publish false numbers in its statements. In the October 30, 2024 Form 8-K the Company admitted that the May 10, 2024 proxy statement incorrectly averred that the Axos loan was backed by 4,389,553 shares, not the 5,804,124 shares that had been pledged. The 8-K also disclosed similar figures were underreported in the proxy statements in 2020 and 2023 and the Form 10-K amendments filed on April 23, 2020 and April 29, 2024.

259.    The October 30, 2024 8-K further stated that it had authorized the Audit Committee to conduct a "thorough investigation of Mr. Riley's pledges and related disclosures," engaging Winston & Strawn LLP as independent counsel.  Following the investigation, the Company had "undertake[n] certain remedial and personnel actions to ensure adherence to and accountability for the Company's policies and accurate disclosures of pledged securities in the Company's public filings."  This action was approved by the Board, with Bryant Riley and Kelleher recusing themselves.

260.    Thus, Bryant Riley had between 4 and 5 million B. Riley shares during the Class Period that had been pledged to a margin loan.  Furthermore, Bryant Riley had shares of Freedom VCM and associated entities.  If the value of these shares fell too far, Bryant Riley could be subject to a margin call, and if he was unable to satisfy that margin call, then Axos could pursue *any of his assets*.

261.    Keeping the value of these assets sufficiently inflated to avoid a margin call provided Bryant Riley a powerful motive to conceal negative information from the market.

262.    Furthermore, in an October 30, 2024, Bloomberg News article discussing the revelation that Bryant Riley had underreported collateral in the Axos loan, Bryant Riley noted that the Axos loan still had a remaining balance of 55%. Thus, Bryant Riley admitted knowledge that a margin call could lead to further selling of B. Riley's stock.

263.    The same article noted the risk to B. Riley of a Bryant Riley margin call, writing that if a "lender seizes and sells shares backing a loan," it would "potentially push[] the price down even further."

### E.    Numerous Government Investigations Support an Inference of Scienter

264.    As detailed more fully above (¶ 121), on the afternoon of November 2, 2023, Hughes pled guilty to an Information charging him with one count of conspiracy to commit securities fraud under Rule 10b-5, in violation of 18 U.S.C. § 361, for his role in the fraud at PAM pursuant to a plea agreement.  The Information described "Co-conspirator-2," the "CEO and President of a multi-billion dollar company that owned and managed diversified retail franchises," a clear reference to Brian Kahn.

265.    On the same day, the SEC filed civil charges against Hughes arising from the fraud at PAM.  The SEC Complaint described "Individual 2," a resident of Florida who received loans from the PAM Funds through VCM, another clear reference to Brian Kahn.

266.    On November 21, 2023, a notice was posted to the docket in the DOJ's criminal case against Hughes stating that a copy of the transcript of the plea hearing from November 2, 2023, was available for purchase from the court reporter.  After purchasing and receiving a copy, The Friendly Bear posted an excerpt of the transcript to X before the close of trading on November 27, 2023, which showed that Hughes was continuing to cooperate with the DOJ's investigation.

267.   On December 20, 2023, the U.S. Attorney's Office for the District of New Jersey filed a motion to stay the SEC civil case, explaining that the stay was necessary to "limit the ability of uncharged subjects and targets to tailor evidence, testimony, and defenses, and circumvent or defeat prosecution."  The Court subsequently granted the motion, and the stay remains in place, indicating that the criminal investigation remains ongoing.

268.   By no later than January 21, 2024, the SEC expanded the PAM fraud investigation to include B. Riley, according to reporting by Bloomberg that described "interviews in recent month about B. Riley and its relationship with Brian Kahn," including how the two worked together to finance the FRG Buyout.  After SEC staff reportedly received additional information from informants in June and July, 2024, the SEC issued B. Riley and Bryant Riley subpoenas related to, *inter alia*, B. Riley's dealings with Kahn.

