1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

IN RE B. RILEY FINANCIAL, INC.
SECURITIES LITIGATION

This Document Relates To:
All Actions

Case No. 2:24-cv-00662-SPG-AJR

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS [ECF NO. 110]**

Before the Court is the Motion to Dismiss, (ECF No. 110 ("Motion")), filed by Defendants B. Riley Financial, Inc., Bryant R. Riley, Philip J. Ahn, and Thomas J. Kelleher (together, "Defendants"). Lead Plaintiff the KL Kamholz Joint Revocable Trust, along with Plaintiff Mike Coan (together, "Plaintiffs"), individually and on behalf of a proposed class, timely opposed Defendants' Motion, (ECF No. 112 ("Opp.")), and Defendants replied, (ECF No. 115 ("Reply")).[1] The Court has read and considered the parties' submissions and concluded that the Motion is suitable for decision without oral argument. *See* Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15. Having considered the parties' submissions,

---

[1] Plaintiffs have also filed a Motion for Leave to File a Sur-Reply, *see* (ECF No. 118), seeking leave to respond to several arguments that Defendants purportedly raised for the first time in Reply, *see* (ECF No. 118-1). Because, however, the Court is not persuaded by any of the arguments to which Plaintiffs seek to respond, *see generally* (*id.*), the Court DENIES Plaintiffs' Motion for Leave to File a Sur-Reply as moot.

the relevant law, and the record in this case, the Court GRANTS the Motion, in part, and DENIES the Motion, in part.

## I.  BACKGROUND

Plaintiffs claim that Defendants made 24 statements that were false or materially misleading in light of B. Riley Financial, Inc.'s ("the Company") business relationship with Brian Kahn.  *See* (ECF No. 110-1 ("Defendants' Brief") at 39–41).  In essence, Plaintiffs allege that the Company took on undisclosed risk by investing large amounts of money alongside Kahn and providing generous margin loans to Kahn's businesses.  *See, e.g.*, (ECF No. 104 ("FAC") ¶¶ 170–215).  Beginning in 2017, Kahn sustained large trading losses in his capacity as an advisor to a hedge fund called Prophecy Asset Management LP ("PAM").  *See* (*id.* ¶¶ 53, 66–70).  Kahn and others allegedly executed a series of fraudulent transactions to cover up Kahn's losses.  *See* (*id.* ¶¶ 71–72).  Plaintiffs allege that, when the PAM fraud became public, the Company was forced to dramatically write down the value of its loans and investments.  *See* (*id.* ¶¶ 158–59).  As a result, the Company's stock has lost 91.5% of its value, falling from a high of $72 per share on March 21, 2022, to just $5.70 per share on November 1, 2024.  *See* (*id.* ¶¶ 1, 159).

### A.  The Company's Relationship with Brian Kahn

Bryant Riley founded the Company in 1997 as a "small, niche-market operation" that primarily researched California businesses for institutional investors.  (*Id.* ¶¶ 28–29).  Riley has served as the Chairman of the Company's board of directors since it was founded in 1997.  *See* (*id.* ¶ 21).  He has also served as the Company's Co-Chief Executive Officer, alongside Tom Kelleher, since July 2018.  *See* (*id.* ¶¶ 21–22).  Phillip Ahn has served as the Company's Chief Financial Officer and Chief Operating Officer since April 2013.  *See* (*id.* ¶ 23).  In 2014, after the Company conducted an initial public offering ("IPO"), it "entered [into] a new phase of growth."  (*Id.* ¶ 30).  Since then, its "profits have soared," with the Company "generat[ing] over $1 billion in annual revenue" at the start of 2023.  (*Id.* ¶¶ 27, 31).  Following the IPO, the Company carried out a series of acquisitions

targeting financial services companies and, in 2016, it "also began investing directly in various debt and equity opportunities on a 'principal basis.'" (*Id.* ¶¶ 27, 30–32).

Brian Kahn was one of the Company's early clients. *See* (*id.* ¶ 54). Kahn is a private equity investor, and the founder of Vintage Capital Management, LLC ("VCM"). *See* (*id.* ¶ 50).[2] Initially, the Company only provided brokerage services to Kahn. *See* (*id.* ¶¶ 54, 56). That changed in 2017, when the Company partnered with VCM to purchase 37% of Liberty Tax, Inc., a publicly traded tax preparation franchise company. *See* (*id.* ¶¶ 57, 61). After this initial investment, Kahn proposed that the Company and VCM partner to purchase a controlling interest in Liberty Tax, using it as a vehicle to purchase other franchise businesses. *See* (*id.* ¶¶ 60–61).

## B. The Company Partners with Kahn to Invest in FRG

In July 2019, the Company and VCM acquired a controlling interest in Liberty Tax, named Kahn as its CEO, and changed its name to Franchise Group, Inc. ("FRG"). *See* (*id.* ¶ 61). Over the next year, the Company and VCM "significantly increased their investment in FRG," ultimately purchasing more than 50% of FRG's common stock. (*Id.* ¶¶ 62–63).[3] Between July 2019 and January 2020, Kahn, VCM, and VCM's affiliates invested $92.5 million in FRG. *See* (*id.* ¶ 62). As VCM built its ownership stake, the Company made a series of margin loans to Kahn and his affiliated entities. *See* (*id.* ¶¶ 87–88). To continue borrowing, Kahn pledged his holdings in FRG as collateral. *See* (*id.* ¶ 89). By early January 2023, Kahn and his wife had pledged all of their FRG stock as collateral to secure the Company's loans. *See* (*id.*). As of mid-2023, the Company had $154 million in outstanding loans to Kahn and affiliates. *See* (*id.* ¶ 87).

---

[2] Kahn initially founded the private equity firm Kahn Capital Management, LLC ("KCM") in 1998. *See* (*id.*). In 2010, KCM was succeeded by VCM. *See* (*id.*). For ease of reference, this Order refers to both KCM and VCM as "VCM."

[3] As of February 2020, VCM and its affiliates owned approximately 45.4% of FRG's common stock, and the Company and its affiliates owned approximately 13.2% of FRG's common stock. *See* (*id.* ¶ 63).