269.   By August 12, 2024, *Bloomberg* reported that the SEC had expanded its investigation into B. Riley to determine whether the Company "adequately disclosed the risks embedded in some of its actions," seeking additional information on "interactions between founder Bryant Riley and longtime business partner Brian Kahn" as well as "the movement between companies of receivables due from cash-strapped retail customers whose repayment might be doubtful."  The reporting indicated that SEC lawyers from multiple offices were working together.  On the same day, Bryant Riley acknowledged that "the company and I received subpoenas in July from the SEC" that "primarily relate to the company's dealings with prior [sic] Brian Kahn."

270.   By no later than October 16, 2024, Kahn hired former New Jersey prosecutor Chris Christie to represent him in the ongoing criminal investigation arising from the PAM fraud, meaning he had reason to believe the case against him was moving forward.

271.   On November 22, 2024, B. Riley and Bryant Riley each received an additional subpoena from the SEC seeking the production of documents relating to FRG,

including its holding company, Freedom VCM Topco, as well as Riley's pledge of B. Riley shares as collateral for a personal loan.

272.    Despite entering a guilty plea in the DOJ action, Hughes has not been sentenced.    At the initial appearance to enter the guilty plea, the District Court set sentencing for March 21, 2024.  However, the sentencing hearing was reset to August 13, 2024, then February 5, 2025, and is currently scheduled for August 20, 2025.  As the transcript excerpt posted by The Friendly Bear shows that Hughes was cooperating with the investigation, it is likely that sentencing is being deferred until after Hughes continues to cooperate, to ensure Hughes does not cease cooperating once sentence is finalized.

**F.    Bryant Riley Admitted to Monitoring the Allegations Against Kahn**

273.    Civil litigation involving Kahn dates back to 2021, which supports an inference that Defendants knew about or were deliberately reckless in not finding such litigation during their manager due diligence process.

274.    Bryant Riley was on the board of directors at FRG from 2018 through 2020. Yet he abruptly resigned from the Board on March 31, 2020 in an 8-K dated April 3, 2020.

275.    Further, public reporting in February 2021 named Kahn as the advisor where funds were lost after being invested into a concentrated single sub-advisor, PAM.

276.    Sometime between November 2 and November 8, 2023, despite saying that Brian Kahn's denials were "good enough for me," Riley—acting as a director on FRG's board—authorized engaging an outside firm to conduct an independent investigation into anyone on management aware of Kahn's fraud.

277.    Yet, on November 8, 2023, Bryant Riley addressed investors during an investor conference call to announced financial results for Q3 2023 and, during prepared introductory remarks addressing the November 2 revelation that the SEC and DOJ were investigating the PAM fraud, stated that B. Riley "continue to monitor relevant developments."

278.    According to FRG board meeting minutes from November 9, 2023 which were read into the record of the FRG bankruptcy proceeding, Bryant Riley and another board member were tasked with investigating how to proceed with Brian Kahn after the revelations emerged. Yet nothing was said of the Kahn loans in the Company's Q3 2023 10-Q filed November 9, 2023, after Riley had such knowledge.

279.    Furthermore, according to the testimony of a lawyer from Willkie, the law firm representing B. Riley and which had previously represented VCM and FRG, Bryant Riley personally negotiated Brian Kahn's departure from FRG as a member of the FRG board, securing him a $15 million loan from FRG as compensation.

280.    Thus, Bryant Riley, as both CEO of B. Riley and a board member of FRG, kept abreast of developments and yet continued to conceal the truth from investors.

## G.    The Size of the FRG Buyout Supports an Inference that The Individual Defendants Were Aware of Kahn's Involvement With Prophecy or Were Deliberately Reckless in Not Knowing

281.    As discussed more fully above (¶¶ 97-102), the FRG Buyout involved an equity investment of $281.1 million, representing 31% of B. Riley's outstanding equity, and was the single largest equity investment B. Riley ever made.