Between 2019 and 2021, FRG purchased a number of franchise-oriented businesses, including W.S. Badcock Corporation ("Badcock"). *See* (*id.* ¶¶ 63–64). Badcock was a home furnishing company that sold goods to consumers on credit and, as a result, had a large accounts receivable balance. *See* (*id.* ¶ 93). In connection with the acquisition, FRG planned to have Badcock stop underwriting, holding, and servicing consumer credit accounts. *See* (*id.*). To facilitate this transition, FRG "began exploring partnerships with third-party consumer finance vendors." (*Id.*). In December 2021, "a newly formed . . . subsidiary" of the Company agreed to purchase "a series of receivable portfolios from Badcock." (*Id.* ¶ 94). Between December 2021 and March 2023, that subsidiary purchased $945 million in Badcock accounts receivable. *See* (*id.*).

In March 2023, the Company decided to stop purchasing Badcock receivables. *See* (*id.* ¶ 95). This decision was "concerning to FRG," as management believed that FRG may not be able to pay its quarterly dividend and could even default if it was unable to "move the remaining Badcock receivable assets off its balance [sheet]." (*Id.*). The Company "subsequently advised" FRG that it was interested in "explor[ing] an acquisition of FRG." (*Id.*). On March 19, 2023, the Company proposed to purchase FRG at a price of $30 per share. *See* (*id.* ¶ 96). However, the Company ultimately determined "that it wished to avoid [acquiring FRG] in a manner that resulted in [the Company] . . . consolidating [FRG] into its own financial statements." (*Id.* ¶ 96). As a result, the Company decided to finance a management buyout led by Kahn (the "FRG Buyout"). *See* (*id*).

## C. The FRG Buyout

On May 10, 2023, FRG entered an agreement through which a consortium of investors would take FRG private at $30 a share, and FRG would become a wholly owned subsidiary of a newly formed entity, Freedom VCM. *See* (*id.* ¶ 97).[4] Riley, Kahn, and

---

[4] Under the agreement, "FRG would become a wholly owned subsidiary of Freedom VCM, Inc.," which was itself "an indirect wholly owned subsidiary of Freedom VCM Holdings, LLC." (*Id.* ¶ 97). For ease of reference, this Order refers to both Freedom VCM, Inc. and Freedom VCM Holdings, LLC as "Freedom VCM."

Kelleher entered agreements to exchange their FRG stock for Freedom VCM stock. *See* (*id.* ¶¶ 98–99). The Company helped finance the FRG Buyout, committing to invest $560 million in Freedom VCM through a consortium of investors, ultimately investing $216.5 million itself. *See* (*id.* ¶¶ 99, 102). The FRG Buyout closed on August 21, 2023. *See* (*id.* ¶ 102). Through the Company's equity investment and rollover of FRG stock, it invested a total of $281.1 million in Freedom VCM and held 31% of Freedom VCM's equity. *See* (*id.*). On the same day as the FRG Buyout, the Company also entered into an Amended and Restated Note ("VCM Loan"), in which the Company restructured $200.5 million in VCM's debt and secured that debt with Kahn's equity in Freedom VCM. *See* (*id.* ¶ 103).

## D.   The Alleged PAM Fraud

In addition to his position at VCM, beginning in 2017, Kahn also worked as a "sub-advisor" for Prophecy Asset Management LP and, in that capacity, was allocated the vast majority of PAM's capital under management. (*Id.* ¶¶ 53, 68). Based on Kahn's investments, PAM almost immediately "began sustaining massive trading losses." (*Id.* ¶ 70). According to the FAC, to cover this up, Kahn and other PAM executives—including John Hughes, PAM's Chief Operating Officer and Chief Compliance Officer—obscured PAM's losses through a series of allegedly fraudulent transactions. *See* (*id.* ¶¶ 71–72, 75–78). By 2020, PAM had incurred $401 million in losses but only had $386 million in assets under management. *See* (*id.* ¶ 79). In March 2020, PAM's auditor, Deloitte & Touche LLP ("Deloitte"), allegedly "uncover[ed] the fraud." (*Id.*). Deloitte withdrew its prior audit reports and resigned. *See* (*id.*). Less than two weeks later, PAM suspended all redemptions. *See* (*id.*).

In May 2020, PAM filed an arbitration claim against Kahn. (*Id.* ¶ 80). Kahn has reportedly "agreed to repay $200 million to investors in connection with [that] proceeding." (*Id.* ¶ 84). Shareholders have also brought two separate securities fraud suits against PAM in the U.S. District Court for the Southern District of New York. *See* (*id.* ¶ 81). In one action, investors alleged that "Kahn syphoned off a staggering $160 million from [PAM] into a 'secret' side account, which he then used to purchase his controlling position in

FRG."  (*Id.*) (emphasis omitted).  The other action attached communications from PAM's CEO to the complaint, indicating that "Pam had initiated an arbitration claim against Kahn to recover 'hundreds of millions' in losses."  (*Id.*).  Both complaints "were public by no later than May 2022."  (*Id.* ¶ 82).

On November 2, 2023, Hughes pled guilty to a criminal charge of conspiracy to commit securities fraud under Securities and Exchange Commission ("SEC") Rule 10b-5 in connection with his role in the PAM fraud.  *See* (*id.* ¶ 121).  On the same day, the SEC filed a civil complaint against Hughes.  *See* (*id.* ¶ 122).  Investors quickly inferred that Kahn was an unindicted co-conspirator, referenced in the SEC complaint as a "sub-advisor" at PAM, who received the vast majority of PAM's capital, and received loans from PAM funds through VCM.  *See* (*id.* ¶¶ 123–24).  At the same time, investors began to speculate about the PAM fraud's potential impact on the Company.  *See* (*id.* ¶ 124).