282.    In addition to the equity investment, the FRG Buyout increased B. Riley's aggregate loans to Kahn—the key principal at the center of the FRG Buyout—to $200.5 million, representing 36% of B. Riley's overall loan receivable balance, by far the largest single principal investment.  Combining the loans and the equity investment, B. Riley extended approximately $480 million from its balance sheet toward the success of Freedom VCM Topco—an amount that exceeded the Company's $413.8 million of stockholders' equity.

283.    According to B. Riley's December 2023 investor presentation, with respect to FRG, Defendants stated that B. Riley has helped FRG since its inception and is "*deeply familiar with the asset base* and the management team."

284.    Additionally, the $108 million loan to Conn's, which indirectly benefited FRG by buying Badcock from FRG, together with the two other loans that B. Riley made to its customers of Conn's worth an additional $62.8 million, brought B. Riley's total exposure to Conn's to $167.5 million, or 32.6% of its portfolio as of December 31, 2023.

285.    The $480 million contributed to FRG together with the $167.5 million contributed to Conn's and its customers, that then went to FRG by selling Badcock, represented a total of over $647 million, which is larger than B. Riley's stockholder equity of $359.6 million as of December 31, 2023, and multiples larger than its current market capitalization of roughly $96 million.

286.    Given the scale of these investments, it is absurd to suggest Defendants did not complete basic due diligence on Kahn.  Accordingly, Defendants either knew of Kahn's legal issues or were deliberately reckless in not knowing about them.

## H.    Defendants' Multiple GAAP Violations Support Scienter

287.    GAAP compliance is required under federal securities laws to ensure that public companies like B. Riley issue reliable and accurate financial statements and public disclosures. Indeed, financial statements filed with the SEC that do not comply with GAAP are "presumed to be misleading or inaccurate." 17 C.F.R. §210.4-01(a)(1). Authoritative GAAP is promulgated by the Financial Accounting Standards Board ("**FASB**") and contained with FASB's Accounting Standards Codifications ("**ASC**"). Rules and interpretive releases of the SEC under authority of the federal securities laws are also sources of authoritative GAAP for SEC registrants.

### 1.    Undisclosed Related Party Transactions Violate GAAP

288.    Disclosure of related-party transactions is governed by Statement of Financial Accounting Standards No. 57 ("**FAS 57**") and Item 404 of Regulation S—K ("**Item 404**").  FAS 57 requires "disclosures of material related-party transactions." Related Party Disclosures, FAS No. 57. "When related-party transactions occur, companies must disclose the nature of the relationship, ***provide a description of the transactions, report the dollar amounts of the transactions and any amounts due from***

*or to related parties*." J. David Spiceland et al., I Intermediate Accounting 124 (5th ed. 2009) (citing Related Party Disclosures, FAS 57). Pursuant to FAS 57, related party transactions include those between "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates." Under FAS 57, "affiliates" include any company that is under common control or management with the public company, and "immediate family" is defined as "[f]amily members whom a principal owner or a member of management might control or influence or by whom they might be controlled or influenced because of the family relationship." FAS 57 has since been codified by ASC 850-10.

289.   The glossary defines "control" as "[t]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an enterprise through ownership, by contract, or otherwise." *Id.* These definitions accord with those found in SEC Regulation S–X. *See* 17 C.F.R. § 210.1–02(b), (g).

290.   Disclosures of related party transactions shall include (a) the nature of the relationship involved, (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (c) the dollar amount of transactions for each of the periods for which income statements are presented, and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. SFAS No. 57 ¶ 2; 850-10-50-1.

291.   Similarly, Item 404 requires disclosures of related-party transactions when "the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest." 17 C.F.R. § 229.404(a) (2013).

292.   If Item 404's $120,000 threshold is crossed, the issuer must disclose:

> (1)   The name of the related person and the basis on which the person is a related person.

(2) The related person's interest in the transaction with the registrant, including the related person's position(s) or relationship(s) with, or ownership in, a firm, corporation, or other entity that is a party to, or has an interest in, the transaction.