### E.    The Impact on the Company

Days after Hughes pled guilty, the Company formally retained the law firm Petrillo Klein & Boxer LLP to investigate whether any of its directors, officers, or employees were involved in, or had knowledge of, Kahn's alleged misconduct.  *See* (*id.* ¶ 126).  The Company also rescheduled a pre-planned earnings call from after market close on November 9, 2023, to before the start of trading on November 8, 2023.  *See* (*id.* ¶ 125). Ahead of that call, on the morning of November 8, 2023, the Company issued a press release disclosing a net loss of $75.8 million for the quarter, driven by a decline in the market value of its equity investments.  *See* (*id.* ¶ 128).  After the close of trading the next day, the Company filed its Form 10-Q for the period ending September 30, 2023, where it disclosed that it had purchased a 31% equity interest in Freedom VCM for approximately $281 million "but made no mention" of the VCM Loan.  *See* (*id.* ¶ 130).  Days later, S&P Global Ratings downgraded FRG's debt from a B to a B-.  *See* (*id.* ¶ 131).  On December 13, 2023, the Company held an "investor day" conference "to quell ongoing investor concern" surrounding losses reported in the Company's most recent financial results and

from the S&P's downgrade of FRG.  (*Id.* ¶¶ 133–34).  There, Riley allegedly disclosed the VCM Loan for the first time.  *See* (*id.* ¶ 134).

On December 18, 2023, Conn's Inc., a specialty retailer, purchased Badcock from Freedom VCM in a stock-for-stock transaction.  *See* (*id.* ¶ 135).  On the same day, the Company loaned $108 million to Conn's.  *See* (*id.*).  Together with two outstanding loans to Conn's customers, the Company's "total exposure to Conn's reached $167.5 million." (*Id.*).  On July 15, 2024, Bloomberg reported that Conn's was "teetering near bankruptcy," with the Company "potentially on the hook for $148 million, around a third of its entire loan portfolio."  (*Id.* ¶ 148).  On July 23, 2024, Conn's filed for bankruptcy.  *See* (*id.*).  The next day, on July 24, 2024, the S&P downgraded FRG's credit rating to CCC+, explaining that Conn's bankruptcy placed "FRG in danger of violating covenants in its loan documents."  *See* (*id.* ¶ 149).  In response, the Company was forced to "sell[] off assets and intellectual property" to pay down debt.  (*Id.* ¶ 156).  Then, on November 3, 2024, FRG filed for bankruptcy.  *See* (*id.* ¶ 158).  The next morning, on November 4, 2024, the Company filed a Form 8-K report, disclosing that it would write down the remaining value of its investments in Freedom VCM, including the VCM Loan.  *See* (*id.*).

On January 21, 2024, Bloomberg reported that the SEC "was investigating [the Company's] deals with Kahn."  (*Id.* ¶ 139).  According to Bloomberg's reporting, the SEC had conducted interviews in which it asked about the Company, its relationship with Brian Kahn, and how the Company worked with Kahn to finance the FRG Buyout.  *See* (*id.*).  In July 2024, the SEC served subpoenas on the Company and Bryant Riley requesting, among other items, documents concerning the Company's business dealings with Kahn.  *See* (*id.* ¶ 147).  On August 12, 2024, Bloomberg reported that the SEC has begun investigating whether the Company "adequately disclosed the risks embedded in some of its assets" and was "seeking information on the interactions between founder Bryant Riley and [his] longtime business partner Brian Kahn."  (*Id.* ¶ 151).

## II.  LEGAL STANDARD

To state a claim for securities fraud, plaintiffs must satisfy three requirements.  *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 690–91 (9th Cir. 2011).  First, consistent with Rule 8(a)(2), a plaintiff must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), alleging "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In ruling on such a motion, the Court must "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).  However, the Court is "not required to accept as true allegations that contradict exhibits attached to the Complaint," allegations that contradict "matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Seven Arts Filmed Ent., Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013) (internal quotation marks and citation omitted).

Second, a plaintiff must satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b), requiring that fraud claims "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  To meet this standard, a plaintiff must identify "the time, place, and content of [the] alleged misrepresentation[s]," as well as the "circumstances indicating falseness" or "the manner in which the representations at issue were false and misleading."  *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547–48 (9th Cir. 1994) (internal quotation marks, citation, and alterations omitted); *see also Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) ("Rule 9(b) requires a party to state with particularity the circumstances constituting fraud or mistake, including the who, what, when, where, and how of the misconduct charged." (internal quotation marks and citation omitted)).  Those allegations "must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud

charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citation omitted). Although the circumstances of the alleged fraud must be alleged with specificity, knowledge "may be alleged generally." Fed. R. Civ. P. 9(b).

Finally, a plaintiff must satisfy the additional requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which "require that a complaint plead with particularity both falsity and scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (internal quotation marks and citation omitted). Under the PSLRA, a complaint must (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and (2) "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)–(2) (emphasis added).

## III.    REQUEST FOR JUDICIAL NOTICE

Generally, at the motion to dismiss stage, courts may not consider any material beyond the pleadings when assessing the sufficiency of a complaint under Federal Rule of Civil Procedure 12(b)(6). *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) ("[R]eview is limited to the complaint." (citation omitted)). If a court considers such extrinsic evidence, "the motion must be treated as one for summary judgment under Rule 56" and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). However, under the doctrines of incorporation-by-reference and judicial notice, courts may consider the contents of certain extrinsic documents "without converting the motion to dismiss into a motion for summary judgment." *Lee*, 250 F.3d at 688.

### A.    Incorporation by Reference

First, pursuant to the "judicially created" incorporation-by-reference doctrine, courts may consider an external document to be "part of the complaint itself" if "the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). The doctrine

seeks to prevent "plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Id.* A court may also "assume an incorporated document's contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Id.* at 1003 (alterations and citation omitted). However, "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id.*

Defendants request that the Court consider three documents referenced in the Complaint: (1) Exhibit 2, the Company's 2023 Form 10-K; (2) Exhibit 3, a Form 8-K and earnings release presentation that the Company filed with the SEC on December 13, 2023; and (3) Exhibit 5, a transcript of the Company's December 13, 2023, Investor Day Presentation. *See* (ECF No. 111 ("RJN") at 3); *see also* (ECF No. 110-2 ("McGimsey Decl.") ¶¶ 3, 4, 6). Plaintiffs do not object to the Court's consideration of Exhibits 3 and 5 but argue the Court should not consider Exhibit 2 incorporated by reference into the Complaint. *See* (ECF No. 114 ("Opp. to RJN") at 5). In support, Plaintiffs argue that "the very gravamen of this action is that the [FAC] alleges that [the Company's] filings with the SEC were false and misleading" and, therefore, "Defendants should not be permitted to rely on those very documents as if they were true at the pleading stage." (*Id.* at 7).