(3) The approximate dollar value of the amount involved in the transaction.

(4) The approximate dollar value of the amount of the related person's interest in the transaction, which shall be computed without regard to the amount of profit or loss.

(5) In the case of indebtedness, disclosure of the amount involved in the transaction shall include the largest aggregate amount of principal outstanding during the period for which disclosure is provided, the amount thereof outstanding as of the latest practicable date, the amount of principal paid during the periods for which disclosure is provided, the amount of interest paid during the period for which disclosure is provided, and the rate or amount of interest payable on the indebtedness.

(6) Any other information regarding the transaction or the related person in the context of the transaction that is material to investors in light of the circumstances of the particular transaction.

17 C.F.R. § 229.404(a).

293. Here, B. Riley's acquisition of a 31% stake in FRG, through a transaction that was announced in early-2023, along with Bryant Riley's board membership on FRG, rendered the $200.5 million PIK loan a material related party transaction. Indeed, the Company acknowledged in its Q3 2023 10-Q, filed with the SEC on November 9, 2023, that its equity investment constituted a related party transaction and in subsequent filings was listed as a Related Party Loan. Yet it was not disclosed as a related party transaction either within the Company's August 25, 2023 8-K, nor in the Company's 3Q 2023 Form 10-Q.

AMENDED CLASS ACTION COMPLAINT:  Case No. 3:24-CV-00662-SPG-AJR

294.    Thus, because GAAP required disclosure of the PIK Loan along with the series of loans previously extended to Kahn, Defendants' violation of GAAP to conceal it, further supports scienter.

295.    As do the non-disclosed related party transactions involving Conn's. As the Company would later admit in its Form 10-K for the period ending December 31, 2024, the loans to Conn's were also undisclosed related party transactions in violation of GAAP:

> On December 18, 2023, we made a $108.0 million loan to Conn's Inc. ("Conn's") a specialty retailer of home goods, pursuant to a second-lien term loan and security agreement (the "Conn's Term Loan") in connection with the acquisition by Conn's of W.S. Badcock LLC ("Badcock"), a portfolio company of Freedom VCM. The Conn's Term Loan bears interest at an aggregate rate per annum equal to the Term SOFR Rate (as defined in the Conn's Term Loan), subject to a 4.80% floor, plus a margin of 8.00% and matures on February 20, 2027. The Conn's Term Loan is secured by liens (subject, in the case of priority, to the liens under Conn's revolving credit facility with JPMorgan Chase Bank, N.A., as Administrative Agent for the lenders party thereto) on substantially all of the assets of the Conn's, the other borrowers party thereto and their subsidiaries, subject to customary exceptions.

> This loan is reported as a related party loan receivable due to the Company's related party relationship with Freedom VCM and Freedom VCM's ability to exercise influence over Conn's as a result of the equity consideration Freedom VCM received from the sale of Badcock to Conn's on December 18, 2023.

## 2.    Undisclosed Concentration Risk Violates GAAP

296.    Defendants separately violated GAAP's provisions concerning sufficient disclosure of a Company's concentration risk. Under ASC 275-10-50, a reporting entity should disclose concentrations when the following elements are met:

(1) The concentration exists at the financial statement date

(2) The concentration results in vulnerability to a near-term severe impact;

It is at least reasonably possible that the events that could result in the severe impact will occur in the near-term.

98

297.  B. Riley's investment in FRG and/or its PIK Loan each represented a concentration that existed as of the Company's August 25, 2023 Form 8-K and all subsequent financials filed thereafter until the Company subsequently announced that it would impair those investments on August 12, 2024.