Here, Plaintiffs reference the contents of Exhibits 2, 3, and 5 extensively in the Complaint. For example, Plaintiffs specifically challenge several statements made in the Company's 2023 Form 10-K (Exhibit 2) as false or misleading, *see* (*id.* ¶¶ 192–93, 203). Similarly, Plaintiffs claim that the Company's December 13, 2023, earnings presentation (Exhibit 3) revealed "the scale of the risk posed by the relationship to Kahn" by disclosing the VCM Loan. *See* (*id.* ¶ 9); *see also* (*id.* ¶¶ 244, 249, 283 (relying on other statements from the presentation as evidence of scienter)). Finally, Plaintiffs rely on a statement from the December 13, 2023, earnings transcript (Exhibit 5) as evidence of scienter. *See* (*id.* ¶¶ 244–49). Therefore, the Court will consider these documents to the extent doing so is necessary to determine the surrounding context of the Company's disclosures. *See Khoja*, 899 F.3d at 1002; *see also Knievel v. ESPN*, 393 F.3d 1068, 1076–77 (9th Cir. 2005).

However, the Court has not accepted as true any statements made in the Company's investor disclosures in deciding this Motion.

**B.    Judicial Notice**

Judicial notice under Federal Rule of Evidence 201 authorizes courts to notice an adjudicative fact if it is "not subject to reasonable dispute." Fed. R. Evid. 201(b). A fact is "not subject to reasonable dispute" if it is "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1), (2). Accordingly, "[a] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment." *Lee*, 250 F.3d at 689 (internal quotation marks and citation omitted). A court, however, may not "take judicial notice of disputed facts contained in such public records." *Khoja*, 899 F.3d at 999.

Defendants request that the Court take judicial notice of Exhibits 1 and 4. *See* (RJN at 4). Exhibit 1 is a chart reflecting FRG's stock prices and market capitalization, obtained from Bloomberg Terminal, for the period from May 1, 2023, to August 18, 2023. *See* (McGimsey Decl. ¶ 2). Exhibit 4 is the Company's 2021 Form 10-K. *See* (McGimsey Decl. ¶ 5). As an initial matter, it is clear that Exhibits 1 and 4 "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Documents showing historical stock prices, *see, e.g.*, *Sentinelone, Inc. Sec. Litig.*, No. 23-CV-02786-HSG, 2024 WL 3297150, at *3 (N.D. Cal. July 2, 2024); *Kampe v. Volta Inc.*, No. 4:22-cv-2055-JST, 2024 WL 308262, at *7 (N.D. Cal. Jan. 26, 2024), and documents publicly filed with the SEC, *see, e.g.*, *Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1143 (C.D. Cal. 2018); *In re Aqua Metals, Inc. Sec. Litig.*, No. 17-cv-07142-HSG, 2019 WL 3817849, at *5 (N.D. Cal. Aug. 14, 2019), are both subject to judicial notice.

However, "accuracy is only part of the inquiry under Rule 201(b)" and courts "must also consider—and identify—which fact or facts" are being noticed. *Khoja*, 899 F.3d at 999. "It is improper to judicially notice a [document] when the substance of the [document]

is subject to varying interpretations, and there is a reasonable dispute as to what the [document] establishes." *Id.* at 1000 (internal quotation marks and citation omitted). While a court may "take judicial notice of *undisputed* matters of public record," it may not take notice of "*disputed* facts stated in public records." *Lee*, 250 F.3d at 690.

Therefore, as with Exhibits 2, 3, and 5, the Court will take judicial notice as to the contents of the Company's 2021 Form 10-K (Exhibit 4) but will not accept any statements therein as true. *See Troy Grp., Inc. v. Tilson*, 364 F. Supp. 2d 1149, 1152 (C.D. Cal. 2005) ("SEC filings should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents" (internal quotation marks and citation omitted)). The Court will likewise take judicial notice of FRG's historical stock prices and market capitalization, as set out in Exhibit 1. *See Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 50 F. Supp. 3d 1328, 1349 (C.D. Cal. 2014) ("Because [publicly] traded companies historical stock prices can be readily ascertained and those prices are not subject to reasonable dispute, courts routinely take judicial notice of them.").

## IV.    DISCUSSION

To state a claim for a violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), a plaintiff must allege "(1) a material misrepresentation or omission ('falsity'), (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation." *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1180 (9th Cir. 2024). In the Motion, Defendants argue that Plaintiffs fail to plead any actionable misstatements, scienter, or loss causation. *See* (Defendants' Brief at 18–37).[5] The Court will address each argument in turn.

---

[5] Defendants also argue, for the first time in their Reply, that Plaintiffs cannot state a claim for "scheme liability" under Rule 10b-5(a) and (c). *See* (Reply at 23–24); *see also* (FAC ¶ 324). To the extent Defendants' argument as to scheme liability differs from their argument as to Plaintiffs' failure to state a claim under Rule 10b-5(b), they have waived this argument by not raising it in their opening brief. *See H & H Pharms., LLC v. Cambrex*

### A.    Falsity

The parties group the challenged statements into eight categories: (1) Statements regarding the Company's commitments in connection with the FRG Buyout; (2) Statements regarding the composition of the Company's loan portfolio; (3) Statements regarding the Company's risk concentration; (4) Statements regarding the Company's investment correlation; (5) Statements regarding the Company's process for due diligence; (6) Statements regarding the Company's compliance with generally accepted accounting principles ("GAAP"); (7) A statement regarding Badcock's valuation; and (8) A statement regarding whether Kahn was culpable for the PAM fraud. *See* (Defendants' Brief at 39–41 (grouping alleged misstatements by category)); *see also* (ECF No. 112 ("Opp.") at 19–29 (analyzing Defendants' categorization of alleged misstatements)).