298.  In the Company's Form 10-Q for the period ending June 30, 2024, filed on January 14, 2025, the Company revealed that it would incur a $196.7 million "fair value adjustment" to its related party loans, the of which $168.3 million was related to Vintage Capital Management LLC. That adjustment was essentially a write off and flowed through revenue on the Company's income statement. To put that in perspective, over the six-month period ending June 30, 2024 when B. Riley recognized the adjustment, it had total revenue of just $148.3 million over the same period. Thus, B. Riley's investment in FRG and/or its PIK Loan should have been disclosed as constituting a concentration risk as of the Company's August 25, 2024 Form 8-K, and thereafter. Indeed, in the Company's Q1 2024 10-Q, the "concentration of risk" section included Freedom VCM Loans.

299.  Defendants' failure to disclose such transactions prior to the Q1 2024 form 10-Q violated GAAP and thus support scienter.

## I.    Defendants' SOX Certifications Support an Inference of Scienter

300.  Following a series of high-profile financial scandals that occurred in the early 2000s at large public companies, Congress enacted the Sarbanes-Oxley Act of 2002 ("**SOX**") to protect investors by improving the accuracy and reliability of corporate disclosures.

301.  Among other things, Section 404 of SOX directed the SEC to prescribe rules which effectively required all public companies to establish and maintain a system of internal controls over financial reporting ("**ICFR**"), and to assess the effectiveness of those controls on a periodic basis.  As provided in Rules 13a-15 and 15d-15 of the Exchange Act, management must not only maintain ICFR but evaluate the effectiveness of ICFR annually and evaluate any change that is reasonably likely to materially affect ICFR each quarter.  Other provisions of SOX require the CEO and CFO of any such

company to certify compliance with SOX in each annual and quarterly report filed with the SEC on Form 10-K or Form 10-Q, including that it complies with GAAP.

302.    During the Class Period, Riley, Kelleher, and/or Ahn included such SOX certifications in each Form 10-K and Form 10-Q that B. Riley filed with the SEC. Specifically, each signed SOX certifications accompanying the filings in the table below:

| Defendant | Filings Including a SOX Certification |
|---|---|
| Riley | 2022 Form 10-K, Q1 2023 Form 10-Q, Q2 2023 Form 10-Q, Q3 2023 Form 10-Q, Q1 2024 Form 10-Q |
| Kelleher | 2022 Form 10-K, Q1 2023 Form 10-Q, Q2 2023 Form 10-Q, Q3 2023 Form 10-Q, Q1 2024 Form 10-Q |
| Ahn | 2022 Form 10-K, Q1 2023 Form 10-Q, Q2 2023 Form 10-Q, Q3 2023 Form 10-Q, Q1 2024 Form 10-Q |

303.    Among other things, the SOX certifications accompanying each of these filings certified that the signatory was "responsible for establishing and maintaining disclosure controls and procedures" and that such controls and procedures were designed "to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared."

**J.    Respondeat Superior and Agency Principles Apply**

304.    B. Riley is liable for the acts of the Individual Defendants and other Company officers, directors, employees, and agents under the doctrine of *respondeat superior* and common law principles of agency as all wrongful acts alleged herein were carried out within the scope of their employment or agency with the authority or apparent authority to do so.  The scienter of the Individual Defendants and other Company officers, employees, and agents is therefore imputable to B. Riley.

**IX.    LOSS CAUSATION**

305.    At all relevant times, B. Riley securities traded in an open, well-developed, and efficient market which promptly digested new information regarding the Company from all reasonably accessible public sources and reflected such information in the price of B. Riley securities.

306.    As described above, throughout the Class Period, Defendants made false and misleading statements which misrepresented and/or failed to disclose the adverse facts detailed herein.  Defendants' false and misleading statements caused B. Riley securities to trade at artificially inflated prices throughout the Class Period and, thus, operated as a fraud or deceit on Plaintiffs and other members of the Class who purchased or otherwise acquired such securities before such the inflation was removed.