Defendants argue, generally, that Plaintiffs' "core thesis" as to why any of these statements are false "boils down to an argument that [the Company] misjudged the risks associated with its loans to FRG and Kahn-linked entities," which at most, suggests corporate mismanagement, not securities fraud. *See* (Defendants' Brief at 18). Defendants also challenge whether each identified statement is false or misleading. For example, Defendants argue that the Company's statement in December 2023, after Hughes pleaded guilty in connection with the PAM fraud, that Badcock had an enterprise value of $390 million was not false because it referred to "an estimated valuation for the company three years later, in 2026." (Defendants' Brief at 22). *But see* (Opp. at 25 ("[T]he $390 million valuation . . . applied a multiple to forward earnings (*i.e.*, 2026 expected earnings), [which is] a customary method used by bankers to calculate present valuations.")).

However, it is not necessary to parse the parties' arguments regarding each of the alleged misstatements, as Plaintiffs have sufficiently alleged that, at a minimum, the Company's disclosures as to the FRG Buyout were materially misleading. *See Cooper v. Pickett*, 137 F.3d 616, 623 (9th Cir. 1997) (court "need not at this juncture in the case opine

---

*Charles City, Inc.*, 836 F. App'x 619, 620 (9th Cir. 2021) ("[A]rguments presented for the first time in a reply brief are waived.").

on some of the closer questions" of falsity where "many of the allegations of the complaint state causes of action"); *see also In re DDi Corp. Sec. Litig.*, No. CV 03-7063 NM, 2005 WL 3090882, at \*13 (C.D. Cal. July 21, 2005) (court "need not consider whether" every alleged misstatement was false and materially misleading where "Plaintiffs have sufficiently alleged that [disclosure] was materially false and misleading with respect to at least three matters"); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999) (considering it "unwise" to "parse out" each alleged misstatement on motion to dismiss if "other statements remain[] in the case to be tried").

The FAC alleges that on May 10, 2023, "FRG entered into a definitive agreement . . . pursuant to which a group of senior executives led by Brian Kahn, in financial partnership with a consortium of other investors including Kahn's affiliated entities and [the Company], agreed to take FRG private." (FAC ¶ 97). The same day, the Company entered into an "equity commitment letter," through which the Company committed to contribute $560 million to Freedom VCM to help fund the FRG Buyout and publicly disclosed that it had "agreed to provide certain equity funding and other support in connection with the acquisition." *See* (*id.* ¶¶ 99, 171). The next day, the Company publicly filed a Form 8-K summarizing the equity commitment letter, writing that it "expects the actual amount to be funded by it . . . to be substantially less than $560 million." (*Id.* ¶ 99). The Company also disclosed that "[c]ertain financial institutions have agreed to provide [Freedom VCM] with debt financing in an aggregate principal amount of up to $475 million." (*Id.* ¶ 174).

On August 21, 2023, the FRG Buyout closed. *See* (*id.* ¶ 102). "In connection with the FRG Buyout, [the Company] invested $216.5 million of its own cash." (*Id.* ¶ 102). Together with the equity that the Company rolled over from FRG, the Company invested a total of $281.1 million in Freedom VCM. *See* (*id.*). On the same day, the Company entered into the VCM Loan, whereby "the aggregate principal amount that [VCM] owed to [the Company] increased in connection with the FRG Buyout to $200.5 million and was

now secured by equity interests in Freedom VCM." (*Id.* ¶ 103).[6]  Under that agreement, "repayments prior to [the loan's] maturity [on December 31, 2027]" were to be paid "from certain proceeds received by Mr. Kahn or his affiliates from, among other proceeds, distributions or dividends paid by Freedom VCM." (*Id.*).  On August 25, 2023, the Company filed a Form 8-K in which it disclosed that it "made a new cash Equity Investment of $216.5 million in FRG's new parent entity, bringing the Company's entire equity investment in the parent entity to approximately $280 [million]." (*Id.* ¶ 108).

Based on the Company's disclosures, investors could reasonably believe that, at most, the Company could lose $280 million from its investment in Freedom VCM.  *See* (FAC ¶ 108).  Indeed, the Company previously disclosed that its total investment would be "substantially less" than the $560 million sum it committed to raise for the FRG Buyout. (*Id.* ¶ 99).  Collectively, these disclosures suggest the Company had far less exposure to Freedom VCM than it did.  *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) ("a statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists" (internal quotation marks and citation omitted)).  In reality, the Company "extended approximately $480 million from its balance sheet toward the success of [Freedom VCM]—an amount that exceeded the Company's $413.8 million of stockholders' equity." (*Id.* ¶ 282).

Defendants' argument to the contrary is unavailing.  Plaintiffs do not, as Defendants argue, treat the loan to VCM as "effectively a loan to FRG." (Defendants' Brief at 19). Instead, they argue that the Company's disclosures would lead investors to reasonably believe that the Company's total financial exposure to Freedom VCM was limited to its equity investment.  *See* (Opp. at 20).  Similarly, Plaintiffs have adequately alleged that the

---

[6] The Complaint does not specify the balance of VCM's debt prior to August 21, 2023. Elsewhere, the Complaint alleges that "the total principal balance remaining on the loans to Kahn and his affiliates totaled $154 million by mid-2023." (*Id.* ¶ 87).  The Company allegedly failed to disclose these prior loans to Kahn as well.  *See* (*id.* ¶ 2).

Company's failure to disclose the VCM Loan rendered its statements as to the FRG Buyout misleading, notwithstanding the fact that "the [VCM] loan was a separate transaction, owed by [VCM] and fully secured, with [VCM] alone obligated to repay." (Reply at 9); *see also* (Defendants' Brief at 11). Plaintiffs allege that the Company made this loan on the same day that the FRG Buyout closed and did so "in connection with the FRG Buyout." (FAC ¶ 103). At this stage of the proceedings, the Court need not determine whether the VCM Loan was connected to the FRG Buyout and VCM is connected to Freedom VCM.