307.    As detailed herein, the price of B. Riley securities fell precipitously on high volume in response to disclosures made on November 3, 2023, November 8, 2023, November 10, 2023, November 27, 2023, December 13, 2023, December 18, 2023, January 19, 2024, February 15, 2024, February 17, 2024, February 29, 2024, July 24, 2024, August 12, 2024, and November 4, 2024.  The price of B. Riley securities fell in response to each such disclosure by revealing information that removed part of the inflation introduced by Defendants' previous misstatements and omissions, causing real economic loss to Plaintiffs and other members of the Class who purchased B. Riley securities during the Class Period at inflated prices.

308.    Each decline in the price of B. Riley securities referenced above was a direct and proximate result of Defendants' misstatements or omissions being revealed to the market and/or the materialization of risks concealed by the fraud.  The timing and magnitude of each such price decline negates any inference that the losses suffered by Plaintiffs and other members of the Class were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to the fraud alleged herein.

309.    Accordingly, Defendants' wrongful conduct directly and proximately caused Plaintiffs and other members of the Class to suffer economic losses, *i.e.,* damages under the federal securities laws.

## X.    **PRESUMPTION OF RELIANCE**

310.    Plaintiffs and the other members of the Class are entitled to a presumption of reliance under the fraud-on-the-market doctrine adopted by the Supreme Court in *Basic*

*v. Levinson*, 485 U.S. 224 (1998).  Such a presumption is appropriate because, among other things:

        (a)     during the Class Period, Defendants made public misrepresentations or failed to disclose material facts necessary to make the public statements that were made not misleading;

        (b)     such misrepresentations and/or omissions were material;

        (c)     the Company's securities traded in an efficient market;

        (d)     the misrepresentations and/or omissions would tend to induce a reasonable investor to misjudge the value of B. Riley securities; and

        (e)     Plaintiffs and other members of the Class purchased B. Riley securities between the time Defendants misrepresented or failed to disclose material facts necessary to make the statements that were made not misleading and the time the true facts were disclosed, without knowledge of the true and/or omitted facts.

     311.   At all relevant times, the market for B. Riley securities was efficient for the following reasons, among others:

        (a)     B. Riley securities met the requirements for listing, and were listed, on the NASDAQ, a highly efficient and automated market;

        (b)     as a regulated issuer, B. Riley filed periodic public reports with the SEC;

        (c)     throughout the Class Period, B. Riley's securities were highly liquid, with an average daily trading volume of 944,985 shares for common stock;

        (d)     B. Riley regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

        (e)     B. Riley had earnings calls following the Company's quarterly results that were widely attended, including one with up to 480 attendees; and

(f)     unexpected company-specific news was reflected and incorporated into the stock price for B. Riley securities.

312.   As a result of the foregoing, the market for B. Riley's securities promptly digested new information regarding the Company from all reasonably accessible public sources and reflected such information in the price of those securities.  Under these circumstances, all purchasers of B. Riley securities during the Class Period suffered similar injury through their purchase of such securities at artificially inflated prices, and a presumption of reliance applies.

313.   In addition, a Class-wide presumption of reliance is also appropriate under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated on the omission of material facts for which there was a duty to disclose.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's operations and business prospects—information that Defendants were obligated to disclose in light of the statements they made on these very topics and/or applicable SEC rules and regulations—positive proof of reliance is not a prerequisite to recovery.

## XI.   **NO SAFE HARBOR**

314.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged herein to be false or misleading.

315.   None of the statements alleged herein to be false or misleading are forward-looking statements.  Rather, such statements relate to facts and conditions existing at the time the statements were made or prior to the time the statements were made.  Furthermore, none of the historic or present-tense statements alleged herein to be false or misleading were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such an assumption when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

316.   To the extent certain of the statements alleged herein to be false or misleading may be characterized as forward-looking, they were neither identified as such when made nor accompanied by any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  To the extent Defendants issued any statements designed to "warn" or "caution" investors of relevant risks, those statements were not meaningful because they warned only of theoretical future risks at times when such risks were not merely hypothetical and/or identified risks that already began to materialize. Moreover, the purported cautionary language failed to adjust over time, using the same theoretical tone even after concrete changes of circumstance.  Thus, the boilerplate and abstract cautionary statements made by Defendants were themselves false and misleading and insufficient to insulate Defendants from liability.