## B. Scienter

To establish scienter under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). To meet this standard, "a complaint must allege that the defendant made false or misleading statements with an intent to deceive, manipulate, or defraud, or with deliberate recklessness." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1106 (9th Cir. 2021) (internal quotation marks and citation omitted). Deliberate recklessness is "an *extreme* departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Id.* (citation omitted).

In assessing whether the allegations of a complaint give rise to a "strong inference" of scienter, courts "must consider plausible, nonculpable explanations for the defendant's conduct." *Tellabs*, 551 U.S. at 323–24. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* In assessing this question, courts "must consider the complaint in its entirety" rather than looking to "whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–33. Under Ninth Circuit precedent, courts conduct a dual inquiry, asking first "whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter" and, if not, "whether the insufficient allegations combine to create a strong inference" of scienter. *Zucco Partners*, 552 F.3d at 992.

As an initial matter, Plaintiffs have failed to establish a strong inference of scienter as to either Ahn or Kelleher. Plaintiffs' argument as to both Defendants relies heavily on "the commonsense inference" that Ahn and Kelleher, as the Company's CFO and co-CEO, would know about the VCM Loan, as part of "the single largest principal investment it ever made." (Opp. at 33). However, Ahn and Kelleher's knowledge that the Company made a large loan to VCM is insufficient, by itself, to establish that either Defendant acted with "an intent to deceive, manipulate, or defraud, or with deliberate recklessness" in failing to disclose the VCM Loan. *Prodanova*, 993 F.3d at 1106 (internal quotation marks and citation omitted). Plaintiffs do not plead any other allegations as to Kelleher that would support an inference of scienter, and the only other allegations as to Ahn would, if anything, undercut a finding of scienter. *See* (Opp. at 32 (citing FAC ¶ 189)). Specifically, Plaintiffs point to a statement that Ahn made on the Company's earnings call for the quarter ending December 31, 2023, where Ahn confirmed the Company's average loan size but did not disclose the Company's loans to Kahn, after Riley explicitly told an analyst that the Company had some "notable" loans "out there." (FAC ¶ 189).

By contrast, Plaintiffs have adequately pled that Bryant Riley acted with scienter. According to the Complaint, Riley had a "very close relationship" with Kahn, describing him as "a friend of the company." (FAC ¶¶ 59, 237); *see also* (*id.* ¶ 237 (Kahn was a "significant source of [the Company's] business")).[7] In 2019, the Company partnered with

---

[7] These allegations are based upon statements from a confidential witness who served as a Senior Executive Assistant at the Company from July 2013 to January 2025. *See* (FAC ¶ 25). "[A] complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements": (1) the confidential witness must be described with sufficient particularity to establish their reliability and personal knowledge; and (2) the statements must be indicative of scienter. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009), *as amended* (Feb. 10, 2009). Here, the Court credits these statements for purposes of the Motion because the confidential witness at issue allegedly reported to Riley and describes a conversation with Riley about Kahn. *See* (FAC ¶ 59); *see also Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 772 (9th Cir. 2023) (crediting allegations based on statements from confidential witnesses where witnesses "described conversations that they themselves heard").

Kahn, through VCM, to acquire a controlling stake in FRG. *See* (*id.* ¶ 61). Following the acquisition, the Company loaned Kahn and entities affiliated with Kahn large sums of money, with Kahn pledging every share in FRG that he and his wife owned as collateral on his debt to the Company. *See* (*id.* ¶ 89). Given the close relationship between Riley and Kahn, Riley's position as the Company's founder and CEO, and the size of the Company's loans to Kahn, the Court can infer that Riley was aware of these loans. *See In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 402 (S.D.N.Y. 2003) (inferring knowledge from, among other things, CEO's "position in the company," "close relationship" with CFO accused of fraud, and the "size of the fraud").

Following the Company and VCM's investment in FRG, the Company took on almost a billion dollars in debt to support FRG's subsidiary, Badcock. *See* (*id.* ¶¶ 93–95). Ultimately, in March 2023, the Company refused to take on any more of Badcock's debt. *See* (*id.* ¶ 95). Without the Company to purchase Badcock's debt, FRG risked defaulting on its own debt. *See* (*id.*). In response, the Company worked with Kahn to facilitate a management buyout, whereby a newly formed entity, Freedom VCM, would acquire FRG. *See* (*id.* ¶ 97). In connection with the FRG Buyout, the Company disclosed that it had committed $280 million in equity to support Freedom VCM's acquisition but did not disclose that it had also extended a large margin loan to VCM. (*Id.* ¶ 103). The VCM Loan represented the Company's "largest single principal investment" at the time, "representing 36% of [the Company's] overall loan receivable balance." (*Id.* ¶ 282). As a result, the Company's financial exposure to Kahn, VCM, and Freedom VCM exceeded its total shareholder equity. *See* (*id.*).

Plaintiffs allege that the VCM Loan was "highly unusual." (*Id.* ¶ 104). The loan was allegedly "structured to allow Kahn to avoid making any interest payments in cash," instead providing that payments would be made from "distributions or dividends paid by Freedom VCM." (*Id.* ¶¶ 103–04). Plaintiffs contend that this structure "suggests that [the Company] knew Kahn was unable to repay [the VCM Loan] in cash and, as such, amounted to incremental equity in [Freedom VCM] that it did not need to keep on its books." (*Id.*

¶ 104). Plaintiffs further allege that the loan was "severely undercapitalized" for a margin loan. (*Id.*). Whereas such loans "rarely exceed 50% of the securities posted as collateral to account for the fact that their value can change significantly," the loan to Kahn had a "staggering [loan-to-value ratio] of almost 90%." (*Id.*). Again, given the size of this loan, the importance of the FRG Buyout, and the fact that he was "personally involved with the FRG deal," (*id.* ¶ 100), the Court can infer Riley was familiar with the terms of this loan. *See Karinksi v. Stamps.com, Inc.*, 2020 WL 281716, at *16 (C.D. Cal. Jan. 17, 2020) (inferring knowledge of transaction where "Defendants were involved in the negotiations"). [8]