317.   In addition, Defendants are liable for those forward-looking statements because at the time each such statement was made, the speaker knew that the forward-looking statement was false or misleading or had actual knowledge of material facts undermining the statement, and/or the forward-looking statement was authorized or approved by an executive officer of B. Riley who knew that the statement was false or misleading when made or had actual knowledge of material facts undermining the statement.

## XII.   CLASS ACTION ALLEGATIONS

318.   Plaintiffs brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class.  Excluded from the Class are Defendants, members of the immediate families of the Individual Defendants, the Company's subsidiaries and affiliates, any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the  Class Period, any entity in which such excluded party has or had a controlling interest, and the legal representatives, heirs, successors, or assigns of any such excluded party.

319.    The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  During the Class Period, B. Riley securities were actively traded on the NASDAQ.  As of February 19, 2025, there were approximately 30,497,066 shares of B. Riley common stock outstanding.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by B. Riley or its transfer agent, and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

320.    Plaintiffs' claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' wrongful conduct in violation of the Exchange Act, as complained of herein.

321.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation.  Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

322.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including:

(a)    whether the acts described herein violated the federal securities laws and/or SEC rules promulgated thereunder;

(b)    whether statements made by Defendants to the investing public during the Class period misrepresented material facts or omitted material facts necessary in order to make the statements made, in the circumstances under which they were made, not misleading;

(c)    whether Defendants made such statements;

(d)    whether Defendants acted with the requisite level of scienter;

(e)    whether and to what extent the material misstatements and omissions alleged herein artificially inflated the market price of B. Riley securities; and

(f)    whether the Individual Defendants were controlling persons;

(g)    whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

323.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other reasons, joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class individually to redress the wrongs done to them individually.  There will be no difficulty in the management of this action as a class action.

## XIII.  CLAIMS FOR RELIEF

### COUNT I

**(Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) and Rule 10b-5(a) and (c)**
**Against All Defendants)**

324.    Plaintiffs repeat and reallege every allegation pleaded above as if fully set forth herein.  This Count is brought against all Defendants under Section 10(b) of the Exchange Act, codified at 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, codified at 17 C.F.R. § 240.10b-5. Rule 10b-5(b) prohibits false statements and Rule 10b-5(a) and (c) prohibit deceptive acts and conduct, which can include the dissemination or making of a false statement. Plaintiffs expressly allege violations of all three subsections.

325.    Throughout the Class Period, Defendants, individually and in concert, directly or indirectly, by means or instrumentalities of interstate commerce, including but not limited to the mails and the internet, and/or the facilities of a national securities exchange, carried out a plan, scheme, or course of conduct in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, in that they:  (i)

employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of B. Riley securities during the Class Period.

326.  Specifically, throughout the Class Period, Defendants made or caused B. Riley to issue untrue statements of material fact and/or omit material facts from its public disclosures that were necessary to make the statements that were made, in light of the circumstances under which they were made, not misleading, including those specified above, which were intended to, and did, as alleged herein:  (i) deceive the investing public, including Plaintiffs and the other members of the Class; (ii) artificially inflate and maintain the price of B. Riley securities; and (iii) cause Plaintiffs and members of the Class to purchase B. Riley securities at artificially inflated prices.  Defendants are individually and collectively responsible for making such statements by virtue of having made the public statements or otherwise prepared, approved, signed, and/or disseminated documents that contained those statements to the investing public.

327.  Defendants made the false and misleading statements and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased B. Riley securities during the Class Period.

328.  As a result of the foregoing, the market price of B. Riley securities was artificially inflated during the Class Period.  Plaintiffs and other members of the Class relied on the integrity of the market price for B. Riley securities during the Class Period and paid prices for such securities that were artificially inflated as a result of the false and misleading statements described herein.  Plaintiffs and members of the Class would not have purchased such securities at the prices they paid, or at all, if they had been aware

that the market prices of such securities was artificially inflated by Defendants' false and misleading statements.