Standing alone, Riley's knowledge of the Company's undisclosed loans to Kahn and related entities, his knowledge of the VCM Loan, and the highly unusual terms of the VCM Loan are not sufficient to establish a strong inference of scienter. *See* (Defendants' Brief at 34). However, Riley's close personal relationship with Kahn, the Company's historical loans to Kahn-related entities as Kahn built up his stake in FRG, the size of the VCM Loan relative to the Company's overall loan portfolio, and the highly favorable terms of the VCM Loan all lend support to an inference of scienter. Taken together with allegations that Riley was aware of Kahn's alleged involvement in the PAM fraud, the inference that Riley acted with scienter is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

On March 31, 2020, PAM notified investors that Deloitte had resigned as its auditor and indefinitely suspended redemptions. *See* (*id.* ¶ 79). On the same day, Riley resigned

---

[8] Plaintiffs rely on statements from two confidential witnesses to show Riley was personally involved in the FRG Buyout. *See* (FAC ¶ 100). One witness was a Director in the Company's Investment Banking Group from August 2019 to August 2024, located in Chicago. *See* (*id.* ¶ 24). The other was a Managing Director for the Company from January 2023 to March 2025, located in Los Angeles. *See* (*id.* ¶ 26). Defendant has not challenged Plaintiffs' reliance on these statements to show Riley was personally involved in the FRG Buyout. *See generally* (Defendants' Brief; Reply). Because the Company's principal investing group was allegedly small and close-knit, *see* (FAC ¶ 33), the Court accepts these statements as reliable and supported by the witnesses' personal knowledge.

1  from FRG's board of directors, effective immediately.  *See* (*id.*); *see also Matrixx*, 563
2  U.S. at 49 (strong inference of scienter where defendant "convened a panel of physicians
3  and scientists" in response to reports of adverse events from use of pharmaceutical).  By
4  the time the FRG Buyout closed in August 2023, Kahn was already subject to multiple
5  actions in connection with PAM's collapse.  Between 2020 and 2021, PAM had filed an
6  arbitration claim against Kahn, and two lawsuits "named or implicated" Kahn in securities
7  fraud claims related to PAM's collapse.  *See* (*id.* ¶¶ 80–81).  One of the lawsuits alleged
8  Kahn had "syphoned off" $160 million from PAM funds, and the other attached
9  communications in which PAM's CEO stated that PAM sought to recover "hundreds of
10  millions" in losses from Kahn in arbitration.  *See* (*id.*).

11      Given Riley's abrupt resignation from the FRG board, his personal involvement in
12  the FRG Buyout, the size of the FRG Buyout, and Kahn's importance to the Company's
13  business, the Court infers for purposes of this Motion that Riley was at least aware of public
14  allegations Kahn had engaged in fraud.  With the other allegations supporting scienter, the
15  inference that Riley acted with deliberate recklessness is at least as compelling as any
16  nonculpable explanation for the Company's failure to disclose the VCM Loan. *See Tellabs*,
17  551 U.S. at 324

18      **C.    Loss Causation**

19      Finally, as part of the 10b-5 claim, the Court must consider whether the Complaint
20  adequately pleads loss causation.  Under the PSLRA, a plaintiff must plausibly allege that
21  the challenged misstatements "caused the loss for which the plaintiff seeks to recover
22  damages."  15 U.S.C. § 78u-4(b)(4).  In other words, "the plaintiff must demonstrate a
23  causal connection between the deceptive acts that form the basis for the claim of securities
24  fraud and the injury suffered by the plaintiff." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049,
25  1055 (9th Cir. 2008).  "In fraud-on-the-market cases like this one, the plaintiff's theory of
26  loss causation begins with the allegation that the defendant's misstatements (or other
27  fraudulent conduct) artificially inflated the price at which the plaintiff purchased her
28  shares—meaning the price was higher than it would have been had the false statements not

been made." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020); *see also* (FAC ¶ 310) (alleging fraud on the market to show reliance).

To establish loss causation, a "plaintiff must show that after purchasing her shares and before selling": (1) "the truth became known"; and (2) "the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *In re BofI*, 977 F.3d at 789. "The most common way for plaintiffs to prove that 'the truth became known' is to identify one or more corrective disclosures." *Id.* at 790. Where a plaintiff seeks to establish loss causation through a corrective disclosure, they "must plausibly allege that the defendant's fraud was *revealed* to the market and *caused* the resulting losses." *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1205 (9th Cir. 2020) (internal quotation marks and citation omitted). However, "[a] plaintiff is not required to show that a misrepresentation was the *sole* reason for the investment's decline in value." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008) (internal quotation marks and citation omitted). Instead, the Complaint must plausibly allege "the drop in [Defendants'] stock price was causally related to [Defendants'] financial misstatements." *Id.* (internal quotation marks and citation omitted).

Plaintiffs claim that the Company's "stock price fell in direct response to a series of partial disclosures between November 2023 and November 2024, each of which gradually revealed the full extent of the fraud." (Opp. at 38.) In response, Defendants argue that the decline in the Company's stock price was simply attributable to "unrelated bad news" and "market events." (Reply at 21); *see also* (Defendants' Brief at 35–36). However, the allegations set out in the FAC are sufficient at this stage of the proceedings.

According to Plaintiffs, the Company's stock price began to decline "after market close on November 3, 2023," when "the investment community identified Kahn as the unindicted coconspirator referenced in the [DOJ] Information and SEC Complaint against Hughes." (FAC ¶ 217). Between November 3, 2023, and November 6, 2023, the Company's stock price declined 22%, from $41.56 to $32.54. *See* (*id.* ¶ 217). The Company saw further losses over the next month, after "the Company reported a $76

million net loss due to decreases in the value of its investments," the S&P downgraded FRG's credit rating, and "a notice on the docket" in Hughes' criminal case "showed that [he] was continuing to cooperate with the DOJ's investigation." (*Id.* ¶¶ 217–20). By the close of trading on November 27, 2023, the Company's stock price fell to $19.17. *See* (*id.* ¶ 220).