329.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class have suffered damages in connection with their purchases of B. Riley securities during the Class Period.

330.    By reason of the foregoing, Defendants are liable to Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against Defendants the Individual Defendants)**

331.    Plaintiffs repeat and reallege every allegation pleaded above as if fully set forth herein.  This Count is brought against the Individual Defendants under Section 20(a) of the Exchange Act, codified at 15 U.S.C. § 78t(a).

332.    As alleged above, Defendants, and each of them, violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omitted material information in connection with the purchase and sale of the Company's securities and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period.

333.    Throughout the Class Period, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of B. Riley and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.

334.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to B. Riley's business, operations, financial condition, and prospects.  In this capacity, the Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by

Plaintiffs to be false or misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

335. Thus, by virtue of their positions as senior officers and/or directors of B. Riley, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading statements alleged herein to give rise to the primary violations alleged herein. Indeed, the Individual Defendants exercised their power and authority to cause B. Riley to engage in the wrongful acts alleged herein or personally participate in the unlawful conduct alleged.

336. Because of their senior positions, the Individual Defendants knew of or recklessly disregarded the adverse, non-public information about B. Riley's business practices, financial condition, and prospects. The Individual Defendants acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute culpable participation in the primary violation.

337. By reason of the foregoing, the Individual Defendants are liable to Plaintiffs and members of the Class for violations of Section 20(a) of the Exchange Act.

## XIV. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A. Declaring that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the class representative and Lead Plaintiff's counsel as lead counsel under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with pre-judgment interest thereon;

AMENDED CLASS ACTION COMPLAINT: Case No. 3:24-CV-00662-SPG-AJR

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in connection with this action, including, but not limited to, reasonable attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

D.    Awarding such other and further relief as the Court deems just and proper.

## XV.  **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  April 21, 2025                              Respectfully submitted,

                                                    **POMERANTZ LLP**

                                                    */s/ Justin D. D'Aloia*
                                                    Justin D. D'Aloia (*pro hac vice*)
                                                        (NY Bar # 4935979)
                                                    Guy Yedwab (*pro hac vice* application
                                                        forthcoming)
                                                        (NY Bar # 6052914)
                                                    600 Third Avenue, 20th Floor
                                                    New York, New York 10016
                                                    Telephone:  (212) 661-1100
                                                    Facsimile:  (212) 661-8665
                                                    jdaloia@pomlaw.com

                                                    Jennifer Pafiti (SBN 282790)
                                                    1100 Glendon Avenue, 15th Floor
                                                    Los Angeles, California  90024
                                                    Telephone:  (310) 405-7190
                                                    Facsimile:  (917) 463-1044
                                                    jpafiti@pomlaw.com

                                                    *Counsel for Lead Plaintiff and Lead*
                                                    *Counsel for the Proposed Class*

                                                    **WOHL & FRUCHTER LLP**
                                                    Joshua E. Fruchter
                                                    (admitted pro hac vice in Case No. 24-cv-
                                                    02121)
                                                    25 Robert Pitt Drive, Suite 209G
                                                    Monsey, New York 10952
                                                    Telephone: (845) 290-6818
                                                    Facsimile: (718) 504-3773
                                                    jfruchter@wohlfruchter.com

                                                    *Additional Counsel for Movant The KL*
                                                    *Kamholz Joint Revocable Trust*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**GLANCY PRONGAY & MURRAY LLP**
Raymond D. Sulentic (SBN 316913)
12526 High Bluff Drive, Suite 300
San Diego, California 92130
Telephone: (310) 201-9150
rsulentic@glancylaw.com


*Attorney for Additional Plaintiff Mike Coan*

AMENDED CLASS ACTION COMPLAINT:  Case No. 3:24-CV-00662-SPG-AJR