On December 13, 2023, the Company "revealed, for the first time, that [] it had a $200.5 million PIK loan to VCM secured primarily by shares of FRG owned by Kahn in addition to its $281 [million] equity investment in FRG." (*Id.* ¶ 221). The FAC quotes reactions from a number of investors. *See, e.g.*, (*id.* ("[O]ne market participant later told Institutional Investor, 'I fell out of my chair' when Riley put up the slide showing that it had a $200 million loan to Kahn."). Over the next several days, the Company's stock fell from $21.60 to $20.44. *See* (*id.*); *see also* (*id.* ("Bloomberg reported that [the Company's] shares dropped by as much as 18% during intraday trading in response to the presentation."). The Company's stock proceeded to decline over the next several months, amidst further revelations concerning fallout from the PAM fraud, the SEC's investigations into the Company and Kahn, and the associated financial impact on the Company's equity holdings. *See* (*id.* ¶¶ 222–28). By November 1, 2024, the Company's stock traded at just $4.92 per share, down from a class-period high point of $72 per share. *See* (*id.* ¶¶ 12, 228).

At a minimum, the Company's December 13, 2023, Investor Day Presentation "reveal[ed] new facts that, taken as true, render[ed] some aspect of the [Company's] prior statement[s] false or misleading." *Genius*, 97 F.4th at 1184 (internal quotation marks and citation omitted). Before December 13, 2023, the Company's stock allegedly sold off as a result of Kahn's purported misconduct, speculation as to the potential financial impact of that misconduct on the Company, and disclosures concerning how that alleged misconduct had impacted the value of the Company's investments. *See* (*id.* ¶¶ 217–20). However, Plaintiffs have plausibly alleged that, beginning on December 13, 2023, some portion of the decline in the Company's stock price was driven by the revelation that the Company had roughly double the financial exposure to Kahn-related entities that it had previously

disclosed to investors.  *See* (*id.* ¶ 221).  At this stage of the proceedings, the Court cannot "disentangle" what portion of that decline was attributable to the Company's disclosure of the VCM Loan and what portion was attributable to "the fallout of Kahn's alleged misconduct and FRG's collapse," *see* (Reply at 22), especially insofar as Plaintiffs allege that the "fallout" and "FRG's collapse" was tied to the Company's financial exposure to Kahn-related entities, *see, e.g.*, (FAC ¶ 159 ("As a result of [the Company's] undisclosed exposure to Brian Kahn, the value of [the Company's] securities was decimated.")); *see also City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1046 (N.D. Cal. 2018) ("Whether the stock drop was due to other factors is a factual inquiry better suited for determination on summary judgment or trial, rather than at the pleading stage.").[9]

Therefore, Plaintiffs have sufficiently alleged that Riley and, through him, the Company, are liable under Section 10(b).  However, Plaintiffs' Section 10(b) claim fails as to Ahn and Kelleher because Plaintiffs have not sufficiently alleged that either Defendant acted with the requisite scienter.  The Court thus DENIES the Motion as to the Section 10(b) claim against Riley and the Company and GRANTS the Motion as to the Section 10(b) claim against Ahn and Kelleher.

### D.    Control Person Liability

Defendants argue that Plaintiffs' Section 20(a) claim should fail because the complaint does not sufficiently allege that the Individual Defendants "exercised actual power or control over the primary violator." (Defendants' Brief at 36).  "In general, the determination of who is a controlling person . . . is an intensely factual question." *Paracor Finance, Inc. v. General Electric Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996); *see*

---

[9] Many of Defendants' arguments as to loss causation merely restate their argument that "Plaintiffs fail to plead facts to show . . . that any of Defendants' previous alleged misstatements were false." (Defendants' Brief at 35).  However, the Court has already determined that the FAC sufficiently alleges facts to demonstrate the Company's statements addressing the Company's financial exposure to the FRG Buyout were false or materially misleading.

*also Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (determining control person status "involv[es] scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions"). However, to survive a motion to dismiss, Plaintiffs nevertheless must plausibly allege that a given defendant exercised control over a primary violator. *See In re Downey Sec. Litig.*, No. CV 08-3261-JFW(RZX), 2009 WL 2767670, at *15 (C.D. Cal. Aug. 21, 2009) ("[B]oilerplate allegation[s]" are "insufficient to state a claim for control person liability.").

Here, Plaintiffs allege that Riley was directly involved in the FRG Buyout, and Riley, Ahn, and Kelleher each signed certain of the Company's financial statements addressing the equity investment in the FRG Buyout that omitted the VCM Loan. *See, e.g.*, (FAC ¶¶ 100, 185). These allegations are sufficient to survive a motion to dismiss. *See Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1208 (N.D. Cal. 2012) ("[N]umerous courts have found that allegations that directors signed the statements which contain the material misrepresentations are sufficient to state . . . control status.") (collecting cases); *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1440–42 (9th Cir. 1987) (officers subject to control person liability where they allegedly "had direct involvement not only in the day-to-day affairs of [the company] in general but also in [the company's] financial statements in particular"), *overruled on other grounds by Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990). Thus, the Court DENIES the Motion as to the Section 20(a) claim.

### E.    Leave to Amend

Plaintiffs have requested leave to amend. Generally, "in dismissals for failure to state a claim, a district court should grant leave to amend." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990). Nevertheless, a district court may, in its discretion, deny leave to amend when amendment would be futile. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009). Amendment is considered futile where "allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Telesaurus VPC, LLC v. Power*, 623 F.3d 998,

1003 (9th Cir. 2010) (citation omitted).  The Court does not find at this time that amendment would be futile and will grant Plaintiff one additional opportunity to amend to cure the deficiencies identified in this Order only.

## V.    CONCLUSION

For the foregoing reasons, Court GRANTS, in part, and DENIES, in part, the Motion.  Within twenty-one (21) days of the issuance of this Order, Plaintiffs may file a Second Amended Complaint curing the deficiencies identified herein.  If Plaintiffs fail to file a Second Amended Complaint within twenty-one days, the FAC shall become the operative complaint, and Defendant must answer the FAC within fourteen (14) days thereafter.

**IT IS SO ORDERED.**

DATED:  December 12, 2025

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE